# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
07/14/2010

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **ENDEAVOUR HIGHRISE, L.P.** | § | **Case No. 09-33151-H4-11** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| **ENDEAVOUR GP, LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adversary No. 09-03267** |
| v. | § | |
| | § | |
| **ENDEAVOUR HIGHRISE, L.P. ET AL** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION ON TRUSTEE'S AMENDED CROSS-CLAIMS AND THIRD-PARTY CLAIMS
[Adv. Doc. No. 180]

## I. INTRODUCTION

The facts in this case demonstrate the continuing vitality of the adage that "if it sounds too good to be true, it really is." Here, several individuals paid over $1 million in the aggregate as non-refundable deposits for certain real estate without reading the contracts or inspecting the condominium units they were purchasing. Their actions were motivated at least in part by the belief—however unrealistic—that they could earn a significant return on their investment within a matter of weeks. With unrealized expectations, they now seek a judgment from this Court returning the rashly spent monies to their possession. This, the Court will not do.

On March 23-26 and 30, 2010, this Court held a trial in this adversary proceeding. Nineteen

witnesses testified at this trial, and a total of 72 exhibits were admitted into evidence.[1]  Based upon

the entire record, the Court now makes findings of fact and conclusions of law pursuant to Federal

Bankruptcy Rule 7052.[2]  To the extent that any finding of fact is construed as a conclusion of law,

it is adopted as such; and to the extent any conclusion of law is construed as a finding of fact, it is

also adopted as such.  This Court reserves the right to make additional findings and conclusions as

it deems appropriate or as any party may request.

## II. PRESENT POSTURE OF THIS CHAPTER 11 CASE

This Chapter 11 case is almost one year old.  A Chapter 11 trustee was appointed in the

second month of the case, and he spent several months thereafter overseeing the repair and sale of

the major tangible asset of the estate: a condominium complex.  Now, through the filing of various

suits, he is attempting to recover assets for the estate in order to pay claims, in part if not in whole.

The pending adversary proceeding is one of the suits the trustee has prosecuted in order to recover

assets.  No plan has yet been filed in the main case.

## III. FINDINGS OF FACT

### A.   General Background of this Chapter 11 Bankruptcy

1.   Endeavour Highrise, L.P. (the Debtor)[3] is a limited partnership whose principal place of

---

[1] The Purchasers' exhibits which this Court admitted were Ex. Nos. 1–16, 18 & 22.  The Trustee's exhibits which this Court admitted were Ex. Nos. 1–17, 19, 26, 28–52, 54, 56–59, 61–63, 66–67 & 70.  Exhibit 70 was admitted for demonstrative purposes only.  During the course of the trial, this Court carried certain objections lodged to the admission of some of the Trustee's exhibits.  To the extent that the Court, prior to the close of the trial, did not admit all of the exhibits propounded by the Trustee, the Court now admits these exhibits into the record.

[2] Unless otherwise noted, all section references refer to 11 U.S.C. and all references to the "Code" or the "Bankruptcy Code" refer to the United States Bankruptcy Code.  References to a "Rule" or "Bankruptcy Rule" refer to the Federal Rules of Bankruptcy Procedure.

[3] References to "the Debtor" refer to Endeavour Highrise, L.P. both prior and subsequent to the filing of its Chapter 11 bankruptcy petition.  The Court expressly does **not** refer to pre-petition Endeavour Highrise, L.P. as "Endeavour" in order to avoid confusing the Debtor with Endeavour GP, LLC, the original Plaintiff in this adversary

business is located at 3901 NASA Parkway, Seabrook, Texas.  The Debtor is the developer of a high-rise condominium complex located in Seabrook, Harris County, Texas.

2.  On May 4, 2009, the Debtor filed a voluntary Chapter 11 petition in this Court. [Main Case 09-33151, Doc. No. 1].  On the petition date, the Debtor had total assets of approximately $9.5 million and total liabilities of $31.0 million,[4] and its primary asset consisted of its interest in a condominium highrise project (the Property).  Within the one year preceding the filing of the petition, the Debtor's liabilities also exceeded its assets.

3.  On June 12, 2009, this Court appointed David R. Jones as trustee of the Debtor's Chapter 11 estate (the Trustee). [Main Case 09-33151, Doc. No. 96].  Mr. Jones is a very experienced, seasoned attorney who has been practicing as a bankruptcy lawyer since 1992.  He has served as counsel for a trustee-in-bankruptcy on numerous occasions, and has been appointed as a Chapter 11 trustee by bankruptcy courts between ten and twelve times. [March 23, 2010 Tr. 90:8–17].

4.  After his appointment, the Trustee took possession of all of the Debtor's books and records from the place of business where the Debtor previously maintained its files, and has since kept

---

proceeding and an entity entirely separate and distinct from the Debtor.

[4] The trustee appointed by this Court to oversee the Debtor's Chapter 11 estate testified as to these amounts, which are derived from the $9.5 million received for the Debtor's interest in the Property (*i.e.*, the remaining units, parking rights, storage units, rights and permits to boat docks, and causes of action related to storm damage on remaining units) in a § 363 sale [Trustee's Ex. No. 52] and claims filed against the Debtor's estate totaling $31,894,753.48. [Trustee's Ex. Nos. 51 & 54].  This Court made a finding in its § 363 sale order, dated December 3, 2009, that the value "to be paid to the Trustee (a) is fair and reasonable; (b) constitutes the highest and best offer for the property; (c) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative; and (d) constitutes reasonably equivalent value and fair consideration for the property." [Trustee's Ex. No. 52; Adv. Doc. No. 218-18].

the books and records in a single location, preserving their original content.[5] [March 24, 2010 Tr. 25:19—26:18]. The Trustee carefully reviewed these documents and met with numerous individuals who have knowledge about the Property to determine, among other things, what causes of action the Debtor's estate had, or might have, against third parties to recover monies for the Chapter 11 estate.

5.    The Trustee also investigated pre-petition transactions concerning the Debtor in order to determine whether the Debtor's Chapter 11 estate had any claims against third parties. The Trustee conducted this investigation to fulfill his fiduciary duty to the estate to recover assets so that claims against the estate could be paid, in part if not in whole.

6.    After reviewing the Debtor's books and records and conducting his investigation, the Trustee determined that the estate has claims against certain funds on deposit at two title companies totaling $1,030,205.47.[6]

7.    The parties who have asserted or could potentially assert an interest in these funds are as follows (collectively the Interested Parties or the Nichols Group):

    (1) Horace James Colbert;
    (2) Carter Hartwig;
    (3) Glenn Nichols;
    (4) Jerry Wayne Pace;

---

[5] Thus, as of the date of this hearing, the Trustee has been in custody of, and maintaining, the Debtor's books and records for approximately nine months. Moreover, he has signed documents on behalf of the Debtor's estate for purposes ranging from selling units to repairing damage to the Property.

[6] As noted in subsequent findings, the Debtor entered into purchase agreements in which buyers were required to pay "non-refundable deposits" equaling approximately 10% of the purchase price under the agreements. The ownership of these funds is at issue in the pending adversary proceeding. These funds were deposited with the title companies and, thus, were also referenced by the parties to this suit as "earnest money," despite the label given them in the underlying purchase agreements (*i.e.* the "non-refundable deposits"). The Court has retained the nomenclature used in the parties' pleadings (*i.e.* "earnest money") but subsequently defines the specific funds at issue in this suit as "the Deposits." Accordingly, all references in the procedural background to "earnest money" are discussing the disputed funds totaling $1,030,205.47.

(5) Dorothy Eileen Pace;

(6) Fred Shepherd;

(7) Mary Shepherd;

(8) Daniel Waldenmaier;

(9) Gregory Boyle;

(10) Demostene F. Tajolosa;

(11) Joyson Abraham;

(12) Anna Abraham;

(13) Edward A. Schroeppel;

(14) Jim Butcher;

(15) Vivian Abobo;

(16) Glenn Nichols, trustee for Behrouz Abassi;

(17) Kevin D. Mitchell;

(18) Andrew N. Pace;

(19) Stephanie Pace;

(20) Rebecca Anne Pace;

(21) Wayne Alexander Pace;

(22) Amina Abdulla;

(23) Tom Monheim;

(24) Entrust Retirement Services, Inc. FBO Amina Abdulla IRA# 10846-01;

(25) Entrust Retirement Services, Inc. FBO Vivian Abobo IRA# 10812-01;

(26) Entrust Retirement Services, Inc. FBO Suleman Abdulla IRA# 10821-01;

(27) Entrust Retirement Services, Inc. FBO Tom Monheim IRA# 10695-01;

(28) Entrust Retirement Services, Inc. FBO Gregg Boyle IRA# 10811-01;

(29) Entrust Retirement Services, Inc. FBO Wayne Pace IRA# 11214-21;

(30) Entrust Retirement Services, Inc. FBO Andrew Pace IRA# 11257-21;

(31) Entrust Retirement Services, Inc. FBO Jerry Pace IRA# 10853-21;

(32) Entrust Retirement Services, Inc. FBO Joyson C. Abraham IRA# 11222-21;

(33) Entrust Retirement Services, Inc. FBO Anna G. Abraham IRA# 11223-21;

(34) Entrust Retirement Services, Inc. FBO Carter Hartwig IRA# 10693-01;

(35) Entrust Retirement Services, Inc. FBO Danny Tajolosa IRA# 10733-01;

(36) Entrust Retirement Services, Inc. FBO Glenn Nichols IRA# 10675-02; and

(37) Entrust Retirement Services, Inc. FBO James Butcher IRA# 10865-21.[7]

---

[7] All of the Interested Parties either reside or have their principal place of business in Texas. [Adv. Doc. No. 180, p. 2–4, ¶ 2–22].

**B.   Procedural Background of this Adversary Proceeding**

i)  Initial Suit: Endeavour GP, LLC v. the Debtor (Trustee),[8] the Title Company, and StarTex

8.   On July 13, 2009, the pending adversary proceeding was initiated through the filing of a

complaint by an entity known as Endeavour GP, LLC (the Plaintiff).[9] [Adv. Doc. No. 1].  Three

defendants were named in this suit: (a) the Debtor; (b) First American Title (the Title

Company); and (c) StarTex Title Company (StarTex).  The Plaintiff alleged that: (a) the title

companies were holding earnest money relating to contracts between the Debtor and various

purchasers; and (b) contrary to any position taken by the Trustee (on behalf of the Debtor's

estate), the earnest money is not property of the bankruptcy estate, but rather belongs to these

purchasers.  The Plaintiff requested this Court enter a declaratory judgment that the earnest

money is not property of the Debtor's estate, and consequently order the title companies to

immediately deliver the monies to the Plaintiff.[10] [Adv. Doc. No. 1, p. 3].

a.   *First Counterclaim and Cross-claim: StarTex v. the Plaintiff; and StarTex v. the Debtor
       (Trustee)*

9.   On August 10, 2009, StarTex filed its counterclaim against the Plaintiff and cross-claim against

the Debtor. [Adv. Doc. No. 7].  These claims were made in the nature of an interpleader, with

---

[8] As previously noted, the Court appointed the Trustee to oversee the Debtor's estate in June of 2009.  Pursuant to Sections 1106 and 1108 of the Bankruptcy Code, the Trustee is given the authority to operate the Debtor's business, and is charged with the duty of defending and prosecuting causes of action related to the Debtor's estate.  Thus, any reference to the Debtor as a party to the initial suit or subsequent counterclaims or cross-claims necessarily implicates the Trustee acting on behalf of the Debtor and its Chapter 11 estate.

[9] The Court emphasizes that Endeavour GP, LLC is an entity separate and distinct from Endeavour Highrise, L.P., the Debtor in the main case.  Indeed, these two entities have interests adverse to one another.

[10] Although the complaint itself did not expressly describe the relationship between the Plaintiff and the purchasers referenced therein, the Plaintiff attached releases as exhibits which purportedly provided for the earnest money to be delivered to the Plaintiff on behalf of the individual purchasers.  Thus, the Plaintiff appears to have sought return of the earnest money so it could distribute the funds in the appropriate amounts to the individual purchasers.

StarTex asserting that it is an innocent stakeholder with respect to the earnest money which it holds (totaling $100,000.00) and that it will pay the funds to the party entitled to them, less attorneys' fees and costs of court. [Adv. Doc. No. 7, ¶¶ 1–2].

    b.  *Second Counterclaim and Cross-claim and First Third-Party Complaint: the Title Company v. the Plaintiff; the Title Company v. the Debtor (Trustee); and the Title Company v. the Interested Parties*

10.  On August 20, 2009, the Title Company filed its counterclaim against the Plaintiff, cross-claim against the Debtor, and third-party complaint against Daniel Waldenmaier, Fred and Mary Shepherd, Jerry and Dorothy Pace, Glenn Nichols, Carter Hartwig, Horace Colbert, and Entrust Retirement Services, Inc. [Adv. Doc. No. 9].  The Title Company asserted that it held, as escrow agent, earnest money deposits made by the named members of the Nichols Group totaling $994,760.00, and, thus, requested that: (a) the Court permit it to interplead the earnest money deposits into the registry of the Court; (b) the Court discharge the Title Company from any claims or liability with respect to the deposits; and (c) the Court award it reasonable and necessary attorneys' fees. [Adv. Doc. No. 9, p. 7].

    c.  *Third Counterclaim and Cross-claims: the Trustee v. the Plaintiff; the Trustee v. StarTex; the Trustee v. the Title Company*

11.  On September 30, 2009, the Trustee filed his counterclaim against the Plaintiff and cross-claims against StarTex and the Title Company. [Adv. Doc. No. 51].  The Trustee requested: (a) a declaratory judgment that the earnest money is property of the Debtor's bankruptcy estate; (b) an immediate turnover of all estate property pursuant to § 542; and (c) an award of attorney's fees, interests, and costs. [Adv. Doc. No. 51, ¶¶ 31–40].

ii)  StarTex and the Title Company's Interpleader of Funds and Subsequent Dismissal as Parties

12.  On December 8, 2009, StarTex filed a third-party complaint in interpleader. [Adv. Doc. No. 84].

In its third-party complaint, StarTex sought an order from this Court that: (a) the disputed funds

be deposited into the registry of the Court; (b) StarTex be dismissed from this suit and released

from any liability with respect to the deposit; (c) any rival claimants be enjoined from taking

action against StarTex; and (d) StarTex be awarded reasonable attorneys' fees and costs. [Adv.

Doc. No. 84, ¶ 10].

13.  On January 15, 2010, the Court held a hearing on Star-Tex's third party complaint in

interpleader and entered an order that same day granting StarTex's request for interpleader of

funds. [Adv. Doc. No. 121].  StarTex was ordered to deposit $100,000.00 into the registry of

the Court, and, thereby, was promised release of all liability with respect to the funds.  The

Court further authorized the Clerk of Court to release $4,500.00 for payment of StarTex's

attorneys' fees. [Adv. Doc. No. 121].  On January 21, 2010, StarTex made a deposit into the

registry of the Court in the amount of $100,000.00, receipt number 608214.  On January 29,

2010, $4,500.00 was disbursed to StarTex's attorneys from the registry of the Court.

14.  On January 18, 2010, the Trustee filed a motion for interpleader of the $994,760.00 of earnest

money funds held by the Title Company. [Adv. Doc. No. 123].  The Trustee sought this

interpleader pursuant to the Title Company's request in its original answer, counterclaim, cross-

claim, and third-party claim.

15.  On January 21, 2010, the Court held a hearing on the Trustee's motion for interpleader and

entered an order that same day requiring the Title Company to deposit $994,760.00 (the amount

of funds represented as being held in escrow) into the registry of the Court, and, thereby,

promising release of liability with respect to the funds. [Adv. Doc. No. 130].  On February 4, 2010, $930,205.47 was received into the registry of the Court, receipt number 608622.

16. On February 23, 2010, the Title Company filed a motion for entry of an amended order regarding the interpleader of funds and for payment of fees. [Adv. Doc. No. 229].  The Title Company requested that the Court: (a) enter an amended order changing the amount required for deposit to $930,205.47 and clarifying the identity of the rival claimants to the interpleaded funds; and (b) award it reasonable and necessary attorneys' fees out of the funds. [Adv. Doc. No. 229, p. 3].  The parties subsequently stipulated that the Title Company was, in fact, awarded $7,500.00 in attorneys' fees from the $930,205.47 deposited into the registry of the Court. [Adv. Doc. No. 265, p. 3, ¶ 16].

17. On March 24, 2010, the Court entered an agreed amended order regarding the funds interpleaded by the Title Company. [Adv. Doc. No. 268].  The Court ordered that : (a) the Title Company was required to deposit the sum of $930,205.47 into the registry of the Court, representing the amount of earnest money held on behalf of the parties in this suit; (b) the Title Company has already deposited this sum into the registry of the Court and is thus discharged from this suit and all liability with respect to the funds; and (c) the Title Company's attorneys' fees totaling $7,500.00 shall be paid out of the interpleaded funds. [Adv. Doc. No. 268, ¶¶ 1–3].

iii) Dismissal of the Plaintiff's Claims due to Lack of Standing

18. On February 2, 2010, the Trustee filed a motion for summary judgment against the Plaintiff. [Adv. Doc. No. 167].  The Trustee asserted that the Plaintiff has no interest in the earnest money that is the subject of this adversary proceeding, and, therefore, all claims brought by the Plaintiff

should be dismissed for lack of standing.[11] [Adv. Doc. No. 167, ¶¶ 17–23]. The Trustee's assertions were supported by both the answers to interrogatories and the deposition testimony of Glenn Nichols (Nichols), who is the sole manager of the Plaintiff. In response to interrogatory number five regarding the nature of the Plaintiff's legal interest in the earnest money paid by the Interested Parties, Nichols stated that "I have no interest in their money only that they receive it back." [Adv. Doc. No. 167–20, Ex. 17, p. 7]. During his deposition, Nichols testified that he was, in fact, asserting in his interrogatory response "that Endeavour GP [the Plaintiff] had no interest in the earnest money, only that the purchasers receive it back." [Adv. Doc. No. 167–21, Ex. 18, p. 3].

19. On February 12, 2010, the Plaintiff filed its response to the Trustee's motion for summary judgment. [Adv. Doc. No. 192]. The Plaintiff asserted that it is the designated agent and/or trustee for the earnest money at issue in this adversary proceeding. In this capacity, the Plaintiff claimed a legally protected interest in the earnest money for the benefit of the Interested Parties. [Adv. Doc. No. 192, ¶¶ 1–4]. In his affidavit, attached to the Plaintiff's response as exhibit 1, Glenn Nichols asserted, contrary to his prior deposition testimony, that Endeavour GP, LLC "has a legally protected interest in the earnest money as the designated agent and fiduciary for the purchasers" because releases signed by a representative of the Debtor and the purchasers provide for the funds to be released directly to Endeavour GP, LLC. [Adv. Doc. No. 192, Ex.

---

[11] Specifically, the Trustee asserted that the Plaintiff failed to satisfy the three elements necessary to establish standing pursuant to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) and *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217–18 (5th Cir. 2002). First, the Plaintiff suffered no injury in fact, or invasion of a legally protected interest, because it has no interest in the earnest money held by the title companies. Second, without any injury in fact, there is no causal connection to conduct complained of by the Plaintiff. Indeed, the Debtor's refusal to honor the pre-petition releases has no effect on the Plaintiff. Third, a favorable decision—*i.e.*, that the earnest money is not property of the estate—benefits only the Interested Parties, not the Plaintiff. [Adv. Doc. No. 167, ¶¶ 18–22].

1, ¶ 4].

20. On March 18, 2010, the Court held a hearing on the Plaintiff's[12] and the Trustee's motions for summary judgment.  Based on the written submissions of the parties and the arguments presented at the hearing, the Court found that the Plaintiff does not have an interest in the interpleaded funds and lacks standing to assert any claims in this adversary proceeding.[13]  In light of these findings, the Court granted the Trustee's motion for summary judgment and denied as moot the Plaintiff's motion for summary judgment.

21. On March 22, 2010, the Court entered an order: (a) granting the Trustee's motion for summary judgment; (b) dismissing the claims asserted by the Plaintiff in this adversary proceeding; (c) denying as moot the Plaintiff's motion for summary judgment; and (d) dismissing the Trustee's counter-claims against the Plaintiff. [Adv. Doc. No. 262].

iv) <u>The One Remaining Suit to be Tried: the Trustee v. the Interested Parties</u>

22. On November 4, 2009, the Trustee filed cross-claims against Entrust Retirement Services, Inc., Horace Colbert, Carter Hartwig, Glenn Nichols, Jerry and Dorthy Pace, Fred and Mary

---

[12] On February 2, 2010, the Plaintiff filed a motion for summary judgment upon its claim for declaratory judgment against the Trustee. [Adv. Doc. No. 166].  The Plaintiff argued that validly executed releases, which were attached to the Plaintiff's motion as exhibits [Purchasers' Ex. No. 166–3—166–6], terminated the contracts for sale of the condominium units prior to the petition date.  Because the contracts provided for the return of the earnest money in the event of a proper termination, the Plaintiffs asserted that they were entitled to the earnest money and that it is not property of the Debtor's estate. [Adv. Doc. No. 166, p. 4–6].

[13] The Court heard arguments of counsel and considered the evidence presented by the parties, including the deposition testimony of Glenn Nichols as the corporate representative of the Plaintiff and Nichols' affidavit in support of the Plaintiff's response to the Trustee's motion for summary judgment.  The Court found that the affidavit testimony directly contradicted the deposition testimony.  Under *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 2010), such an affidavit does not create a fact issue precluding summary judgment.  Thus, the releases, which provided for the payment of the earnest money directly to the Plaintiff, were the only evidence of an agency or fiduciary relationship validly presented for consideration by this Court.  The releases, even if held validly executed by this Court, neither create an agency and/or fiduciary relationship between the Interested Parties and the Plaintiff nor place the Plaintiff at risk of liability if the earnest money is not returned.  Accordingly, this Court held that no fact issue had been raised regarding the Plaintiff's legal interest in the earnest money. [Adv. Doc. No. 262].

Shepherd, and Daniel Waldenmaier; and third-party claims against Gregory Boyle, Demostene

F. Tajolosa, Joyson and Anna Abraham, Edward Schroeppel, and Jim Butcher. [Adv. Doc. No.

55]. In these cross-claims and third-party claims, the Trustee seeks: (a) a declaratory judgment

that the earnest money is property of the Debtor's estate; (b) money damages based on the cross-

defendants' and counter-defendants' breach of the earnest money contracts; and (c) attorneys'

fees, interest, and costs. [Adv. Doc. No. 55, p. 4–5, ¶¶ 20–23].

23. On January 24, 2010, Entrust Retirement Services, Inc. (Entrust)[14] filed its original answer to

the Trustee's cross-claim and third-party claim. [Adv. Doc. No. 134]. Entrust asserted that there

is a defect in the parties; namely, that it cannot be liable in the capacity in which it was sued

because "[a]ll actions taken by Entrust with respect [sic] all of the transactions and occurrences

involved in this lawsuit were taken only as an authorized agent for an IRA trust account

established and maintained by Entrust." [Adv. Doc. No. 134, p. 9, ¶ 23]. Accordingly, Entrust

requests that it be dismissed with its costs and that the Trustee take nothing. [Adv. Doc. No.

134, p. 9, ¶ 24].

24. At a hearing held on January 26, 2010, stipulations were stated on the record regarding the

substitution of the IRA account holders as parties for Entrust. The Trustee stated that when he

filed the adversary, he treated Entrust as a party, and, thus, has asserted a claim against Entrust

for affirmative damages. [Tape Recording, 1/26/2010 Hearing at 4:03:43 p.m.—4:04:05 p.m.].

However, Entrust, through its counsel, confirmed to the Trustee that it claims no interest in any

of the funds that are the subject of this adversary proceeding. [Tape Recording 1/26/2010

---

[14] Entrust Retirement Services, Inc. is a corporation organized under Texas law. [Adv. Doc. Nos. 55, ¶ 2 & 134, ¶ 2].

Hearing at 4:03:32 p.m.—4:03:43 p.m.; 4:04:05 p.m.—4:04:15 p.m.]. Based on this representation, the Trustee stipulated that he is "not seeking any damages against Entrust as an individual entity." [Tape Recording 1/26/2010 Hearing at 4:04:15 p.m.—4:04:26 p.m.]. Counsel for Entrust reiterated on the record that "Entrust really doesn't have any authority to essentially waive rights of the IRAs or their beneficiaries. We are talking solely on behalf of Entrust as an individual entity to the extent that claims are being asserted against it as a principal." [Tape Recording 1/26/2010 Hearing at 4:06:21 p.m.——4:06:41 p.m.]. The Court then instructed the Trustee to file a proposed order regarding the substitution of parties, which the Trustee did file on February 4, 2010. [Adv. Doc. No. 171].

25.   On February 8, 2010, the Court entered an order removing Entrust, "in its corporate capacity only," from the suit (once it provided proof of service on the IRA account holders)[15] and replacing it with a number of parties bearing the designation: Entrust Retirement Services, Inc., FBO [account holder name] IRA# [XXXXX-XX] (the IRA Parties).[16] Entrust filed certificates of service on February 12 and 17, 2010, evidencing that it complied with the Court's order by

---

[15] Specially, Entrust was required, within three days of the February 8 order, to forward a copy of that order, as well as the Trustee's complaint and summons, to each holder of an IRA account involved in this suit. Each account holder was ordered, in turn, to appear and file a written answer within 20 days. [Adv. Doc. No. 174, p. 2, ¶¶ 4–5]. The account holders did, in fact, receive notice of the substitution. [Tape Recording, 2/19/2010 Hearing at 2:33:46 p.m.—2:34:28 p.m.].

[16] Specifically, the IRA Parties are as follows: Entrust Retirement Services, Inc., FBO Amina Abdulla IRA# 10846-01; Entrust Retirement Services, Inc., Vivian Abobo IRA# 10812-01; Entrust Retirement Services, Inc., FBO Suleman Abdulla IRA# 10821-01; Entrust Retirement Services, Inc., FBO Tom Monheim IRA# 10695-01; Entrust Retirement Services, Inc., FBO Gregg Boyle IRA# 10811-01; Entrust Retirement Services, Inc., FBO Wayne Pace IRA# 11214-01; Entrust Retirement Services, Inc., FBO Andrew Pace IRA# 11257-21; Entrust Retirement Services, Inc., FBO Jerry Pace IRA# 10853-21; Entrust Retirement Services, Inc., FBO Joyson C. Abraham IRA# 11222-21; Entrust Retirement Services, Inc., FBO Anna G. Abraham IRA# 11223-21; Entrust Retirement Services, Inc., FBO Carter Hartwig IRA# 10693-01; Entrust Retirement Services, Inc., FBO Danny Tajolosa IRA# 10733-01; Entrust Retirement Services, Inc., FBO Glenn Nichols IRA# 10675-02; and Entrust Retirement Services, Inc., FBO James Butcher IRA# 10865-21.

providing notice of substitution to each account holder. [Adv. Doc. Nos. 191 & 220].

26. On February 10, 2010, the Trustee filed his first amended cross-claim and third-party claim against all of the Interested Parties seeking a declaratory judgment that the earnest money is property of the Debtor's estate. [Adv. Doc. No. 180, p. 7].  The Trustee also seeks money damages based on breach of contract from the Interested Parties who entered into the purchase agreements with the Debtor, namely:

    (a) Entrust Retirement Services, Inc., FBO Suleman Abdulla IRA# 10821-01, unit 5W;[17]

    (b) Entrust Retirement Services, Inc., FBO Tom Monheim IRA# 10695-01 or Tom Monheim individually and Entrust Retirement Services, Inc., FBO James RM Butcher IRA# 10865-21 or James Butcher individually, unit 6W;

    (c) Horace James Colbert, unit 11W;

    (d) Entrust Retirement Services, Inc., FBO Vivian Abobo IRA# 10812-01 or Vivian Abobo individually and Entrust Retirement Services, Inc., FBO Gregg Boyle IRA# 10811-01 or Gregg Boyle individually, unit 14W;

    (e) Edward A. Schroeppel and Jim Butcher, unit 14E;

    (f) Daniel Waldenmaier and Vivian Abobo, unit 15E;

    (g) Carter Hartwig and Kevin D. Mitchell, unit 15W;

    (h) Fred Shepherd and Mary Shepherd, unit 18S;

    (i) Carter Hartwig, unit 19W;

    (j) Jerry Wayne Pace, Dorothy Eileen Pace, Wayne Alexander Pace, and Rebecca Anne Pace, unit 20S;

    (k) Glenn Nichols, unit 20W;

    (l) Glenn Nichols, trustee for Behrouz Abassi, unit 21S;

    (m) Entrust Retirement Services, Inc., FBO Amina Abdulla IRA# 10846-01 or Amina Abdulla individually, unit 23S;

    (n) Jerry Wayne Pace, Dorothy Eileen Pace, Andrew N. Pace, and Stephanie Pace, unit 25W; and

    (o) Glenn Nichols, unit 26W (collectively the Purchasers).[18] [Adv. Doc. No. 180, p.

---

[17] Suleman Abdulla is not named individually as a Purchaser against whom the Trustee is seeking money damages because he is now deceased. [March 25, 2010 Tr. 168:21–25].

[18] As subsequently noted, Demonstene Tajolosa testified that he paid $50,000.00 toward the Deposit on unit 15E and sent a letter to the Debtor stating that he intended to close on the purchase of unit 15E, even though he was not a signatory to the Contract for this unit.  The Court is unsure why, given these facts, the Trustee did not name him as a Purchaser against whom he seeks damages based on breach of the Contracts.  Nevertheless, because Demonstene is only named as an Interested Party (*i.e.* a party to the declaratory judgment cause of action) in the Trustee's first amended

5–6, 8].

To the extent that releases were granted in favor of the Purchasers, the Trustee seeks to avoid the releases as fraudulent transfers under the Bankruptcy Code and Texas law or as unauthorized post-petition transfers under Section 549. [Adv. Doc. No. 180, p. 8–9]. Finally, the Trustee requests that the Court award it reasonable attorneys' fees, pre and post-judgment interest at the maximum rate provided by law, court costs, and "all other such and further relief to which the Trustee may be entitled." [Adv. Doc. No. 180, p. 9–10].

27. On February 26, 2010, Joyson and Anna Abraham, Gregory Boyle, Jim Butcher, Horace Colbert, Carter Hartwig, Glenn Nichols, Jerry and Dorothy Pace, Edward Schroeppel, Fred and Mary Shepherd, Demostene Tajolosa, and Daniel Waldenmaier filed their second amended answer to the Trustee's first amended cross-claim and third-party complaint. [Adv. Doc. No. 231]. The third-party defendants admit that this is a core proceeding pursuant to 28 U.S.C. § 157(b), that the Court has jurisdiction pursuant to 28 U.S.C. § 1334, and that venue is appropriate pursuant to 28 U.S.C. § 1409. [Adv. Doc. No. 231, p. 2, ¶ 3]. They assert the defenses of release,[19] waiver, failure of consideration, estoppel, accord and satisfaction; that the Debtor was in breach of the purchase contracts; and that the Trustee's causes of action are barred by § 365. [Adv. Doc. No. 231, p. 3, ¶¶ 11–12]. The Court granted the third-party

---

cross-claim and third party claim, the Court will not hold him liable for any money damages awarded against the Purchasers in this suit.

[19] Specifically, as set forth in the Joint Pretrial Statement, the Interested Parties contend that the Contracts were terminated by the Debtor's execution of the Releases, and that those mutual releases constituted an accord and satisfaction of the Contracts. [Adv. Doc. No. 239, p. 11, ¶ 34]. They further assert in their memorandum of authorities for trial that "parties may rescind their contract by mutual agreement and thereby discharge themselves from their respective duties. A mutual release of rights of parties is regarded as a sufficient consideration as a matter of law for such a release instrument." [Adv. Doc. No. 264, p. 3].

15

defendants leave to amend their answer to include these affirmative defenses in an order dated February 19, 2010 [Adv. Doc. No. 225] upon consideration of their motion for leave to file an amendment [Adv. Doc. No. 178].[20]

28. On March 12, 2010, Amina Abdulla, Vivian Abobo, Glenn Nichols, Trustee for Behrouz Abassi, Kevin D. Mitchell, Andrew Pace, Stephanie Pace, Wayne Pace, and Rebecca Pace filed their original answer to the Trustee's first amended cross-claim and third-party claim. [Adv. Doc. No. 241]. The third-party defendants admit that this is a core proceeding pursuant to 28 U.S.C. § 157(b), that the Court has jurisdiction pursuant to 28 U.S.C. § 1334, and that venue is appropriate pursuant to 28 U.S.C. § 1409. [Adv. Doc. No. 241, p. 2, ¶ 3]. They assert the defenses of release, waiver, failure of consideration, estoppel, accord and satisfaction; that the Debtor was in breach of the purchase contracts; and that the Trustee's causes of action are barred by § 365. [Adv. Doc. No. 241, p. 3, ¶¶ 14–15].

29. On March 17, 2010, the Court entered an agreed order on the motion to vacate order substituting parties. [Adv. Doc. No. 250]. All parties agreed that Joyson and Anna Abraham and Tom Monheim retain no interest in or rights to the earnest money, and, therefore, are dismissed from the proceeding with prejudice. Further, the agreed order specified that Entrust,

---

[20] The motion for leave to amend was filed by the following Interested Parties: Jim Butcher, Horace Colbert, Glenn Nichols, Jerry Pace, Dorothy Pace, Fred Shepherd, Mary Shepherd, and Daniel Waldenmaier. [Adv. Doc. No. 178]. Consequently, the Court's order specifically grants these named parties leave of court to file their amended answer to the Trustee's third-party claim. [Adv Doc. No. 225]. However, the Court notes that the amendments are nevertheless valid as to the remaining Interested Parties, as the amended answer was filed within 21 days after the filing of the Trustee's amended cross-claim and counterclaim. FED. R. CIV. P. 12(a)(1)(B) (providing that a party has 21 days to answer a pleading that asserts a cross-claim or counterclaim). Additionally, the Trustee failed to raise any objection to the amendments being filed by additional Interested Parties. *See, e.g., Land of Oberoesterreich v. Gude*, 86 F.2d 621, 625 (2nd Cir. 1936) (holding that defendants, by consenting to an order allowing the plaintiff's amended complaint to be filed, answering the complaint, and not objecting on the grounds that it raised a cause of action arising after the date of the original complaint, waived any such procedural objection and consented to the court adjudicating the causes of action presented therein).

in its corporate capacity, is dismissed as a defendant without prejudice.[21]  The dismissed third

party defendants withdrew their objection to the order substituting the IRA accounts for Entrust

[Adv. Doc. No. 174],[22] and their motion to show authority to consent to the order [Adv. Doc.

No. 173] became moot.

30.   On March 22, 2010, Amina Abdulla, Vivian Abobo, Tom Monheim, Gregg Boyle, Wayne Pace,

Andrew Pace, Jerry Pace, Joyson Abraham, Anna Abraham, Carter Hartwig, Danny Tajolosa,

Glenn Nichols, and James Butcher (the IRA Account Holders) filed their answer on behalf of

the IRA accounts in which they own or hold an interest, requesting that the Trustee take nothing

with respect to the accounts.[23] [Adv. Doc. No. 263].  Within their answer, the IRA Account

Holders admit that this is a core proceeding pursuant to 28 U.S.C. § 157(b) but deny the

Trustee's assertions regarding jurisdiction and venue. [Adv. Doc. No. 263, p. 2, ¶¶ 3–5].  The

IRA Account Holders assert the following affirmative defenses: lack of jurisdiction of the

---

[21] Despite the order dismissing Entrust with prejudice in its corporate capacity, Entrust was still served with summons for the Trustee's amended cross-claim and third-party claim on behalf of the IRA account holders. [Adv. Doc. Nos. 202–212].  At the March 12, 2010 hearing, counsel for Entrust clarified that it was only being dismissed from the case in its corporate capacity, not in its fiduciary capacity. [March 12, 2010, Tape Recording 3/12/2010 Hearing at 2:33:30 p.m.—2:37:00 p.m.].

[22] On February 9, 2010, the account holders filed a motion to vacate the order substituting parties, requesting that the order be vacated on the basis that, among other things, "an IRA account is an item of personal property, not an entity, and therefore may not properly be named as a party to litigation." [Adv. Doc. No. 175, p. 3, ¶ 9].

[23] Although Joyson and Anna Abraham and Tom Monheim are named as third-party defendants in the answer, the Court notes that this is an obvious error in the pleading.  As stated above, the Court dismissed these individuals from the suit with prejudice because they claimed no interest in or rights to the funds in dispute. [Adv. Doc. No. 250].

subject matter and the person,[24] statute of limitations,[25] lack of capacity to be sued,[26] insufficiency of process, and failure to state a claim upon which relief may be granted. [Adv. Doc. No. 263, p. 2–3, ¶¶ 10–12]. They further assert the defenses of release, waiver, failure of consideration, estoppel, accord and satisfaction; that the Debtor was in breach of the purchase contracts; and that the Trustee's causes of action are barred by § 365. [Adv. Doc. No. 263, p. 3, ¶¶ 11–12].

## C.  Events Giving Rise to the Purchase of the Condominium Units

31.  Nichols, a real estate broker for Remax Realtors, issued mass mailings in Fort Bend County to entice attendance for a workshop he hosted in Sugar Land, Texas.[27]  At the seminar, Nichols discussed investing in condominiums through several vehicles, including letters of credit, cash, or IRAs. [Trustee's Ex. No. 57,[28] p. 4–6]. Nichols' presentation entitled "How to Make $, How to Keep $" represented an opportunity "to make a lot of money in real estate in the next 10 years in Houston" by buying into developing real estate with a "small deposit, no closing, and no

---

[24]  Specifically, the IRA Account Holders assert that the Court "has no jurisdiction over the [ ] IRA accounts [sic], as such accounts are exempt personal property under Tex. Prop. Code § 42.0021." [Adv. Doc. No. 263, p. 3, ¶ 10(a)].

[25]  The answer states that "[t]o the extent that the Trustee claims or may claim that the IRA accounts are not exempt property, Third Party Defendants assert the statute of limitations, Tex. Prop. Code § 42.004." [Adv. Doc. No. 263, p. 3, ¶ 10(b)].

[26]  The IRA Account Holders explicitly allege that "[t]he IRA accounts are not persons, and therefore have no legal existence or capacity to be sued." [Adv. Doc. No. 263, p. 3, ¶ 10(c)].

[27]  Nichols disclosed to the Trustee that he sent out a mailer to 50,000 people within Fort Bend County to entice participation in his seminar. [March 25, 2010 Tr. 7:12–23].  His flier, however, stated that seating was limited to 35 persons, which the Trustee testified was an attempt to take advantage of an exemption to the securities laws. [March 25, 2010 Tr. 8:14–21].  Nichols further disclosed to the Trustee that many of the Purchasers were attendees of this seminar. [March 25, 2010 Tr. 8:23—9:8].  Indeed, certain Purchasers confirmed that they were present at Nichols' event. [*E.g.* March 26, 2010 Tr. 36:11–12; March 26, 2010 Tr. 140:4–5].

[28]  Trustee's Ex. No. 57 is a copy of the PowerPoint presented at Nichols' seminar.

qualifying." [Trustee's Ex. No. 57, p. 1 & 10–13].

32.    Nichols presented a specific opportunity to invest in the Debtor's then developing condominium

project, which would be "the only waterfront condo in Houston" with "29 stories, 12' ceilings

. . . only 78 units, a $1M pool, 1st two floors in common, and 4 penthouses." [Trustee's Ex. No.

57, p. 19–20].  He stated that he would put together a partnership because "you can do so much

more with a group than you can individually. And here is why: 10% deposit—not 15%;

LOC—not cash; $500K shares; Limited partnership/LLC; Every sale is shared; Leave profits

in; Last 5 units = profits; Bank as a group; Reinvest." [Trustee's Ex. No. 57, p. 23].

33.    Nichols further discussed the benefits of a self-directed IRA, where contributors can direct the

funds to be invested "almost anywhere except lottery, insurance, art, [and] antiques" including:

"money market, stock market, lender (self), [or] real estate (investor)."  Of these investment

options for a self-directed IRA, Nichols promoted real estate as the alternative with "the chance

of the best return." [Trustee's Ex. No. 57, p. 47–48].  When investing small amounts in a self-

directed IRA, Nichols recommended "not buying the real estate but buying the rights to the real

estate, which is buying contracts or options," because buying options allows investors to

"control a lot with a little." [Trustee's Ex. No. 57, p. 50–52].

34.    Nichols then tied all of his investment strategies into the Debtor's condominium project.  First,

Nichols noted that "pre-development by definition equates to contracts/options.  There is

nothing there so all you can do is buy/sell the rights." [Trustee's Ex. No. 57, p. 51].  He then

emphasized the expected return on investing in these real estate "options" when done through

a partnership vehicle: "10% down (cash, LOC, or IRA); $500K shares; Price—deep discount."

[Trustee's Ex. No. 57, p. 54].  Nichols projected that a $500,000 condominium could be quickly

re-sold for $600,000, a 20% growth of $100,000 that translates into a 200% return on an investor's $50,000 deposit. [Trustee's Ex. No. 57, p. 55]. Nichols rationalized that "the reason we could do the unreasonable is because we are investing in options on real estate and not real estate itself. It's not the option amount that is gaining value, it's the condo that we didn't have to buy." [Trustee's Ex. No. 57, p. 56–57]. Nichols then projected an accelerated rate of return when investing with pre-tax IRA funds, as opposed to a regular account, based on "the principal of compound interest in reverse." [Trustee's Ex. No. 57, p. 60–65]. Thus, Nichols concluded "that buying real estate options is an investment vehicle for the small investor [or the] huge investor, [and] that self-directed IRA's are the only things like it in the world. Combined together you can realize all your economic dreams and become famous." [Trustee's Ex. No. 57, p. 67–69].

35. On June 7, 2006, the partnership agreement of Endeavour Partners, LP[29] was entered into between Nichols, as manager of the general partner—Endeavour GP, LLC—and the following Interested Parties as limited partners: Wayne Pace, Jerry Pace, Andrew Pace, Jim Butcher, Edward A. Schroeppel, Vivian Abobo, Dan Waldenmaier, Danny Tajolosa, Gregory A. Boyle, Tom Monheim, Horace Colbert, Kevin Mitchell, Carter Hartwig, Fred Shepherd, and Suleman Abdulla. [Trustee's Ex. No. 56].

36. Endeavour Partners, LP was organized for: "(a) the purchase of condominium units in the Endeavour Condominiums, 4821 E. NASA Parkway, Pasadena, Texas 77586 (the "Units"); (b) the ownership, leasing, operation, maintenance and management of the Units; and (c) the sale

---

[29] Out of an abundance of caution, the Court once again emphasizes that this entity is separate and distinct from Endeavour Highrise, L.P., the Debtor in the main case.

of the Units." [Trustee's Ex. No. 56, p. 5, § 2.5]. Each limited partner made representations and warranties to the partnership, the general partner, and each other, including that he/she: (a) "acknowledges receipt of written information concerning the Partnership and that the Limited Partner, or such Limited Partner's tax advisor or attorney, has thoroughly read and evaluated all of the information and understands the nature of the risk involved in the proposed investment and the obligations of the Limited Partner pursuant to the terms of the Partnership Agreement;" (b) is "experienced and knowledgeable in real estate investments in general, and with respect to investments similar to the investment in this Partnership, or has obtained qualified and experienced independent advice with respect to such Limited Partner's investment in the Partnership"; and (c) "recognizes that the Partnership is newly organized and has no financial and operating history and is a speculative venture involving a high degree of risk of loss." [Trustee's Ex. No. 56, p. 11, § 5.1(b), (c), & (d)].

**D. Execution of Contracts to Purchase Condominium Units**

37. On the dates indicated below, the Debtor, as seller, entered into condominium purchase agreements with the following Purchasers, as buyers, for their corresponding units. [Trustee's Ex. Nos. 1–15].[30] Pursuant to their purchase agreements, the Purchasers were required to deliver to their respective title company[31] a non-refundable deposit equal to 10% of the purchase price. Certain Purchasers deposited an amount less than 10% of the purchase price with their respective title company, but the Debtor never made any demand upon them to deliver the

---

[30] These purchase agreements were signed and negotiated in Texas.

[31] Edward A. Schroeppel and James R.M. Butcher, purchasers under the agreement covering unit 14E, delivered their non-refundable deposit to StarTex. All of the remaining Purchasers deposited their funds with the Title Company.

remaining amounts.   The Debtor's subsequent willingness to proceed to closing on these contracts reflects its acceptance of the actual deposits as sufficient to comply with that particular provision of the agreements.   Other Purchasers actually deposited more than 10% of the purchase price with their respective title company.   It remains unclear to this Court why these Purchasers delivered an amount above what was required, but the Court nevertheless acknowledges receipt of these funds in the amounts stipulated to by the parties to this suit:

| Date | Purchaser | Unit | Purchase Price | Deposit[32] | % of Price |
|------|-----------|------|----------------|-------------|------------|
| 02/27/2006 | Entrust Retirement Services, Inc. FBO Tom Monheim IRA | 6W | $539,000.00 | $55,965.47 | 10.38% |
| 01/13/2006 | Horace James Colbert | 11W | $525,150.00 | $52,000.00 | 9.90% |
| 06/30/2006 | Entrust Retirement Services, Inc. FBO Gregg A. Boyle IRA; Entrust Retirement Services, Inc. FBO Vivian Abobo IRA | 14W | $932,600.00 | $100,000.00 | 10.72% |
| 08/04/2006 | Edward A. Schroeppel; James R.M. Butcher | 14E | $981,600.00 | $100,000.00 | 10.18% |
| 01/29/2006 | Dan Waldenmaier; Vivian Abobo | 15E | $975,000.00 | $100,000.00 | 10.25% |
| 12/30/2005 | Carter Hartwig; Kevin D. Mitchell | 15W | $939,600.00 | $80,000.00 | 1.49% |
| 12/30/2005 | Fred & Mary Shepherd | 18S | $575,000.00 | $57,500.00 | 10% |
| 04/17/2006 | Carter Hartwig | 19W | $730,000.00 | $73,000.00 | 10% |
| 04/01/2006 | Wayne Alexander & Rebecca Anne Pace; Jerry Wayne & Dorthy Eileen Pace | 20S | $555,350.00 | $75,000.00 | 13.5% |
| 04/17/2006 | Glenn Nichols[33] | 20W | $666,200.00 | $66,620.00 | 10% |
| 12/04/2006 | Glenn Nichols, Trustee | 21S | $595,000.00 | $50,000.00 | 8.40% |
| 05/30/2006 | Entrust Retirement Services, Inc. FBO Suleman Abdulla IRA# | 5W | $535,000.00 | $50,000.00 | 9.34% |

---

[32] The parties stipulated as to the amount of funds on deposit at the title companies for the various contracts applicable to this suit. [Adv. Doc. No. 265, Stipulated Facts for Trial, ¶ 1–15].

[33] Nichols received approximately $175,000.00 in commissions from the Debtor for securing purchase agreements from the Purchasers. [March 25, 2010 Tr. 14:2–25].

| 07/25/2006 | Entrust Retirement Services, Inc. FBO Amina Abdulla IRA# | 23S | $570,350.00 | $50,000.00 | 8.76% |
|---|---|---|---|---|---|
| 10/14/2006 | Jerry Wayne & Dorthy Eileen Pace; Andrew N. & Stephanie Pace | 25W | $691,200.00 | $50,000.00 | 7.23% |
| 04/17/2006 | Glenn Nichols | 26W | $701,200.00 | $70,120.00 | 10% |

38. All of the above referenced contracts to purchase condominium units (the Contracts) are identical, or very similar.  Each of the Contracts contains language setting forth the following:

(a) The deposits equal to approximately 10% of the purchase price required to be delivered to the respective title companies by the buyers (the Deposits)[34] are "non-refundable."  Indeed, in Section 2, on page 1, each contract expressly sets forth that the Deposits "shall be non-refundable whether the Contract closes or otherwise." [Trustee's Ex. Nos. 1–15].

(b) "Upon the substantial completion of the construction of the Property and the issuance of a Certificate of Substantial Completion, in the form attached as Exhibit 'E', the Property shall be deemed completed (the '**Completion Date**')." [Trustee's Ex. Nos. 1–15, p. 4, § 5(c)].

(c) "Seller shall convey fee simple title to the Property to Buyer by Special Warranty Deed, subject to the Permitted Exceptions, to be delivered at the Title Company on the date and time designated by Seller by notice to Buyer (the '**Closing Date**'), but in no event earlier than three (3) days or later than twenty (20) days after the Completion Date defined in Section 5 above.  Buyer shall be obligated to purchase the Property and pay to Seller the Purchase Price on the Closing Date at the title company (the '**Closing**')." [Trustee's Ex. Nos. 1–15, p. 5, § 8(a)[35]].

(d) "[I]f any other obligation hereunder is not performed as herein provided, or if any other material default exists in the provisions of this Agreement, the parties shall have the following remedies: (a) If Seller is in default, Buyer's sole remedy is to treat this Agreement as terminated, in which event all payments made thereunder shall be returned to Buyer, except for any payments which by definition herein, are non-refundable.  (b) If Buyer is in default, Seller's sole remedy shall be to terminate this Agreement in which event (i) Seller will be entitled to retain the Earnest Money,

---

[34] The Deposits, labeled "non-refundable deposits" in Section 2 of the Contracts, are the funds interplead into the registry of the Court by the title companies, and, thus, are the same funds referred to as the "earnest money" or "earnest money deposits" in various other documents filed with this Court.

[35] Due to an apparent typographical error, Section 8 is actually titled Section 1 in Ex. Nos. 1, 4–5 & 9–15 but is otherwise identical in substance and placement.

23

and all other amounts paid to Seller as liquidated damages, and (ii) in addition thereto, Buyer shall be liable to Seller for additional liquidated charges equal to 1.5% of the Purchase Price.  Buyer and Seller agree that if Buyer is in breach of Buyer's obligations under this Agreement, it will be difficult to determine Seller's damages (which may include the lost opportunity of effecting a sale of the Property while it was under contract to Buyer).  Consequently, the liquidated damages provided herein are a fair and reasonable estimate of Seller's damages." [Trustee's Ex. Nos. 1–15, § 18].

(e) "If the Property shall be damaged by fire or other casualty prior to the time of Closing, in an amount of not more than ten percent (10%) of the total purchase price, and no other portion of the Building is damaged or destroyed, Seller shall be obligated to repair the same before the date of Closing.  If the Property, or the Building, is destroyed or damaged by fire or other casualty prior to Closing, in an amount of more than ten percent (10%) of the total Purchase Price, Seller may terminate this Agreement by giving notice to Buyer within sixty (60) days of the date on which the Property was destroyed or materially damaged, and Seller shall, within thirty (30) days thereafter, return the earnest [m]oney to Buyer and the parties shall be released from any further obligation or liability hereunder or related hereto. If Seller does not terminate this Agreement under the terms of this Section, the date of Closing shall be delayed and continued until Seller has a reasonable time to effectuate repairs or reconstruction of the Property, which time of delay may not exceed one year.  Any delay of over one (1) year due to such destruction shall be a material default under this Agreement . . . ." [Trustee's Ex. Nos. 1–15, § 16].

39. There were no Buyer Upgrades under any of the Contracts. [Trustee's Ex. Nos. 1–15, § 2].

40. Daniel Waldenmaier did not sign the Contract for the Purchase of Unit 15E.  The Debtor, as the seller, and Vivian Abobo, the other named buyer, dually executed the agreement. [Trustee's Ex. No. 6, p. 1 & 12].

41. Kevin D. Mitchell did not sign the Contract for the purchase of Unit 15W.  The Debtor, as the seller, and Carter Hartwig, the other named buyer, executed the agreement. [Trustee's Ex. No. 7, p. 1 & 11].  Mr. Mitchell did, however, pay at least $40,000.00 of the Deposit to the Title Company.[36] [Trustee's Ex. No. 7].

---

[36] It is unclear whether Mr. Mitchell deposited $40,000.00 or $50,000.00 with the Title Company as a Deposit for the purchase of unit 15W.  While Trustee's Ex. No. 7 contains a receipt from the Title Company with a copy of a check issued to it by Mr. Mitchell in the amount of $40,000.00, Mr. Mitchell testified before this Court that he had, in

42.  The Purchasers under the Contracts are generally sophisticated, well-educated parties:

(a) Amina Abdulla is a physician who works for the University of Texas Medical School as an assistant professor in psychiatry. [March 25, 2010 Tr. 169:1–4].

(b) James Butcher is a retired Air Force sergeant and 30 year manager at Southwestern Bell Telephone Company. [March 25, 2010 Tr. 186:7–18].

(c) Gregory Boyle has a bachelor of business administration degree and has worked in insurance, finance, sales and marketing.  He has also served as a worship minister for the past ten years. [March 26, 2010 Tr. 13:24–14:9].

(d) Vivian Abobo has a doctor of pharmacy and a master of business administration.  She previously worked in the ICU and critical care unit of Methodist Hospital and conducted litigation management at the University of Texas.  She is currently the director of pharmacy at University of Texas, Harris County Psychiatric Center. [March 26, 2010 Tr. 26:12–23].

(e) Wayne Pace has worked for 13 years as an electrical engineer in Houston, Texas. [March 26, 2010 Tr. 43:5–10].

(f) Jerry Pace has worked in quality control, as an engineer, and as a manager; and he has three years of military experience in the U.S. Army Ordnance. [March 26, 2010 Tr. 55:25—56:8].

(g) Horace Colbert has an associate's degree and works in the engineering field. [March 26, 2010 Tr. 73:2–14].

(h) Carter Hartwig was drafted by the Houston Oilers a semester prior to his anticipated graduation from the University of Southern California.  He played for the Oilers for six years, and then started his own glass business, which he continues to operate to this day. [March 26, 2010 Tr. 91:24—92:14].

(i) Kevin Mitchell has a bachelor's in accounting, a master of business administration degree, and is currently employed as a certified public accountant. [March 26, 2010 Tr. 106:1–4].

(j) Andrew Pace has a bachelor of science degree in art and works as an elementary school teacher.  [March 26, 2010 Tr. 118:18—119:3].

(k) Edward Schroeppel has a bachelor's, master's, and Ph.D. in electrical engineering, as well as a master of business administration degree.  He spent six years in the computer

---

fact, deposited $50,000.00 with the Title Company. [March 26, 2010 Tr. 108:8–9].

field, twenty years inventing and developing medical devices for cardiovascular purposes, and thirteen years inventing and developing medical devices for the detection and treatment of cancer.  He is currently the founder and chief scientific officer of a medical device company. [March 26, 2010 Tr. 132:2–15].

(l) Daniel Waldenmaier served six years in the United States Army—two years in active duty and four years in the Reserves. He also completed a four year apprenticeship program to become a machinist, and has since worked as a manager and superintendent for various metal and heat treating companies, machining operations, construction companies, refineries, and chemical plants.  [March 26, 2010 Tr. 143:12—144:5].

(m) Fred Shepherd has a bachelor of science degree in biology, and is a retired trauma center and critical care respiratory therapist for the Harris County Hospital District. [March 30, 2010 Tr. 5:19–25].

## E.  Events Occurring Subsequent to the Execution of the Contracts

i)  The Debtor's Attempts to Close on the Transactions and Subsequent Declarations of the Purchasers' Defaults

43.  Bernado Rojano (Rojano), the chief operating officer of Endeavour Holdings,[37] credibly testified that three months prior to the issuance of the first temporary certificate of occupancy for the Property, Nichols disclosed that "his intentions were not to close on the units, but he was requesting our assistance in helping him promote or resell his clients' units in order for them not to have to close and for profit." [March 24, 2010 Tr. 10:15–25].  According to Rojano, the Purchasers' intent to sell the Contracts for profit prior to closing became more apparent in subsequent meetings with Nichols. [March 24, 2010 Tr. 11:7–19].  He became particularly concerned because "our agreement was for him [and his clients] to close." [March 24, 2010 Tr. 11:5–6].  He noted that the Debtor then made a pointed effort to ensure that the Purchasers "would be prepared to close along with the rest of the contracts" by: appointing a contract

---

[37] Endeavour Holdings is the entity which oversees the operations of Endeavour Highrise, L.P., the Debtor in this case.

administrator to notify the Purchasers when temporary certificates of occupancy were expected to be issued for the Property; requesting information about a lending source to ensure that they had adequate time to arrange financing; and providing further communication regarding the upcoming closing dates through letters and phone calls at the advice of counsel. [March 24, 2010 Tr. 11:20—12:13].

44. On November 30, 2007, the City of Pasadena issued temporary Certificates of Occupancy for floor levels 3–21 of the Property. [Trustee's Exhibit No. 16].

45. A Certificate of Substantial Completion, on an AIA Document G704–2000 form, was issued on December 15, 2007 for floor levels 3–8 of the Property. [Trustee's Ex. No. 19]. The Certificate included, in pertinent part, the language set forth in the form attached to the Contracts as Exhibit "E,"[38] and was signed by an architect at EDI Architects, Inc.[39]

46. On December 27, 2007, the City of Pasadena issued temporary Certificates of Occupancy for floor levels 22–26 of the Property. [Trustee's Ex. No. 16].

---

[38] Specifically, the Certificate of Substantial Completion form attached as Exhibit "E" to the Contracts certifies that the construction contemplated under the respective Contract "has been reviewed and found, to the undersigned Architect's best knowledge, information and belief, to be substantially complete." The form further defines substantial completion as "the state in the construction when the Unit is sufficiently complete so that the Owner can occupy or utilize the Unit for its intended use as a residence." [Purchasers' Ex. No. 22, p. 25]. Likewise, the Certificates of Substantial Completion issued by EDI Architectural, Inc., on an AIA Document G704–2000 form, certify that "[t]he Work performed under this Contract has been reviewed and found, to the Architect's best knowledge, information and belief, to be substantially complete." [Trustee's Ex. Nos. 19 & 26, p. 1]. The Certificate also defines substantial completion as "the stage in the progress of the Work when the Work or designated portion is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use." [Trustee's Ex. Nos. 19 & 26, p. 1].

[39] The contractor's and owner's signatures do not appear on the Certificates of Substantial Completion admitted into evidence by the Trustee [Trustee's Ex. Nos. 19 & 26], but the Court finds that these signatures were not required to certify the substantial completion of the projects. Rather, the contractor's signature would serve as a promise that it intended to "complete or correct the Work on the list of items attached hereto within [t]hirty (30) days from the above date of Substantial Completion," and the owner's signature would acknowledge that it "accepts the Work or designated portion as substantially complete and will assume full possession . . ." at the date and time specified. [Trustee's Ex. Nos. 19 & 26, p. 1]. According to the Trustee's testimony, the owner and contractor agreed to the terms set forth in the Certificates by their own admission as well as their actions subsequent to the time the Certificates were issued. [March 25, 2010 Tr. 77:6—78:2].

47.   On December 27, 2007, the Debtor, through its attorney, sent letters to the following members of the Nichols Group designating January 7, 2008 as the closing date on the purchase of their respective condominium units: (a) Suleman Abdulla, unit 5W [Trustee's Ex. No. 29]; and (b) Tom Monheim, unit 6W [Trustee's Ex. No. 30].  Both letters notified the respective Purchasers that "Endeavour Highrise, L.P. [the Debtor] has substantially completed your unit and received from its architect a Certificate of Substantial Completion.  Your Purchase Agreement provides that closing occur no earlier than three (3) days thereafter as designated by seller."

48.   Three Purchasers, on the dates specified below, signed a Waiver of Inspection with respect to the condominium units they were obligated to purchase under the applicable Contracts: (a) Edward A. Schroeppel, January 4, 2008; (b) James R. M. Butcher, January 10, 2008; and (c) Horace Colbert, January 11, 2008.  These waivers all expressly state that the "Buyer hereby acknowledges that the Unit is 'complete' as provided in the Agreement, having received certification by Seller's architect and hereby waives the Inspection provided in the Agreement." [Trustee's Ex. No. 46].

49.   Additional Certificates of Substantial Completion were issued for various floor levels between December 15, 2007, when the Certificate covering floor levels 3–8 was issued, and January 10, 2008, when the Certificate covering the entire building was issued. [March 24, 2010 Tr. 58:4—59:18].

50.   On January 4, 2008, the Debtor, through its attorney, sent letters to the following members of the Nichols Group designating January 15, 2008 as the closing date on the purchase of their respective condominium units:

    (a) Horace Colbert, unit 11W [Trustee's Ex. No. 32]
    (b) Gregory A. Boyle, unit 14W [Trustee's Ex. No. 33]

28

(c) Edward A. Schroeppel, unit 14E [Trustee's Ex. No. 34]
(d) Dan Waldenmaier, unit 15E [Trustee's Ex. No. 35]
(e) Carter Hartwig, units 15W and 19W [Trustee's Ex. No. 36]
(f) Fred Shepherd, unit 18S [Trustee's Ex. No. 37]
(g) Jerry and Wayne Pace, units 20S and 25W [Trustee's Ex. No. 39]
(h) Glenn Nichols, units 20W and 26W [Trustee's Ex. No. 40]
(i) Glenn Nichols, trustee, unit 21S [Trustee's Ex. No. 41]; and
(j) Suleman Abdulla, unit 23S [Trustee's Ex. No. 42].[40]

Each letter notifies the respective Purchasers that "Endeavour Highrise, L.P. [the Debtor] has substantially completed your unit and received from its architect a Certificate of Substantial Completion.  Your Purchase Agreement provides that closing occur no earlier than three (3) days thereafter as designated by seller."

51.   According to the Trustee, none of the Purchasers responded to the Debtor's correspondence sent in January of 2008. [March 24, 2010 Tr. 143:19–21].  Indeed, certain Purchasers confirmed that they failed to respond and did not close on the date designated in the letters, specifically: (a) Horace Colbert [March 26, 2010 Tr. 77:21—79:3]; (b) Carter Hartwig [March 26, 2010 Tr. 99:13—100:8]; (c) Edward Schroeppel [March 26, 2010 Tr. 137:9–18]; and (d) Daniel Waldenmaier [March 26, 2010 Tr. 148:3–23].

52.   The final Certificate of Substantial Completion, on an AIA Document G704–2000 form, was issued on January 10, 2008[41] for the entire Property, floor levels 1–30. [Trustee's Ex. No. 26].

---

[40] In certain instances where more than one party is named as a Purchaser on a Contract, it is unclear why not every Purchaser was mailed a copy of the January 4, 2008 correspondence. [Trustee's Ex. Nos. 4–7 & 14].  Additionally, in circumstances where the Purchasers wrote in under Section 24 of their respective Contracts the entity or individual whom they wanted to receive notice, it is unclear why the January 4, 2008 correspondence was not always mailed to those entities or individuals designated in the Contracts. [Trustee's Ex. Nos. 1, 2 & 14].

[41] Although the architect signed the Certificate of Substantial Completion on April 11, 2008, the Trustee testified that January 10, 2008 was the date of commencement of the certificate, or the date of substantial completion. [March 24, 2010 Tr. 58:4–17].  Indeed, the express language of the certificate states that "[t]he date of Substantial Completion of the Project or portion designated above is the date of issuance established by this Certificate, which is also the date of commencement . . . ." [Trustee's Ex. No. 26, p. 1].

The Certificate included, in pertinent part, the language set forth in the form attached to the Contracts as Exhibit "E,"[42] and was signed by an architect at EDI Architects, Inc.[43]

53. On January 15, 2008, the Debtor sent deeds to the title companies[44] so that the closings could occur. [Trustee's Ex. No. 28].

54. No closings took place on either January 7 or January 15, 2008, as none of the Purchasers appeared for the closings scheduled at the title companies to effectuate the Contracts.

55. On January 28, 2008, Entrust Retirement Services, Inc. FBO Tom Monheim IRA assigned all rights and interest under the Purchase and Sale Agreement with the Debtor to Entrust Retirement Service, Inc. FBO James R. M. Butcher IRA #10865-21. [Trustee's Ex. No. 31].

56. Rojano credibly testified that Nichols met with Robin Parsley (Parsley)—the Debtor's CEO, Renee' Bornn (Bornn)—contract coordinator for the Purchasers, and the Debtor's attorney in early February 2008.[45]  At the time of this meeting, Rojano represented that all the units covered by the Contracts were complete.  He stated that Dick Mason—the Debtor's superintendent, Carlos Marzano (Marzano)—one of the principals of the Debtor, EDI Architects, Inc.—the architect overseeing the Property, Parsely, and Bornn had all inspected the Purchasers' units, and the subcontractors had been requested to complete their own punch list.  Also, Rojano asserted that the Debtor had conducted closings on other units unrelated to the Contracts.  As represented by Rojano, Nichols said that the Purchasers "were going to attempt to close" but

---

[42] *See supra*, note 38.

[43] *See supra*, note 39.

[44] Specifically, the Debtor arranged for closings to occur at StarTex and the Title Company, both Texas corporations located in Horseshoe Bay, Texas, and Houston, Texas, respectively. [Adv. Doc. No. 1, p. 1, ¶¶ 2–3].

[45] The Trustee also testified that this meeting between Nichols and representatives of the Debtor occurred in February of 2008. [March 24, 2010 Tr. 143:22–24].

had not arranged financing, set up closing with the title company, or inspected their respective units. [March 24, 2010 Tr. 13:14—17:14].

57.  On February 4, 2008, the Debtor, through its attorney, sent letters to the following Purchasers setting forth that because the closings did not take place on the designated closing dates, they were in default:

> (a) Suleman Abdulla, unit 5W [Trustee's Ex. No. 29];
> (b) Tom Monheim, unit 6W [Trustee's Ex. No. 30];
> (c) Horace Colbert, unit 11W [Trustee's Ex. No. 32];
> (d) Edward A. Schroeppel, unit 14E [Trustee's Ex. No. 34];
> (e) Dan Waldenmaier, unit 15E [Trustee's Ex. No. 35];
> (f) Carter Hartwig, units 15W and 19W [Trustee's Ex. No. 36];
> (g) Fred Shepherd, unit 18S [Trustee's Ex. No. 37];
> (h) Jerry and Wayne Pace, units 20S and 25W [Trustee's Ex. No. 39];
> (i) Glenn Nichols, units 20W and 26W [Trustee's Ex. No. 40];
> (j) Glenn Nichols, trustee, unit 21S [Trustee's Ex. No. 41]; and
> (k) Suleman Abdulla, unit 23S [Trustee's Ex. No. 42].[46]

The letters terminated the Contracts, expressly stating in each that "the Purchase Agreement is hereby terminated."  The letters also informed the Purchasers that the Debtor would make demand upon the title companies for delivery of the Deposits.

58.  The Trustee testified that none of the Purchasers responded to the termination letters issued on February 4, 2008. [March 24, 2010 Tr. 152:20–22].  At trial, the following Purchasers corroborated the Trustee's testimony: (a) Horace Colbert [March 26, 2010 Tr. 79:4—80:7]; (b) Edward Schroeppel [March 26, 2010 Tr. 137:19–23]; and (c) Daniel Waldenmaier [March 26, 2010 Tr. 148:24—149:8].

59.  On March 14, 2008, despite having terminated the Contracts, the Debtor's attorney sent letters

---

[46] The Court notes that the February 4, 2008 correspondence was not addressed to every Purchaser named on those Contracts with more than one buyer. [Trustee's Ex. Nos. 4–7 & 14].

to the following Purchasers offering to extend their respective closing dates to March 31, 2008

in exchange for a release forfeiting any claim to their Deposits:

(a)  Tom Monheim (and Entrust Retirement Services, Inc. FBO Tom Monheim), unit
     6W [Trustee's Ex. No. 30];
(b)  Horace Colbert, unit 11W [Trustee's Ex. No. 32];
(c)  Vivian Abobo and Greg A. Boyle, unit 14W [Trustee's Ex. No. 33];
(d)  Edward A. Schroeppel and James Butcher, unit 14E [Trustee's Ex. No. 34];
(e)  Dan Waldenmaier and Danny Tajolosa, unit 15E [Trustee's Ex. No. 35];
(f)  Kevin Mitchell and Carter Hartwig, unit 15W [Trustee's Ex. No. 36];
(g)  Fred and Mary Shepherd, unit 18S [Trustee's Ex. No. 37];
(h)  Carter Hartwig, unit 19W [Trustee's Ex. No. 38];
(i)  Jerry and Wayne Pace, unit 20S [Trustee's Ex. No. 39];[47]
(j)  Glenn Nichols, unit 20W [Trustee's Ex. No. 40];
(k)  Glenn Nichols, trustee, unit 21S [Trustee's Ex. No. 41];
(l)  Amina Abdulla (and Entrust Retirement Services, Inc.), unit 23S [Trustee's Ex.
     No. 42];
(m)  Jerry and Andrew Pace, unit 25W [Trustee's Ex. No. 43]; and
(n)  Glenn Nichols, unit 26W [Trustee's Ex. No. 44].

60.  The Trustee testified that none of the Purchasers revived their Contracts by executing the

enclosed releases or even responded to the March 14, 2008 letters. [March 24, 2010 Tr.

162:21—163:1].  Indeed, the following Purchasers confirmed that they did not respond to the

March 14, 2008 correspondence: (a) James Butcher [March 25, 2010 Tr. 203:7—204:8]; (b)

Horace Colbert [March 26, 2010 Tr. 80:16–23]; (c) Kevin Mitchell [March 26, 2010 Tr.

112:13—115:1]; (d) Andrew Pace [March 26, 2010 Tr. 128:13—129:15]; (e) Edward

Schroeppel [March 26, 2010 Tr. 137:24—138:14]; and (f) Daniel Waldenmaier [March 26,

2010 Tr. 149:9–19]

61.  On March 25, 2008, the Debtor's attorney sent letters to the following Purchasers again offering

to extend their respective closing dates to April 15, 2008 in exchange for their execution of a

---

[47] Although otherwise identical to all of the referenced letters, the correspondence addressed to Jerry and
Wayne Pace is dated March 19, 2008, instead of March 14, 2008.

release forfeiting any claim to their earnest monies:

(a) Tom Monheim (and Entrust Retirement Services, Inc. FBO Tom Monheim), unit 6W [Trustee's Ex. No. 30];
(b) Horace Colbert, unit 11W [Trustee's Ex. No. 32];
(c) Vivian Abobo and Greg A. Boyle, unit 14W [Trustee's Ex. No. 33];
(d) Edward A. Schroeppel and James Butcher, unit 14E [Trustee's Ex. No. 34];
(e) Dan Waldenmaier and Danny Tajolosa, unit 15E [Trustee's Ex. No. 35];
(f) Kevin Mitchell and Carter Hartwig, unit 15W [Trustee's Ex. No. 36];
(g) Fred and Mary Shepherd, unit 18S [Trustee's Ex. No. 37];
(h) Carter Hartwig, unit 19W [Trustee's Ex. No. 38];
(i) Jerry and Wayne Pace, unit 20S [Trustee's Ex. No. 39];
(j) Glenn Nichols, unit 20W [Trustee's Ex. No. 40];
(k) Glenn Nichols, trustee, unit 21S [Trustee's Ex. No. 41];
(l) Amina Abdulla (and Entrust Retirement Services, Inc.), unit 23S [Trustee's Ex. No. 42];
(m) Jerry and Andrew Pace, unit 25W [Trustee's Ex. No. 43]; and
(n) Glenn Nichols, unit 26W [Trustee's Ex. No. 44].

62. The Trustee testified that none of the Purchasers revived their Contracts by executing the enclosed releases or even responded to the March 25, 2008 letters. [March 24, 2010 Tr. 171:18–24]. Indeed, at trial, the following Purchasers confirmed that they did not respond to the March 25, 2008 correspondence: (a) Amina Abdulla [March 25, 2010 Tr. 180:11—182:2]; (b) James Butcher [March 25, 2010 Tr. 204:9–23]; (c) Horace Colbert [March 26, 2010 Tr. 80:24—81:14]; (d) Kevin Mitchell [March 26, 2010 Tr. 115:2–10]; and (e) Andrew Pace [March 26, 2010 Tr. 129:17–24]. Additionally, James Butcher stated that he failed to respond because he "had a conference or a talk with Glenn Nichols and he [Nichols] said don't." [March 25, 2010 Tr. 204:21–23].

63. No closings took place on either March 31, 2008 or April 15, 2008.

64. On April 17, 2008, after attempts to extend the closings proved unsuccessful, the Debtor's attorney sent letters to the following Purchasers giving notice that they were in default under the Contracts:

33

(a) Tom Monheim (and Entrust Retirement Services, Inc. FBO Tom Monheim), unit 6W [Trustee's Ex. No. 30];

(b) Horace Colbert, unit 11W [Trustee's Ex. No. 32];

(c) Vivian Abobo, Greg A. Boyle, and Entrust Retirement Services FBO Greg A. Boyle IRA# 10811-01 and FBO Vivian Abobo IRA# 10812-01 [Trustee's Ex. No. 33];

(d) Edward A. Schroeppel and James Butcher, unit 14E [Trustee's Ex. No. 34];

(e) Dan Waldenmaier and Danny Tajolosa, unit 15E [Trustee's Ex. No. 35];

(f) Kevin Mitchell and Carter Hartwig, unit 15W [Trustee's Ex. No. 36];

(g) Fred and Mary Shepherd, unit 18S [Trustee's Ex. No. 37];

(h) Carter Hartwig, unit 19W [Trustee's Ex. No. 38];

(i) Jerry and Dorothy Eillen Pace and Wayne Alexander and Rebecca Ann Pace, unit 20S [Trustee's Ex. No. 39];

(j) Glenn Nichols, unit 20W [Trustee's Ex. No. 40];

(k) Glenn Nichols, trustee, unit 21S [Trustee's Ex. No. 41];

(l) Amina Abdulla (and Entrust Retirement Services, Inc.), unit 23S [Trustee's Ex. No. 42];

(m) Jerry Wayne and Dorothy Eillen Pace and Andrew and Stephanie Pace, unit 25W [Trustee's Ex. No. 43]; and

(n) Glenn Nichols, unit 26W [Trustee's Ex. No. 44].

The letters made certain demands upon the Purchasers. First, the Purchasers must sign appropriate documentation authorizing the applicable title company to deliver the funds that it was holding to the Debtor. Second, the Purchasers shall pay the amount of liquidated damages as calculated pursuant to each of the Contracts. Finally, the Debtor stated that it would file a lawsuit if the Purchasers failed to take the action required of them in the letters.

65. The Trustee testified that none of the Purchasers took any of the actions demanded of them by the Debtor in the April 17, 2008 letters. [March 24, 2010 Tr. 180:3–6]. The following purchasers confirmed the Trustee's assertion: (a) Kevin Mitchell [March 26, 2010 Tr. 115:11–19]; and (b) Andrew Pace [March 26, 2010 Tr. 129:25—130:10].

66. Some of the Purchasers responded to the Debtor's correspondence to state that they were in the process of obtaining financing from their respective lenders: Dan Waldenmaier, unit 15E [Trustee's Ex. No. 47]; James Butcher, unit 14E [Trustee's Ex. No. 48]; and Edward A.

34

Schroeppel, unit 14E [Trustee's Ex. No. 49].

67. On July 14, 2008, the following Purchasers sent letters to the Debtor as assurance that they fully intended to close on their respective units and were simply awaiting final approval of the loans and title company clearance: (a) Jim Butcher, units 6W and 21S; (b) Horace Colbert, unit 11W; (c) Kevin Mitchell, unit 14W;[48] (d) Edward A. Schroeppel, unit 14E; (e) Dan Waldenmier, unit 15E; (f) Danny Tajolosa, unit 15W; (g) Fred Sheppard, unit 18S; (h) Carter Hartwig, unit 19W; (i) Glenn Nichols, units 19W and 26W; (j) Jerry Pace, unit 20S; (k) Vivian Abodo, unit 23S; and (l) Wayne Pace, unit 25W. [Trustee's Exhibit No. 45].

68. On August 6, 2008, the City of Pasadena issued a final Certificate of Occupancy for all floor levels of the Property. [Trustee's Ex. No. 17].

69. Any mechanics' liens placed on the units arose in the spring or summer of 2008. According to Marzano's testimony, the first mechanics' liens began to appear around March or April of 2008. [March 23, 2010 Tr. 61:12–19]. The Trustee testified that Marzano's recollection was incorrect; he believes the first mechanics' liens were filed on the Property in the summer of 2008. [March 25, 2010 Tr. 71:21—72:5]. Irregardless, there were no mechanics' liens on the Property at the initial closing dates set by the Debtor in accordance with the Contracts.

70. In September of 2008, Hurricane Ike caused severe damage across the Gulf Coast Region, including significant damage to the Property. Marzano testified that there was extensive flooding and "at least two-thirds of the building was damaged." [March 23, 2010 Tr. 28:11–22]. The damage caused by Hurricane Ike, however, occurred several months after the Debtor had

---

[48] The Court notes that while the July 14, 2008 letter references unit 14W, Mr. Mitchell is named as a Purchaser on the Contract for unit 15W. [Trustee's Ex. No. 7]. Thus, the discrepancy appears to reflect a typographical error.

terminated the Contracts.  Accordingly, at the time the Purchasers were obligated to close on the Contracts, Hurricane Ike had not yet caused damage to the Property that might render any of the units either uninhabitable or incomplete.  The Trustee testified that there were no title defects or liens that would have kept the Debtor from closing on the units between January 2008 and April 2008. [March 24, 2010 Tr. 191:6–13].  Indeed, there were 29 closings held on units in the Property during January, February, March, April, May and September of 2008.[49] [March 24, 2010 Tr. 192:12—193:3].

71. Prior to the filing of the pending adversary proceeding, which occurred on July 13, 2009, none of the Purchasers had ever communicated to the Debtor, orally or in writing, that the reason they did not close on the Contracts was due to them not being complete.

72. Certain Purchasers testified that they never looked at the condominium unit that was the subject of their respective Contracts: Amina Abdulla [March 25, 2010 Tr. 183:17–22]; Gregory Boyle [March 25, 2010 Tr. 17:8–13]; Edward Schroeppel [March 26, 2010 Tr. 135:5–12]; Daniel Waldenmaier [March 26, 2010 Tr. 147:1–4]; Fred Shepherd [March 30, 2010 Tr. 9:23–25].

73. The Trustee asserted that the Purchasers did not intend to actually purchase the condominium units. [March 25, 2010 Tr. 13:23—14:1].  The Court finds that he is correct.  Indeed, the testimony of the following Purchasers validated the Trustee's assertion:

(a) Amina Abdulla testified that she never attempted to secure a loan to purchase her condominium unit. [March 25, 2010 Tr. 184:18–25].

(b) James Butcher confirmed that he did not obtain financing to close on his unit, and he disclosed that he did not independently seek financing from anyone other than those individuals or companies recommended by Nichols. [March 25, 2010 Tr. 205:19—206:8].

---

[49] These 29 closings were for the sale of units to buyers other than those in the Nichols Group.

(c) Gregory Boyle stated that at the time he entered into a purchase agreement with the Debtor, his objective was not to close on the unit but rather to sell the Contract for profit. [March 26, 2010 Tr. 19:8–15].

(d) Jerry Pace testified that his intent was not to purchase his respective units but rather to pay earnest money on a deeply discounted purchase price and then resell the Contract prior to closing at market value. [March 26, 2010 Tr. 57:15–21].  He further admitted that he was not financially capable of  purchasing the units. [March 26, 2010 Tr. 66:16–18].

(e) Carter Hartwig admitted that he did not obtain financing to close on his unit. [March 26, 2010 Tr.  97:7–11].

(f) Edward Schroeppel acknowledged that he entered into his purchase agreement simply as an investment [March 26, 2010 Tr. 140:1–3], and he confirmed that he did not have financing in place at the time his Contract was terminated by the Debtor. [March 26, 2010 Tr. 138:25—139:10].

ii) Execution of the Releases

74. On January 25, 2009, Nichols sent an email to members of the Nichols Group stating that Marzano, one of the principals of the Debtor, needed their help obtaining refinancing for the Debtor. [Trustee's Ex. No. 58].  Nichols encouraged them to obtain a pre-approval letter from a lending mortgagor, but he characterized the document as a "worthless piece of paper" that basically says "if the buyer told me the truth or close to it, then he qualifies."  He incited participation by noting, "[w]e are glad to help because he has our earnest money."  Nichols further distinguished this action from moving forward with the purchase of the condominium units by emphasizing that "[i]t doesn't mean that we are closing.  That is another ball game." [Trustee's Ex. No. 58].

75. On February 7, 2009, Nichols sent another correspondence to members of the Nichols Group requesting them to assist Marzano in obtaining refinancing for the Debtor. [Trustee's Ex. No. 59].  Nichols represented that upon completion of the loan applications, Marzano would be "a lot more likely to 'WORK WITH US.'. . . I am only trying to show Carlo [Marzano] that we all

37

tried so when I approach him to help us stay together and/or Earnest [sic] money being preserved, then I will meet with 'positive' and 'not negative'. [sic]" [Trustee's Ex. No. 59].

Nichols then suggested that obtaining return of the Deposits with Marzano's assistance was the most favorable result they could anticipate under the circumstances:

> If we settle for earnest money +1 or 2% interest over the last couple years, then as has been noted—that is a lot better than a 20%–25% loss that has happened to all of us in the marketplace the last 6 months. . . When we did not close on our units per contract last year then our earnest money was 'spent'. In a court of law they would have a good case against each of us. They have already tried on several occasions to move forward legally, as you are aware. I have fought them on every front in order to prevent this, and am continuing to do so. I really think that we are in a good situation. We just need to play smart—No time to get stupid!! Carlo needs us now. We will need him tomorrow. [Trustee's Ex. No. 59].

76. Marzano testified that in "mid to late January of '09, I agreed to release the escrow money [to the Nichols Group]. I was not able to—could see that I was not able to successfully get refinancing. The building had too many construction issues that were very hard to fully identify and there at that point was about four million dollars in mechanics' liens and at that point, I asked First American Title on what I needed to do in order to execute these releases and it was a process that went on for approximately three months and by the time that these releases were finally signed, the—I had to inform First American of the bankruptcy and that froze everything." [March 23, 2010 Tr. 45:25—46:11]. Marzano further admitted that he had "an agreement with Mr. Nichols for him to submit, with his group, applications to support [his] refinance." [March 23, 2010 Tr. 79:2–5].

77. On April 23, 2009, Parsley and Marzano, officers of NSky Living, Inc. (the general partner of the Debtor), signed a certificate of corporate resolution which "resolved, that Mr. Carlo Marzano is an authorized Agent of this Corporation with authority to release escrow funds

38

associated with contracts on the Endeavour Highrise, L.P. [the Debtor] [and] [t]hat as Vice President of NSky Living, Inc.[,] Mr. Marzano has the requisite corporate authority to sign release forms, on behalf of the Corporation, associated with release of escrow funds." [Purchasers' Ex. No. 1]. Marzano admitted to this Court, however, that the resolution did not authorize him to: (a) release non-refundable deposits; (b) terminate the Contracts; or (c) breach his fiduciary duty to the creditors. [March 23, 2010 Tr. 53:1–9].

78.  Subsequently, in undated documents, Marzano and certain Purchasers signed releases directing the title companies holding the Deposits to release the funds directly to Endeavour GP, LLC, the initial Plaintiff in the underlying adversary proceeding (the Releases). [Purchasers' Ex. Nos. 2–17]. The Releases did not require the Debtor or the Purchasers to perform any action in order to take effect and simply provided that the Contracts were "null and void" and "of no further force or effect." Both the Debtor and the Purchasers agreed to "hold harmless First American Title Insurance Company and William V. Condrey, P.C. from any claims whatsoever in connection with said contract and disbursements." [Purchasers' Ex. Nos. 2–17].

79.  Marzano testified that the Debtor benefitted from signing the Releases because it "did not have to finish and perform on the contract." [March 23, 2010 Tr. 87:8–11].

80.  The Trustee testified to the contrary, stating that the Debtor did not gain anything for its execution of the Releases. Rather, according to the Trustee, the Debtor relinquished the Deposits it was entitled to pursuant to the Contracts' terms, as well as its right to seek damages from the Purchasers based on their breaches of the Contracts. [March 25, 2010 Tr. 17:21—18:5]. The Court finds that the Trustee is correct.

81.  Marzano is a sophisticated real estate developer who, in addition to being an officer of the

corporate general partner of the Debtor, was also one of the two principals of the Debtor. [March 23, 2010 Tr. 21:18—22:21]. Marzano testified to this Court both that he had a fiduciary duty to the creditors of the Debtor's Chapter 11 estate and that returning the Deposits to the Purchasers would not benefit these creditors. [March 23, 2010 Tr. 51:17–22].

82. In their responses to the Trustee's requests for admissions, certain Purchasers admitted both that they "failed to close on their earnest money contract with the Debtor" and that they "did not provide any consideration to the Debtor in exchange for the Release of Earnest Money." [*E.g.*, Trustee's Ex. Nos. 61–63 & 67, ¶¶ 17 & 19]. Other Purchasers testified before this Court that they did not pay anything to the Debtor in exchange for the Releases: (a) James Butcher [March 25, 2010 Tr. 206:13–17]; (b) Vivian Abobo [March 26, 2010 Tr. 38:14—41:14]; (c) Edward Schroeppel [March 26, 2010 Tr. 140:21–24]; (d) Daniel Waldenmaier [March 26, 2010 Tr. 151:21–23]; and (e) Glenn Nichols [March 26, 2010 Tr. 160:25—161:3].

83. Various Interested Parties articulated for the Court the following reasons why they desire return of the Deposits:

(a) "Well, it's my money and at this time retiring, old, I need my money back. . . . [N]ow that I'm a widow, I need it." Amina Abdulla, [March 25, 2010 Tr. 174:22—175:5].

(b) "Because it's my money." James Butcher, [March 25, 2010 Tr. 192:16].

(c) "It's my money." Gregory Boyle, [March 26, 2010 Tr. 15:18–23].

(d) "It's my money. I work for it. . . . And I have to use it for my kids teaching. That's why I went in—you know, looked at that." Vivian Abobo, [March 26, 2010 Tr. 28:11–17].

(e) "[I]t's my money and I'd like to have it back." Jerry Pace, [March 26, 2010 Tr. 58:25—59:3].

(f) "I couldn't occupy the building so I just want my money back." Horace Colbert,

[March 26, 2010 Tr. 74:14–15].

(g) "I don't have an agreement that says I—that I shouldn't get it back and they haven't delivered anything to me." Kevin Mitchell, [March 26, 2010 Tr. 108:20–23].

(h) "I believe it's my money."   Daniel Waldenmaier, [March 26, 2010 Tr. 145:16–20].

(i) "It's my money and I want it back." Demostenes Tajolosa, [March 26, 2010 Tr. 157:16–20].

(j) "I don't have anything for it." Fred Shepherd, [March 30, 2010 Tr. 7:10–14].

## IV. CREDIBILITY OF THE WITNESSES

At the trial held on March 23-26 and 30, 2010, this Court heard testimony from David Jones, Bernard Rojano, Carlo Marzano, Roy Hockenberry, and the following Interested Parties: Amina Abdulla, James Butcher, Gregory Boyle, Vivian Abobo, Wayne Pace, Jerry Pace, Horace Colbert, Carter Hartwig, Kevin Mitchell, Andrew Pace, Edward Schroeppel, Daniel Waldenmaier, Demostenes Tajolosa, Howard Glenn Nichols, and Fred Shepherd.  The Court's assessment of the credibility of each witness is set forth below.

### A.  David Jones, the Chapter 11 Trustee

David Jones was appointed the Chapter 11 Trustee of the Debtor's estate by this Court in June of 2009. [Finding of Fact No. 3].  He testified at length regarding the negotiation and execution of the Contracts, as well as subsequent events relating to the agreements and the Property in general. His knowledge regarding these subjects is derived from extensive review of the Debtor's books and records, investigation of pre-petition transactions, discussions with key players, and on-going management of the Debtor's estate. [Findings of Fact Nos. 4–6].  Mr. Jones' testimony was substantiated by ample documentary evidence and remained void of inconsistencies.  As such, the Court finds Mr. Jones to be a very credible witness and gives substantial weight to the testimony he

41

gave before this Court.

## B.  Bernard Rojano, the Chief Operating Officer of Endeavour Holdings

Bernard Rojano is the chief operating officer of Endeavour Holdings, the entity which oversees the operations of the Debtor.  [Finding of Fact No. 43].  He testified regarding the Purchasers' Contracts, the Debtor's attempts to close on the units, and Nichols' intentions to secure buyers prior to the Purchasers' closing dates. [Finding of Fact Nos. 43 & 56].  His knowledge regarding these subjects is derived from his direct involvement as a supervisor of the Debtor's project and personal conferences with Nichols, the Purchasers' representative.  Although relatively brief, his testimony was instructive on the issues presented in this adversary proceeding.  Accordingly, the Court finds Rojano to be a very credible witness and gives substantial weight to the testimony that he gave at trial.

## C.  Carlo Marzano, One of the Principals of the Debtor

Carlo Marzano, one of the principals of the Debtor and an officer of the corporate general partner of the Debtor [Finding of Fact No. 81], testified regarding his involvement with the Debtor, the Property, the Purchasers' Contracts, and the Releases.  He admitted to negotiating an agreement with Nichols that the Purchasers would submit applications to support his efforts to refinance. [Finding of Fact No. 76].  Thereafter, Marzano executed the Releases for the benefit of the Purchasers. [Finding of Fact No. 78].  Marzano admitted both that the creditors of the Debtor's estate did not benefit from the execution of the Releases and that he had a fiduciary duty to act in the best interest of these creditors. [Finding of Fact No. 81].  Moreover, not only did Marzano admit violating his fiduciary duty, he also displayed a general lack of concern for or knowledge about the Debtor's operations.  For example, he claimed that he took charge of the condominium project to remedy

financial and construction defects, but he testified that he was unsure whether any Certificates of Substantial Completion were issued on the Property. [March 23, 2010 Tr. 55:2–14; 58:17—59:17]. Additionally, Marzano testified that the Purchasers' units were not substantially complete and thus not ready for closing in January 2008, but he subsequently admitted that buyers other than those in the Nichols Group closed on multiple units between December 2007 and May 2008. [March 23, 2010 Tr. 59:25—62:16]. For all the reasons set forth above, the Court finds that Marzano's testimony was generally less than credible, and the Court gives little weight to his testimony.

## D. Roy Hockenberry, an Employee of the Debtor

Roy Hockenberry was in charge of marketing and management for the Debtor from April of 2005 to July of 2007, at which time he was removed from his position and began working as a salesperson. He testified before this Court regarding his involvement with the Purchasers' Contracts. His direct examination was very brief, and it consisted primarily of hearsay, vague and irrelevant comments, and otherwise inadmissible testimony. [March 26, 2010 Tr. 8:10—12:13]. To the extent that his testimony was admitted, Mr. Hockenberry appeared to have personal bias against the Debtor due to his demotion. The Court finds his testimony generally uninformative, irrelevant to the resolution of this adversary proceeding, and otherwise lacking credibility due to obvious bias. Thus, the Court gives no weight to Mr. Hockenberry's testimony as presented before this Court.

## E. The Interested Parties

### 1. Amina Abdulla

Amina Abdulla, a physician who works for UT Medical School as an assistant professor in psychiatry [Finding of Fact No. 42(a)], is the holder of the IRA account named as the Purchaser on the Contract for unit 23S [Finding of Fact No. 37]. She is also the widow of Suleman Abdulla, the

IRA Account Holder named as the Purchaser on the Contract for unit 5W. [Finding of Fact No. 37].

Ms. Abdulla testified briefly regarding the Contracts her husband and she entered into with the

Debtor, but her testimony proved uninstructive to the Court's analysis.  Although a seemingly

sophisticated party, Ms. Abdulla possessed little, if any, knowledge or understanding of the Contracts

at issue in this proceeding.  When her counsel inquired as to why her IRA number appeared on the

Contract for unit 23S, Ms. Abdulla responded "I got the, I guess, money from IRA. [sic] I don't

know." [March 25, 2010 Tr. 172:8–11].  Later, when asked whether she knew anything about the

Contract, she simply stated, "I don't remember." [March 25, 2010 Tr. 173:14–15].  Her alleged lack

of recollection extended well beyond the specific terms of the Contracts, as she also testified that she

could not recall whether she had seen any of the correspondence sent to her from the Debtor. [March

25, 2010 Tr. 179:13—181:2].  Ms. Abdulla could not even articulate for the Court why she signed

the Release, responding "I guess I don't know anything, but I guess—I don't know." [March 25,

2010 Tr. 174:3–5].  She also stated that she did not know how her husband met Nichols or whether

she was planning on selling the condominium. [March 25, 2010 Tr. 182:6–14].  She even admitted

that she had never looked at the Property that was the subject of these Contracts. [Finding of Fact

No. 72].  Under all of these circumstances, the Court finds Ms. Abdulla's testimony to be lacking

in substance and credibility and gives little weight to her testimony.

2. <u>James Butcher</u>

James Butcher, a retired Air Force sergeant and 30 year manager at Southwestern Bell Telephone

[Finding of Fact No. 42(b)], is a named Purchaser on the Contract for unit 14E [Finding of Fact No.

37] and the account holder of the IRA which was assigned the Contract for unit 6W [Finding of Fact

No. 55].  He testified regarding these Contracts and his involvement with the Property in general,

and appeared more knowledgeable about the nature of the transactions in question than the majority of the Purchasers who testified before this Court.  Mr. Butcher testified that he visited the Property on multiple occasions [March 25, 2010 Tr. 190:22–24] and that he designated Nichols to complete a walk-through of the Property on his behalf [March 25, 2010 Tr. 194:17–23]. He also acknowledged receipt of the Debtor's correspondence regarding closing and admitted that he did not initially respond, due to advice given by Nichols. [March 25, 2010 Tr. 203:7—205:3].  He further testified that he did not recall ever seeing a Certificate of Substantial Completion for the Property [March 25, 2010 Tr. 190:19–21], even though he sent the Debtor correspondence acknowledging that he received such a Certificate from the seller's architect. [Finding of Fact No. 48].  His only explanation for this inconsistency was that someone else told him to sign it. [March 25, 2010 Tr. 195:19—196:25].  While Mr. Butcher displayed a willingness to unquestioningly follow the advice and direction given by Nichols and other parties involved with the transactions in dispute, the Court finds his testimony to be credible based on his understanding of and involvement with the Contracts at issue in this suit.  Thus, the Court gives some weight to his testimony as presented before this Court.

### 3.  Gregory Boyle

Gregory Boyle has a bachelor of business administration degree and has worked in insurance, finance, sales and marketing.  He has also been a worship minister for the past ten years. [Finding of Fact No. 42(c)].  In spite of his current occupation and the fact that his residence is valued at $163,000.00, Mr. Boyle testified under oath that he could afford to purchase a $930,000.00 condo as a second home "with difficulty." [March 26, 2010 Tr. 18:7–20].  Tellingly, he admitted he had never even looked at the unit [Finding of Fact No. 72] and that his primary objective when he

entered into the transaction was to sell the Contract for profit, although he maintained that he intended to purchase the unit, if necessary. [March 26, 2010 Tr. 18:22—19:15]. Based on the foregoing and other inconsistencies during his testimony, the Court finds Mr. Boyle to lack credibility and gives no weight to his testimony.

4. Vivian Abobo

Vivian Abobo has a doctor of pharmacy and a master of business administration degree, and she is currently the director of pharmacy at the University of Texas, Harris County Psychiatric Center. [Finding of Fact No. 42(d)]. Ms. Abobo is the holder of an IRA account which is a named Purchaser on the Contract for unit 14W. [Finding of Fact No. 37]. Despite Ms. Abobo's advanced education and accelerated position, her testimony regarding this Contract was extremely evasive and somewhat unbelievable. For example, when questioned regarding what the term "nonrefundable" meant to her as stated in her Contract, Ms. Abobo refused to provide a direct response for the Court. In response to a related hypothetical question, she stated that a deposit which a seller explicitly referenced as "nonrefundable" could be returned to a buyer in certain situations. [March 26, 2010 Tr. 29:11—32:12]. Ms. Abobo also testified that she did not remember trying to obtain financing for the purchase of her unit. [March 26, 2010 Tr. 34:1–7]. She also did not recall receiving correspondence from the Debtor relating to the transaction because she claimed that she received too much mail to be bothered with actually reviewing any of the documents. [March 26, 2010 Tr. 34:8—36:3]. Ms. Abobo could not recall whether she had spoken with certain individuals for an equally outlandish reason: "I talk to so many people. I'm serious." [March 26, 2010 36:4–10]. She even testified that she did not remember signing correspondence she mailed to the Debtor relating to closing on her unit. [March 26, 2010 Tr. 36:15—37:2]. Given her testimony, the Court finds that

46

Ms. Abobo is not a credible witness and gives no weight to her testimony.

5. <u>Wayne Pace</u>[50]

Wayne Pace, who has worked as an electrical engineer for 13 years [Finding of Fact No. 42(e)], testified regarding his involvement with the Contracts at issue in this suit.  He appeared to have little, if any, knowledge about the transactions involved.  He testified on direct that he signed a Release relating to the purchase of his respective units [March 26, 2010 Tr. 43:19–21; 47:14–19], but subsequently admitted on cross that his father signed both of the Releases and confirmed that neither document contained language indicating that his father was signing on his behalf. [March 26, 2010 Tr. 49:20—50:7].  Wayne Pace also testified that he did not assign the Contract on unit 20S, as such an assignment was prohibited under the terms of the agreement. He was later forced to concede, upon being confronted with an executed assignment, that he did attempt to assign the Contract to his father. [March 26, 2010 50:23—54:10].  While he did not appear to purposefully falsify testimony, the Court finds, for the reasons set forth above, that Wayne Pace was not an entirely credible witness and gives no weight to his testimony.

6. <u>Jerry Pace</u>

Jerry Pace has worked in quality control, as an engineer, and as a manager; and he has three years of military experience in the U.S. Army Ordnance. [Finding of Fact No. 42(g)].  In his responses to the Debtor's interrogatories, he stated that the Debtor was not entitled to the Deposits because there was "No contract!", but then admitted to the Court that he signed a purchase agreement with the Debtor. [March 26, 2010 Tr. 64:3—66:1].  Indeed, he testified regarding the Contracts that his sons

---

[50] Several members of the Pace family are involved in the pending adversary proceeding and testified before this Court.  They are related to each other as follows: Wayne and Andrew Pace are the sons of Jerry and Dorothy Pace. Wayne is married to Rebecca Pace, and Andrew is married to Stephanie Pace. [March 26, 2010 Tr. 42:23—43:4].

and he entered into with the Debtor. He disclosed to the Court that he was not financially capable of closing on the units and, thus, was attempting to sell the Contracts for a profit prior to the closing date. [Finding of Fact No. 73]. Although at times slightly inconsistent, his testimony seemed truthful. Inconsistencies appeared to arise only to the extent that he did not fully understand the transactions at issue. Therefore, the Court finds Jerry Pace to be reasonably credible and gives some weight to his testimony.

7. Horace Colbert

Horace Colbert has an associate's degree and works in the engineering field. [Finding of Fact No. 42(g)]. He testified before the Court regarding his Contract to purchase unit 11W. He stated that he was unsure whether he was ever fully approved for his loan because "I never had to produce the loan that I had." [March 26, 2010 Tr. 76:9—77:16]. He further asserted that "I could have closed at any time I wanted to." [March 26, 2010 Tr. 77:18—20]. Despite his representations to the Court that he was willing and able to close, Mr. Colbert confirmed that he did not respond to the Debtor's correspondence designating a closing date. [Findings of Fact Nos. 52, 58, 60 & 62]. He stated that he failed to respond because "I think they was [sic] having some problems with the building." [March 26, 2010 Tr. 78:17—20]. Yet, he confirmed that he had signed a Wavier of Inspection acknowledging that his unit was complete and that he had received the architect's Certificate of Substantial Completion. [Finding of Fact No. 48; March 26, 2010 Tr. 81:15—83:22]. Further, Mr. Colbert agreed that his current home is valued at $200,000.00 and that he had previously filed for bankruptcy[51] [March 26, 2010 Tr. 83:23—86:20], thus indicating that he would not be able to

_____

[51] Specifically, Mr. Colbert testified that although he did file for bankruptcy, he withdrew his petition prior to obtaining a discharge. [March 26, 2010 Tr. 86:4—20].

purchase a condominium for over $500,000.00.  Overall, the Court finds that Mr. Colbert was not particularly credible and gives little weight to his testimony.

8.  Carter Hartwig

Carter Hartwig, a former Houston Oilers player who now operates his own glass business [Finding of Fact No. 42(h)],  testified regarding his Contracts to purchase units from the Debtor. After the Debtor issued its second and final notice of default, Mr. Hartwig responded with assurance that he fully intended to close on his units. [Finding of Fact No. 67].  However, he admitted that he never obtained financing to purchase these units [Finding of Fact No. 73(e)] and that he failed to respond to the Debtor's correspondence relating to closing [Finding of Fact No. 51].  His testimony was otherwise vague and uninstructive.  As a result, the Court finds that Mr. Hartwig was not an entirely credible witness and gives little weight to his testimony.

9.  Kevin Mitchell

Kevin Mitchell has a bachelor's degree in accounting, a master of business administration, and is currently employed as a certified public accountant. [Finding of Fact No. 42(i)].  He testified regarding his involvement with the Debtor relating to the purchase of unit 15W of the Property, and he asserted his position that he had no Contract with the Debtor regarding this unit. [March 26, 2010 Tr. 110: 1–8].  Mr. Mitchell paid at least $40,000.00 of the Deposit for the purchase of unit 15W [Finding of Fact No. 41], was named as a Purchaser on the Contract [Finding of Fact No. 37], and sent the Debtor a signed letter indicating that he would close on the transaction. [Finding of Fact No. 67].  The Court notes, however, that he did not sign the Contract. [Finding of Fact No. 41].  Thus, Mr. Mitchell has a good faith basis underlying his argument.  The Court finds Mr. Mitchell to be a fairly credible witness with respect to the assertions presented and gives some weight to his

testimony.

10.  Andrew Pace

Andrew Pace, an elementary school teacher who has a bachelor of science degree in art [Finding of Fact No. 42(j)], testified regarding his Contract with the Debtor to purchase unit 25W. He acknowledged that the Contract expressly prohibited any assignment of a Purchaser's rights under the agreement to a third party. [March 26, 2010 Tr. 127:1–25]. He represented to the Court that he did not attempt any such action [March 26, 2010 Tr. 124:8—125:11], but later hedged and conveyed uncertainty when confronted with an executed assignment. [March 26, 2010 Tr. 126:25]. While this portion of his testimony appeared evasive, he made a concerted effort to forthrightly respond to other questions posed by opposing counsel. Specifically, he openly admitted that he made no attempts to terminate his Contract due to an alleged inability to obtain financing [March 26, 2010 Tr. 130:11–13], and he acknowledged that he never responded to the Debtor's correspondence relating to closing on the unit [Findings of Fact Nos. 60, 62 & 65; March 26, 2010 Tr. 130:17–23]. Accordingly, the Court finds Andrew Pace to be a credible witness on most of the issues about which he testified, and the Court gives some weight to his testimony.

11.  Edward Schroeppel

Edward Schroeppel has a bachelor's, master's, and Ph.D. in electrical engineering, as well as a master of business administration degree. He spent six years in the computer field, twenty years inventing and developing medical devices for cardiovascular purposes, and thirteen years inventing and developing medical devices for the detection and treatment of cancer. He is currently the founder and chief scientific officer of a medical device company. [Finding of Fact No. 42(k)]. The Court finds the extremely high intelligence displayed by Mr. Schroeppel during the course of his

testimony to be commensurate with his esteemed educational background and vocational experience. In addition to his apparent sophistication and professional demeanor, the Court finds that Mr. Schroeppel conveyed a genuine sense of honesty throughout both his direct and cross examinations. He openly admitted that: (1) he did not visit or inspect the unit that was the subject of his Contract [Finding of Fact No. 72]; (2) he viewed this transaction merely as an investment [Finding of Fact No. 73]; (3) he failed to respond to any correspondence from the Debtor regarding closing [Findings of Fact Nos. 51, 58, 60 & 62]; and (4) he paid nothing to the Debtor when he signed the Release [Finding of Fact No. 82]. Overall, the Court finds Mr. Schroeppel to be a very credible witness and gives substantial weight to his testimony.

12. Daniel Waldenmaier

Daniel Waldenmaier served six years in the United States Army and completed a four-year apprentice program to become a machinist. He has since worked as a manager and superintendent for various metal and heat treating companies, machining operations, construction companies, refineries, and chemical plants. [Finding of Fact No. 42(l)]. He testified that his home is valued at approximately $176,760.00. [March 26, 2010 Tr. 147:17–21]. Nevertheless, he represented to this Court that he intended to close on the purchase of a $975,000.00 unit in the Property. [Finding of Fact No. 67]. Not only does the Court find this assertion unbelievable given his current economic situation, but Mr. Waldenmaier testified himself to actions that seemingly contradicted his declared intention. Specifically, he did not respond to the Debtor's correspondence relating to closing and failed to appear on the designated closing dates. [Findings of Fact Nos. 51 & 58]. He never even visited the unit that he purportedly sought to purchase [Finding of Fact No. 72], and he did not obtain financing to close on his unit. [March 26, 2010 Tr. 150:15–17]. Mr. Waldenmaier was also

51

somewhat evasive in his responses on cross examination. [*E.g.* March 26, 2010 Tr. 150:15—151:16]. Based on the foregoing, the Court finds Mr. Waldenmaier's testimony to lack credibility and gives little weight to his testimony.

### 13.  Demostenes Tajolosa

Demostenes Tajolosa is an engineer who has worked as an instrumentation and control systems designer for various companies over the past 30 years. [March 26, 2010 Tr. 155:8–18].  He testified very briefly regarding his involvement with the Debtor and the purchase of unit 15E.  While he is not named as a Purchaser on the Contract [Finding of Fact No. 37], he testified that he put down $50,000.00 toward the Deposit on this unit. [March 26, 2010 Tr. 157:12–13].  The remainder of the testimony Mr. Tajolosa presented on direct consisted almost entirely of inadmissible, irrelevant evidence. [March 26, 2010 Tr. 155:21—156:11; 157:1–10].  Further, his recollection of the few events about which he testified was, at best, unclear.  For example, he testified that he last viewed the Property during the open house in either 1987 or 1988, when the event was actually held in 2007. [March 26, 2010 Tr. 156:13–25].  As a result, the Court finds Mr. Tajolosa's testimony to be lacking in credibility and wholly uninstructive to the issues presented in this suit.  The Court gives very little weight to his testimony.

### 14.  Howard Glenn Nichols (aka Glenn Nichols)

Glenn Nichols, a real estate broker from Remax Realtors, conducted a seminar in Sugar Land, Texas [Finding of Fact No. 31] and enticed the majority of the Purchasers to form a limited partnership for "the purchase of units in the Endeavour Condominiums." [Finding of Fact No. 36]. He is also named as the Purchaser on the Contract for two units in the Property, one individually and the other as trustee for Behrouz Abassi. [Finding of Fact No. 37].  Nichols' testimony before this

Court was extremely brief, and consisted of little more than a meager attempt to affiliate himself with newsworthy individuals. In response to a simple question regarding his educational background, Nichols declared "well, I went to high school. And actually, I graduated at Ouachita Baptist College at Arkadelphia, Arkansas 15 years before Mike Huckabee did, and that was my [sic] extent of my education as far as college." [March 26, 2010 Tr. 159:10–14]. While this needless dissertation alone provides a snapshot of Nichols' general demeanor, the Court also looks to written exhibits in making its credibility findings, as these documents shed light on his true character and the extent of his involvement in these transactions.

Nichols' "How to Make $, How to Keep $" workshop presented an opportunity to make money buying options in real estate. [Finding of Fact No. 31]. He led the attendees to believe that they could use letters of credit, cash, or self-directed IRAs to put down a small deposit toward the purchase of a condominium unit, then sell that contract prior to closing without ever qualifying for financing. [Findings of Fact Nos. 31– 33]. Nichols unrealistically projected that a $500,000.00 condominium could be quickly re-sold for $600,000.00, a 20% growth of $100,000.00 that translates into a 200% return on an investor's $50,000.00 deposit; and he predicted an accelerated rate of return for pre-tax IRA investments based on "the principal of compound interest in reverse." [Finding of Fact No. 34]. He attempted to rationalize his prediction by boldly asserting that "the reason we could do the unreasonable is because we are investing in options on real estate and not real estate itself. It's not the option amount that's gaining value, it's the condo that we didn't have to buy." [Finding of Fact No. 34]. Nichols ultimately concluded "that buying real estate options is an investment vehicle for the small investor [or the] huge investor, [and] that self-directed IRAs are the only things like it in the world. Combined together you can realize all your economic dreams and become

famous." [Finding of Fact No. 34].

Based on these absurd, inflated representations, many of the Interested Parties blindly followed Nichols into a limited partnership agreement [Findings of Fact Nos. 35 & 36] and subsequently executed Contracts to purchase units in the Property [Findings of Fact No. 37].  Once Rojano, the chief operating officer of the entity that oversaw the Debtor's operations, realized that the Purchasers did not intend to close on their units, he appointed a contract administrator, requested additional information about financing, and provided further communication regarding closing dates in order to ensure that the Purchasers "would be prepared to close along with the rest of the contracts." [Finding of Fact No. 43].  Subsequently, Nichols attempted to play both sides of the field by telling the Debtor's representatives that the Purchasers intended to close [Finding of Fact No. 56] while simultaneously instructing the Purchasers not to respond to the Debtor's correspondence designating dates for closing [Finding of Fact No. 62].  However, much to Nichols' dismay, the Purchasers did not secure buyers for their Contracts prior to closing.

After the Debtor declared the Purchasers to be in default under their respective Contracts, Nichols attempted to negotiate a deal with Marzano, one of the principals of the Debtor, by executing the Releases.  He promised Marzano that the Nichols Group would obtain pre-approval letters from a lending mortgagor, but he told the Purchasers that the pre-approval was a "worthless piece of paper" and that moving forward with financing "doesn't mean that we are closing.  That is another ball game." [Finding of Fact No. 74].  He represented that upon completion of the loan application, Marzano would be "a lot more likely to 'WORK WITH US.' . . . I am only trying to show Carlo [*i.e.* Marzano] that we all tried so when I approach him to help us stay together and/or Earnest [sic] money being preserved, then I will meet [sic] with 'positive' and not negative'. [sic]" [Finding of

54

Fact No. 75].

He continually portrayed himself as the tireless advocate for the Purchasers' cause. He admitted that "when we did not close on our units per contract last year then our earnest money was 'spent'. In a court of law they would have a good case against each of us." [Finding of Fact No. 75]. However, he suggested they wait for his master plan to unfold. "They have already tried on several occasions to move forward  legally, as you are aware.  I have fought them on every front in order to prevent this, and am continuing to do so.  I really think that we are in a good situation.  We just need to play smart—No time to get stupid!!  Carlo needs us now.  We will need him tomorrow." [Finding of Fact No. 75].  Unfortunately for Nichols and his followers, however, Marzano did not have authority to sign the resulting Releases and, in attempting to do so, Marzano breached his fiduciary duty to the creditors of the Debtor's Chapter 11 estate. [Finding of Facts Nos. 77 & 81].

In sum, the Court finds that Nichols is the quintessential snake-oil salesman.  Based on his testimony before this Court and the documentary evidence regarding his egregious behavior relating to these transactions, the Court finds Nichols to be thoroughly lacking in credibility and gives no weight to his testimony.

### 15.  Fred Shepherd

Fred Shepherd, a retired trauma center and critical care respiratory therapist for the Harris County Hospital District [Finding of Fact No. 42(m)], testified regarding his Contract with the Debtor to purchase unit 18S.  He candidly admitted that he did not inspect the unit [Finding of Fact No. 72], and that he did not seek to terminate his Contract due to any financing issues. [March 30, 2010 Tr. 15:9–11].  His testimony also indicated that he simply signed the purchase documents at Nichols' instruction, without reviewing or attempting to understand the nature of the transaction.  He also

testified that he did not remember whether he had responded to any of the Debtor's correspondence regarding closing and subsequent default. [March 30, 2010 Tr. 10:6—15:8]. "I can't remember these letters. We got so many. I mean, we just have stacks and stacks and stacks of these." [March 30, 2010 Tr. 15:6–8]. Although forthright on certain issues, the Court finds that, on the whole, Mr. Shepherd's testimony is lacking in substance and credibility. The Court gives marginal weight to his testimony.

## V. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (G), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").[52] Venue is proper pursuant to 28 U.S.C. § 1409.

### 1. Subject matter jurisdiction

The IRA Account Holders assert in their answer that this Court "has no jurisdiction over the

---

[52] Indeed, the Purchasers all admitted in their answers that this dispute is a core proceeding pursuant to 28 U.S.C. § 157. [Findings of Fact Nos. 27, 28 & 30].

56

[ ] IRA accounts [sic], as such accounts are exempt personal property under Tex. Prop. Code § 42.0021." [Finding of Fact No. 30].  For the reasons described below, the Court concludes that this argument is incorrect, and, further, finds that it has the requisite subject matter jurisdiction to decide the entire dispute between the Trustee and the IRA Parties.

    i.   *The IRAs'[53] alleged status as exempt property under the Texas Property Code has no effect on this Court's subject matter jurisdiction.*

Subject matter jurisdiction properly refers to a court's statutory or constitutional authority to adjudicate a dispute, whereas personal jurisdiction properly refers to a court's constitutional or statutory authority over the persons "implicating that authority." *Reed Elsevier, Inc. v. Muchnick*, 130 S.Ct. 1237, 1243 (2010).  Here, the *subject matter* of the dispute is the declaratory judgment, the breach of contract action, and the relief sought; the Court has subject matter jurisdiction if it has power to adjudicate these causes of action and award such relief.  The IRA Parties are persons implicating the authority of the court to hear these disputes, and thus implicate this Court's personal jurisdiction rather than its subject matter jurisdiction.

    ii.   *The Court has subject matter jurisdiction over the declaratory judgment action, and may enter a final judgment on the declaratory judgment in this proceeding.*

**a.   The declaratory judgment action is a core proceeding under 28 U.S.C. § 157.**

The declaratory judgment action, in which the Trustee has asked this Court to declare the Debtor's bankruptcy estate as the rightful owner of the Deposits, is a core proceeding under 28

---

[53] When the Court references the IRAs, rather than the IRA Parties, it is discussing the IRA accounts themselves, without any reference to Entrust Retirement Services, Inc. acting in its fiduciary capacity for the benefit of the IRA accounts.  The IRA Parties, as defined in Finding of Fact No. 25, include Entrust Retirement Services, Inc., acting for the benefit of the designated IRA accounts, as well as the individual accounts themselves.

U.S.C. § 157(b)(2)(A), (B), (E), (G), (O), and the general "catch-all" language of (b)(2).[54]

### (1) Core proceeding under Section 157(b)(2)(A)

Section 157(b)(2)(A) provides that proceedings concerning the administration of the estate are core proceedings. The action by the Trustee, seeking a declaratory judgment that title to the Deposits resides with the bankruptcy estate, constitutes a proceeding concerning the administration of the estate. Identifying, quieting title to, and obtaining possession of property of the estate is a critical part of administering the estate, which typically occurs before the Trustee can begin the process of paying valid claims, and in a Chapter 11 case, generally is completed before the process of plan confirmation begins. As a result, this dispute is a core proceeding because it concerns the administration of the Debtor's estate.

### (2) Core proceeding under Section 157(b)(2)(B)

Section 157(b)(2)(B) provides that proceedings concerning the allowance or disallowance of claims against the estate are core proceedings. Thus, a bankruptcy court will have core jurisdiction over a claim for title to property of the estate. *See Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990).

In *Brown v. Chesnut*, the Fifth Circuit introduced the concept of "arguable property" of the estate. 422 F.3d 298, 300 (5th Cir. 2005). "Arguable property" of the estate is property in "which the debtor has only an arguable claim of right." *Id.* When property is determined to be "arguable property" of the estate, it should be presumed to be property of the estate. *In re Endeavour*, 425 B.R. 402, 414 (Bankr. S.D. Tex. 2010); *In re Global Outreach, S.A.*, No. 09-15985, 2009 Bankr. LEXIS 1602, at * 21 (Bankr. D.N.J. June 8, 2009) ("[T]he Fifth Circuit determined that 'arguable property'

---

[54] In the following portion of this Opinion addressing subject matter jurisdiction, all references to Section 157 refer to 28 U.S.C. § 157, which addresses bankruptcy courts' jurisdiction over core and non-core proceedings.

should be presumed to be property of the estate.") (citing *Chesnut*, 422 F.3d at 303); *see also STFG, Inc. v. Int'l Bank of Commerce (In re S.T.F.G., Inc.)*, Adv. No. 07-5005, 2008 Bankr. LEXIS 1491, at * 7 (Bankr. S.D. Tex. Apr. 14, 2008); *In re Levelnstein*, 371 B.R. 45, 48 (Bankr. S.D.N.Y. 2007).

The conclusion that "arguable property" of the estate is presumed to be property of the estate is not explicitly found in *Chesnut*. However, reconciling the holding of *Chesnut* with the language of the Code compels this conclusion. This Court concludes that Sections 362 & 541 of the Code allow no other interpretation. In *Chesnut*, the Fifth Circuit held that the automatic stay extends to "arguable property" of the estate and that the subject matter jurisdiction of the bankruptcy court extends to property that is subject to the automatic stay. *See Chesnut*, 422 F.3d at 303–04.

The automatic stay is statutorily created, and its scope is set out in Section 362, which "operates as a stay, applicable to all entities, of" a number of enumerated collection activities aimed at one of: (1) the debtor; (2) property of the debtor; or (3) property of the estate. The language of Section 362 demands that, for the automatic stay to apply to "arguable property," the "arguable property" must belong to one of these three categories; there is no catch-all provision. *See* 11 U.S.C. 362. Of these three categories, only collection activities directed towards property of the estate is relevant in either *Chesnut* or the dispute at bar. *See Chesnut*, 422 F.3d at 300. What property constitutes property of the bankruptcy estate is defined in Section 541 of the Code. The relevant portions provide that:

> (a) the commencement of a case under . . . this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>> (1) . . . all legal or equitable interest of the debtor in property as of the commencement of the case.
>> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—
>>> (A) under the sole, equal, or joint management and control of the debtor.

11 U.S.C. 541(a).

Both paragraph (1) and (2) simply designate interests in property as of the commencement of the case as property of the estate. However, no part of the Code answers "the threshold questions of whether a debtor has an interest in a particular item of property and, if so, what the nature of that interest is." *In re FCX, Inc.*, 853 F.2d 1149, 1154 (4th Cir. 1988). "[T]he existence and nature of a debtor's, and hence the estate's, interest in property must be determined by resort to nonbankruptcy law, either federal law, or . . . state law." *Id.* at 1153 (internal citations omitted) (examples of where federal law answers the threshold question of whether the debtor holds an interest in property include the Farm Credit Act of 1971, 12 U.S.C. § 2001, *et seq.*). Thus, viewed in conjunction, Sections 362 and 541 state, in relevant part, that the automatic stay extends to property of the estate, and that property of the estate is property in which the debtor held an interest at the time of the commencement of the bankruptcy case, as determined by nonbankruptcy law. The explicit requirement for the automatic stay to apply to property is an **interest** in the property.

But *Chesnut* does not impose the same requirement. Indeed, the key holding of *Chesnut* is that the question of whether the debtor held an interest in property at the time of the commencement of the case **does not need to be answered in order for the automatic stay to apply**. *Chesnut*, 422 F.3d at 300. In fact, the property at issue in *Chesnut* had been found not to be a part of the debtor's bankruptcy estate in a post-seizure determination by the district court. *Id.* at 302–03. Stated differently, the debtor did not hold an interest in that property at the time of the commencement of the bankruptcy case. However, the Fifth Circuit concluded that with respect to property of "uncertain status," the automatic stay applies until a determination is made that it is not a part of the bankruptcy estate, *i.e.*—that the debtor did not have an interest in it at the time of the commencement of the bankruptcy case. *Id.* at 300, 303. Thus, in looking at the definition of the bankruptcy estate,

*Chesnut*'s holding that the automatic stay is extended to "arguable property" of the estate cannot be based on an interpretation of the use of the term "interest" in Section 541(a). In other words, an "interest" in property as used in Section 541(a) simply does not include an "arguable" interest under *Chesnut*. Therefore, necessarily, the Fifth Circuit could not have been engaging in a broad interpretation of the term "interest" in 541(a) in order to extend the automatic stay to "arguable property." The language of *Chesnut* makes this clear.

Because the property at issue in *Chesnut* was not defined by the Fifth Circuit as property of the estate, the only legal mechanism left to it to extend the automatic stay to "arguable property" is a legal presumption that "arguable property" is property of the estate. As a result, this Court proceeds under the presumption that the Deposits, as "arguable property," are property of the Debtor's estate for all purposes, including the determination of this Court's jurisdiction.

The dispute in this adversary proceeding relates to "arguable property" of the Debtor's estate—*i.e.*, the Deposits—as both the Trustee and the Interested Parties have asserted claims to these interpleaded funds. [*See* Findings of Fact Nos. 26, 27, 28 & 30]. Claims related to the Deposits qualify as claims against "arguable property" of the estate. *See In re Dugas*, No. 94-10027, 2009 WL 3297958, at *10, 2009 Bankr.LEXIS 3231, at *36-37 (Bankr E.D. Tex. Oct. 13, 2009). Accordingly, the Deposits in this adversary proceeding constitute "arguable property" of the estate and, therefore, are **presumed** property of the estate for the purposes of the automatic stay. And, because the Interested Parties have asserted that the Deposits are rightfully theirs, the Interested Parties have asserted a claim against the estate. As a result, this dispute is a core proceeding because it concerns a claim against the estate.

### (3)  Core proceeding under Section 157(b)(2)(E)

Section 157(b)(2)(E) provides that proceedings concerning orders to turn over property of the estate are core proceedings.  In his first amended cross-claim and third-party claim, the Trustee seeks a declaration that the Deposits are property of the bankruptcy estate.  While the Trustee does not explicitly request turnover, the trustee's amended cross-claim and third party claim does request "all other such and further relief to which the Trustee may be entitled." [Finding of Fact No. 26]. Because these Deposits are currently in the Registry of the Court, such a declaration would, by necessity, cause the Court to turn over the funds to the Trustee.  As a result, the declaratory judgment is a *de facto* motion for a turnover order; and, accordingly, this dispute is a core proceeding because it concerns the Trustee's request for a judgment to turn over property of the estate.

### (4)  Core proceeding under Section 157(b)(2)(G)

Section 157(b)(2)(G) provides that proceedings concerning motions to terminate, annul, or modify the automatic stay are core proceedings.  As already discussed, the Deposits, as "arguable property" of the estate, are protected by the automatic stay under Section 362.  The Interested Parties, in their various answers to the Trustee's first amended cross-claim and third party claim, assert that they are the rightful owners of the Deposits.  If the Court were to declare that the Deposits are rightfully owned by the Interested Parties, the automatic stay would, by necessity, be lifted, because the Deposits would no longer be presumed to be property of the estate.  As a result, the Interested Parties' assertion of ownership of the Deposits is, *de facto*, a request to terminate the automatic stay on the Deposits.  *See In re Jones*, 121 B.R. 122, 124 (Bankr. M.D. Fla. 1990) (Holding that the debtors bare legal title to property is not sufficient reason to maintain the automatic stay, where all beneficial or equitable title rests in another party. Here, a declaration that all title, legal and equitable,

rests with a non-debtor party would compel the same result.). Accordingly, this dispute is a core proceeding.

(5) <u>Core proceeding under Section 157(b)(2)(O)</u>

Section 157(b)(2)(O) provides that proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or equity security holder relationship, except personal injury tort or wrongful death claim, are core proceedings. This adversary proceeding affects the liquidation of assets of the estate because it concerns whether specific assets are a part of the Debtor's bankruptcy estate. Liquidation of assets of the estate cannot occur until title to those assets has been determined. Further, the addition of the Deposits to the Debtor's Chapter 11 estate will increase the payout to the creditors, thus affecting the adjustment of the debtor-creditor relationship. *See, e.g., In re Allegheny, Inc.*, 68 B.R. 183, 191–92 (W.D. Pa. 1986); *In re Mego Int'l, Inc.*, 28 B.R. 324, 326 (Bankr. S.D.N.Y.1983).

(6) <u>Core proceeding under the "catch-all" language of Section 157(b)(2)</u>

The introductory language of 157(b)(2) precedes an enumerated list of proceedings which are explicitly made core proceedings for the purposes of the bankruptcy court's jurisdiction, some of which are discussed above. The introductory language of 157(b)(2) explicitly states that this list is nonexclusive, providing that "[c]ore proceedings include, but are not limited to," the enumerated list. *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the

laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Since the time the Bankruptcy Code was amended in 1984 in order to bring its jurisdictional components in line with constitutional requirements, the Supreme Court has expounded upon the nature and extent of the bankruptcy court's jurisdiction. This jurisdiction "at its core, is *in rem*." *Cent. Va. Cmty Coll. v. Katz*, 546 U.S. 356, 362 (2006). The *res* that is the subject of the bankruptcy court's *in rem* jurisdiction is the "debtor's property, wherever located, and . . . the estate." *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004). The bankruptcy court's jurisdiction over this *res* permits it to "determine all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is 'one against the world.'" *Id.* at 448 (quoting 16 J. Moore, et al., Moore's Federal Practice § 108.70[1] (3d ed. 2004)) (internal quotation marks omitted). The power of the bankruptcy courts "adjudicating rights in the bankrupt estate[,] including the power to issue compulsory orders to facilitate the administration and distribution of the res" has been recognized as reaching back to the 18th century. *Cent. Va. Cmty. College*, 546 U.S. at 362. Thus, the Supreme Court has clearly indicated that when the bankruptcy court is handling a dispute over property of the bankruptcy estate, the bankruptcy court is in the heart of its jurisdictional powers, and that proceeding is a core proceeding.

Therefore, even if this Court is incorrect in its conclusions that this dispute is a core proceeding under any of the specific items on the enumerated list of Section 157, this proceeding is a core proceeding because the Deposits, as arguable property, are presumed to be property of the estate. As a result, this dispute is a core proceeding because it is a dispute that concerns property that is presumed to be property of the estate.

**b. In the alternative, if this proceeding is not a core proceeding, the Court has authority to enter appropriate orders and judgments under 28 U.S.C. § 157 (c)(2).**

Even if this Court is incorrect in its conclusion that this dispute is a core proceeding, the Court concludes that it has non-core or "related to" jurisdiction and may hear and determine the dispute, as well as enter "appropriate orders and judgments." According to 28 U.S.C. § 157(a), any or all proceedings related to a case under Title 11 shall be referred to the bankruptcy judges for the district. Under § 157(b)(3), the bankruptcy judge shall determine whether a proceeding is otherwise related to a case under Title 11. Under § 157(c)(1), a bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under Title 11. Both the Supreme Court and the Fifth Circuit have held that bankruptcy courts have jurisdiction whenever the outcome of a proceeding could conceivably have any effect on the estate being administered in bankruptcy. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995); *see also In re Prescription Home Health Care, Inc.,* 316, F.3d 542, 547 (5th Cir. 2002). Here, the outcome of this proceeding can add assets (*i.e.*, the Deposits) to the Debtor's estate, thus allowing the Trustee to pay creditors a larger recovery for their allowed claims. As such, this proceeding has the potential to have an effect on the administration of the estate, and therefore is "related to" a case under Title 11. Thus, this Court has at least "related to" jurisdiction over this dispute and may hear and determine its merits.

Generally, however, a bankruptcy court may not enter final orders or judgments in suits that fall under its "related to" jurisdiction. 28 U.S.C. § 157(c)(1). But, there is an exception to this general rule. Bankruptcy courts may enter final "orders and judgments" subject to ordinary appellate review when: (1) the district court refers the proceeding to the bankruptcy court; and (2) all parties to the proceeding consent. 28 U.S.C. § 157(c)(2); *see also In re OCA, Inc.*, 551 F.3d 359 (5th Cir. 2008).

65

These requirements have been fulfilled in the dispute at bar. In the Southern District of Texas, "[b]ankruptcy cases and proceedings arising under Title 11 or arising in or related to a case under Title 11 of the United States Code are automatically referred to the bankruptcy judges of this district." U.S. Dist. Ct.—S.D. Tex., General Order 2005-6 (2005).  And, in the Joint Pretrial Statement, all parties explicitly consented to the "entry of final orders by the Bankruptcy Judge." [Adv. Doc. No. 239].  Accordingly, both requirements of Section 157(c)(2) are fulfilled, and this Court is therefore authorized to enter final orders and judgments in this dispute.

   iii. *The Court has subject matter jurisdiction over the breach of contract action, and may enter a final judgment on the breach of contract action in this proceeding, as well as make appropriate orders to provide the relief requested in this action.*

The Trustee has sought two types of relief through his breach of contract action: (1) title to the Deposits; and (2) liquidated damages under the terms of the Contracts.  This Court's jurisdictional authority to provide each form of relief is addressed in turn.

### a.   Seeking title to the Deposits under the Contracts is a core proceeding.

The Court has core jurisdiction over a dispute seeking title to the Deposits based on a breach of contract claim for the same reasons this Court discussed with respect to the suit for declaratory judgement.  Alternatively, if this Court is incorrect in its conclusion that it has core jurisdiction over this dispute, it nonetheless has jurisdiction over the dispute as a proceeding related to a case under Title 11.  This Court may also enter "appropriate orders and judgments" under Section 157(c)(2) for the same reasons as those given above.

### b.   Seeking liquidated damages under the Contracts is a proceeding "related to" a case under Title 11.

Under the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, state law contract actions brought by the debtor seeking damages against third parties may not be core

proceedings.[55] 458 U.S. 50, 71–72 (1982).  On the other hand, these actions *can* be considered "related to" a case under Title 11.  *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 n.5 (1995).  Fifth Circuit precedent holds that a dispute is a proceeding "related to" a case under Title 11 if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Matter of Wood*, 825 F.2d 90, 94 (5th Cir. 1987); *Matter of Zale Corp.*, 62 F.3d 746, 753–54 (5th Cir. 1995). Here, the outcome of the dispute absolutely will have a direct effect on the Debtor's estate.  If the Court finds that any of the Interested Parties are liable for liquidated damages, that money will be paid to the Trustee, as representative of the estate, thus becoming property of the estate for distribution to creditors.  As a result, this proceeding for liquidated damages is clearly at least related to a case under Title 11.

(1) <u>Fifth Circuit precedent provides that this Court may enter a final judgment awarding liquidated damages under the Contracts</u>.

The Fifth Circuit has also held that, when a proceeding is core, but certain relief requested in relation to that core proceeding is not, the bankruptcy court has the authority to enter final judgements and orders granting the non-core relief. *See Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479-80 (5th Cir. 2009).  Here, as discussed above, the breach of contract action is a core proceeding, and the relief sought by the Trustee granting title in the Deposits to the estate is a core proceeding; however, it is possible that the liquidated damages sought by the Trustee under the Contracts are not under this Court's core jurisdiction.  Nevertheless, under the precedent of *Morrison*, this Court may enter a final judgment awarding money damages under

---

[55] *Celotex* states that: "[t]he first type of "related to" proceeding involves a claim like the state-law breach of contract action at issue in [*Northern Pipeline*].  In *Northern Pipeline,* the Supreme Court ruled that a bankruptcy court, as an Article I court, did not have jurisdiction to enter a final judgment over a state law contract action by the debtor *seeking damages* against a third party.

the Contracts.  Accordingly, this Court has jurisdiction to enter a final judgment awarding liquidated

damages under the Contracts.

      (2)  <u>In addition, Section 157(c)(2) provides this Court may enter a final judgment</u>
<u>awarding liquidated damages under the Contracts.</u>

As noted above, Section 157(c)(2) provides that a bankruptcy judge may "hear and determine"

proceedings related to a case under Title 11  and enter "appropriate orders and judgments" subject

to ordinary appellate review under Section 158 when: (1) the district court refers the proceeding to

the bankruptcy court; and (2) all parties to the proceeding consent.  In the Southern District of Texas,

"[b]ankruptcy cases and proceedings arising under Title 11 or arising in or related to a case under

Title 11 of the United States Code are automatically referred to the bankruptcy judges of this

district." U.S. Dist. Ct.—S.D. Tex., General Order 2005-6 (2005).  In the Joint Pretrial Statement,

all parties explicitly consented to the "entry of final orders by the Bankruptcy Judge." [Adv. Doc.

No. 239].  Accordingly, both requirements of Section 157(c)(2) are fulfilled, and this Court is

therefore authorized to hear and determine this dispute, as well as enter appropriate orders and

judgments awarding liquidated damages under the Contracts.

2. <u>Personal jurisdiction</u>

A bankruptcy court, like any other federal court, has personal jurisdiction over parties who are

"present within the territory of the forum," or have certain minimum contacts with the forum such

that the maintenance of the suit does not offend "traditional notions of fair play and substantial

justice." *See Northern Pipeline Const. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 54 n.4 (1982);

*International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945); *see Revell v. Lidov*, 317

F.3d 467, 469-70 (5th Cir. 2002).  A party may also waive its right to object to personal jurisdiction.

*See* Fed. R. Civ. Proc. 12(b).

In light of these legal tenets, the Court concludes that the IRA Account Holders' objection to the Court's personal jurisdiction over the IRA Parties must be overruled. This Court concludes that it does, in fact, have personal jurisdiction over the IRA Parties, including both the IRA accounts and Entrust, in its fiduciary capacity, as well as the individuals who are IRA Account Holders.

Furthermore, even if the IRA Account Holders' objection to this Court's personal jurisdiction was effective, the Court concludes that it has personal jurisdiction over Entrust, in its capacity as the fiduciary representative of the IRAs. Entrust is a corporation organized under Texas law, and thus is subject to the personal jurisdiction of federal courts in Texas. *See* [Adv. Doc. Nos. 55 ¶ 2 & 134 ¶ 2]; *Leroy v. Great Western United Corp.*, 443 U.S. 173, 191 (1979). Furthermore, in order for the IRAs involved in this case to be opened, Entrust had to engage in a transaction with residents of Texas (the IRA Account Holders), satisfying the minimum contacts test. [Adv. Doc. Nos. 180 & 241]; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985). By this same rationale, this Court also has personal jurisdiction over the IRA Account Holders, as they are residents of Texas and entered into Contracts governing the IRAs with another resident of Texas. [Findings of Fact Nos. 1, 2, 7 & 37]. Because of these substantial contacts with Texas, the forum state, this Court's exercise of personal jurisdiction over these parties does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.

## B. The Trustee is the Custodian of the Debtor's Books and Records.

At trial, counsel for the Interested Parties objected to certain testimony of the Trustee, and to the admissibility of certain exhibits, on the grounds that the Trustee is not the custodian of the Debtor's books and records. The Court believes that it is appropriate to address this important point of evidence in this Opinion.

69

Counsel for the Interested Parties cited *Powers v. Standard ACC. Ins. Co.*, 188 S.W.2d 239, 242–43 (Tex. App.—Dallas 1945), *overruled on other grounds by*, 191 S.W.2d 7 (Tex. 1945) for the proposition that the Trustee is not the custodian of the Debtor's books and records, and, therefore, is unable to testify in this capacity regarding any of the Debtor's documents admitted into evidence. [March 23, 2010 Tr. 94:12—95:13].  However, the Court distinguishes this case and finds that it is inapplicable to the suit at bar.

*Powers* involved a state court suit under the Workmen's Compensation Act to set aside an award denying compensation for total and permanent disability. 188 S.W.2d at 240–41.  The employer involved in the suit had previously filed for bankruptcy, and, thus, documentary evidence from the debtor's books and records was admitted by the bankruptcy trustee. *Id*. at 242.  The appellant argued that a proper predicate was not laid for the admission of this evidence by the trustee because he could not testify as to either the correctness of the documents admitted or that they were part of the debtor's books and records. *Id*.  While the court noted that "[w]e know of no authority, and none cited here, that books and records coming into the hands of a receiver or trustee in bankrupt proceedings are for that reason alone admissible in absence of preliminary proof identifying the proffered books and records," it nevertheless declined to find error in the admission of the evidence. *Id*.  The court considered that "when constantly the weightiest and most complicated business interests are settled upon the faith of such records, it would be pedantic for the courts to exclude them." *Id*. at 243.

Initially, the Court notes that *Powers* is inapplicable to the present adversary proceeding.  First, *Powers* involved a state court action governed by Texas' rules of evidence, while the current suit is being tried in bankruptcy court where the Federal Rules of Evidence control. Fed. R. Evid. 1101(a),

(b); *Carefree Ranch, Inc. v. Lenard (Matter of Lenard)*, 849 F.2d 974, 977 (5th Cir. 1988). Further, *Powers* was decided in 1945, almost 35 years prior to the enactment of the Bankruptcy Reform Act of 1978. Thus, at the time the *Powers* opinion was issued, the current statutory provisions defining property of the bankruptcy estate or allowing for a Chapter 11 trustee to be appointed were not in existence. For these reasons, the court's statements in *Powers* regarding the admissibility of the debtor's books and records retained by a trustee in a bankruptcy case are not instructive in this adversary proceeding.

Even assuming that *Powers* is applicable to the suit at bar, the Court concludes that it does not warrant a finding that the Trustee is unable to present testimony or introduce evidence relating to the Debtor's books and records. First, unlike the trustee in *Powers*, the Trustee overseeing the Debtor's estate offered evidence identifying the Debtor's books and records. Specifically, the Trustee testified that he took possession of the Debtor's books and records from the place in which the Debtor had previously maintained the files. He has since kept all the books and records in a single location and maintained the original content of the files. [Finding of Fact No. 4]. Thus, as of the date of this hearing, the Trustee has been in custody of, and maintaining, the Debtor's books and records for approximately 9 months. Moreover, he has signed documents on behalf of the Debtor's estate for purposes ranging from selling units to repairing damage to the Property. [Finding of Fact No. 4]. In short, unlike the Trustee in *Powers*—who simply came into possession of books and records upon his appointment and was a passive trustee for a non-operational entity, the Trustee has actively operated the Property. The Trustee's level of activity with respect to the Property necessarily has made him extremely knowledgeable about the Debtor's books and records. Stated differently, the Trustee is extremely familiar with the Debtor's books and records—apparently unlike the trustee in

71

*Powers*.  Thus, the justification set forth in *Powers* for denying admission of the evidence absent the appropriate proof is inapplicable to the suit at bar.

Second, even if the facts in this adversary proceeding are not distinguishable from those presented in *Powers*, the Court would nevertheless hold that evidence or testimony presented by the Trustee in regards to the Debtor's books and records is admissible.  As stated by the court in *Powers*, faith in these types of documents establishes the foundation of complicated business transactions, and, as such, the policy behind excluding documentary evidence based on inadequate preliminary proof is not well served when evaluating a business' books and records.

Indeed, current provisions of the Bankruptcy Code and applicable case law reveal that the Trustee is the custodian of the Debtor's books and records, and, as such, retains the authority to testify regarding these documents and admit them into evidence.  Pursuant to Section 541, a bankruptcy estate is created when a petition is filed and includes all legal and equitable interests of the debtor in property.  Records related to the operation of a debtor's business are included within this property that becomes part of the estate upon filing. *Compton v. C & G Boats, Inc. (In re Dunhill Resources, Inc.)*, 2006 WL 2578862, Adv. No. 05-3260, at *5 (Bankr. S.D. Tex. Sept. 5, 2006).  Section 521(4) provides that "the debtor shall . . . surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate." The trustee then becomes the custodian of the debtor's books and records.  *See, e.g., Springer v. United States*, 340 F.2d 950, 951 (8th Cir. 1965); *Elmwood Dry Dock & Repair v. H&A Trading Co., Ltd.*, No. 93-2156, 1995 U.S. Dist. LEXIS 17600, at *3 (E.D. La. Nov. 15, 1995); *In re Grand Jury Proceedings*, 119 B.R. 945, 948–50 (E.D. Mich. 1990).  By stepping into the Debtor's shoes and becoming the custodian of the Debtor's books and records, the Trustee is deemed to have

personal knowledge of those documents. *Compton*, 2006 WL 2578862, at *6.

The Interested Parties argue that the authority relied on by this Court relates solely to financial records, and, thus, does not apply to documents such as the Contracts implicated in the present suit.[56] The Court disagrees, and discerns no qualification in the broad language of Section 541 that limits the types of records that become part of the Debtor's estate upon filing. *See Compton*, 2006 WL 2578862, at *5 (noting that a bankruptcy estate includes "all legal and equitable interests of the debtor in property" including, but not limited to, financial records). Accordingly, the Court concludes that as a matter of law, the Trustee was automatically the custodian of all records in the Debtor's possession on the date he was appointed by this Court. As custodian of records, the Trustee is deemed to have personal knowledge of the Debtor's records and has ample authority to testify regarding these documents.

## C. The Court will Analyze the Contracts under Texas Law.

In determining which law governs construction of the Contracts' terms, the Court must first decide which choice of law rules control. *Tow v. Rafizadeh (In re Cyrus II Partnership)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008). The Fifth Circuit has not specifically ruled on whether bankruptcy courts should apply federal or state choice of law rules. *See Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981). Within the Southern District of Texas, the Honorable Marvin Isgur, United States Bankruptcy Judge, has held that selecting the appropriate choice of law rules requires a bankruptcy court to analyze whether the pending claim involves important federal bankruptcy policy. *Tow*, 413 B.R. at 614 (applying federal

---

[56] This argument is derived from the fact that the documents at issue in *Compton* were financial records. 2006 WL 2578862, at *6.

choice of law rules to fraudulent conveyance claims under § 544(b) because they are not pendant state claims in federal bankruptcy cases but rather federal causes of action rooted in federal bankruptcy law and policy).[57]   Issues regarding contract interpretation and enforcement do not involve the type of important federal bankruptcy policy contemplated in *Tow*.  *See, e.g., In re Gaston*, 243 F.3d 599, 606–07 (2d Cir. 2001) (finding that a breach of contract claim in bankruptcy does not contain significant federal policy to justify applying federal choice of law rules). Accordingly, this Court applies state choice of law rules to determine which law governs analysis of the Contracts.

Where the parties to a contract have not designated a forum to govern their agreement, Section 188 of the Restatement (Second) of Conflicts of Law (1971) (the Restatement) controls choice of law analysis under Texas law.  *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991); *Neo Sack, Ltd. v. Vinmar Impex, Inc.*, 810 F.Supp. 829, 838 (S.D. Tex. 1993).  Section 188 of the Restatement provides that the rights and duties of the parties to a contract are determined by the local law of the state or country that has the most significant relationship to the transaction and the parties, considering the following factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  Here, the Contracts were signed and negotiated in Texas, the closings were to occur in Texas, the Property is located in Texas, and all parties to the Contracts reside or have their principal place of business in Texas. [Findings of Fact Nos. 1, 2, 7, 31, 36, 37 & 53].  Thus, the

---

[57]   Other circuits have likewise applied state choice of law rules in bankruptcy cases where there was no compelling federal policy.  *See, e.g., In re Merritt Dredging Co.*, 839 F.2d 203, 205 (4th Cir. 1988) (noting that in determining state law issues "[i]t would be anomalous to have the same property interest governed by the law of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy").

Court will apply Texas law when interpreting and analyzing the Contracts.

## D.  The Deposits are Property of the Debtor's Estate.

When construing a written contract under Texas law, courts must discern the true intentions of the parties as expressed in the contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  If its meaning is uncertain or reasonably susceptible to more than one construction, a contract term is deemed ambiguous, and its meaning must be resolved by a  finder of fact. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996). However, when a contract is "so worded that it can be given a certain or definite legal meaning or interpretation," it is not ambiguous and must be construed according to its plain meaning as a matter of law. *Id.*

1.  <u>The Deposits are non-refundable according to the terms of the Contracts, even if the Debtor defaulted</u>.

The Contracts provide that the Deposits delivered to the respective title companies by the Purchasers are "non-refundable."  Specifically, in Section 2, on page 1, each Contract expressly sets forth that these deposits "shall be non-refundable whether the Contract closes or otherwise." [Finding of Fact No. 38(a)].  Further, in Section 18(a), each Contract states that "[i]f Seller is in default, Buyer's sole remedy is to treat this Agreement as terminated, in which event all payments made thereunder shall be returned to Buyer, except for any payments which by definition herein, are non-refundable." [Finding of Fact No. 38(d)].

The contractual language in Sections 2 and 18(a) is unambiguous, as it can be assigned a definite legal meaning or interpretation.  Indeed, a District Court in the Northern District of Texas has held that the initial deposit paid pursuant to a real estate purchase agreement was non-refundable as a matter of law according to the plain language of the agreement.  *Prime Income Asset Management,*

*Inc. v. One Dallas Centre Assoc. L.P.*, No. 3:07-CV-01731-B, 2009 WL 667203, at *3 (N.D. Tex. March 13, 2009), *aff'd*, No. 09-10349, 2009 WL 5102848 (5th Cir. Dec. 23, 2009) (not selected for publication in the Federal Reporter). The Fifth Circuit agreed with the trial court's determination that "the terms of the agreement were unambiguous with regard to the refundability of the initial deposit" by simply noting the critical language: "the initial deposit . . . shall be non-refundable to [the purchaser] but shall be applicable to the Purchase Price at closing." *Prime Income Asset Management*, 2009 WL 5102848, at *1. The court did not engage in any additional analysis as the express terms of the agreement clearly mandated the result reached by the trial court. *Id.*

The Contracts in the suit at bar contain equally unambiguous language. Accordingly, this Court concludes that the Deposits are non-refundable, and that complete title to the Deposits automatically passed to the Debtor upon execution of the respective Contracts and the delivery of the monies to the title companies.

2. <u>Even if the Deposits are refundable, the Purchasers defaulted under the terms of the Contracts and, thus, relinquished any interest in the funds to the Debtor.</u>

According to the Contracts, the closing dates for the purchase of the respective condominium units are contingent on the substantial completion of the Property. Specifically, Section 5(c), on page 4 of each contract, states that "[u]pon the substantial completion of the construction of the Property and the issuance of a Certificate of Substantial Completion, in the form attached as Exhibit "E", the Property shall be deemed completed (the '**Completion Date**')." [Finding of Fact No. 38(b)]. This Completion Date is then used to determine the time for closing, as expressly set forth in Section 8(a), on page 5 of each contract: "[s]eller shall convey fee simple title to the Property to Buyer by Special Warranty Deed, subject to the Permitted Exceptions, to be delivered at the Title Company on the date and time designated by Seller by notice to Buyer (the '**Closing Date**'), but in no event

76

earlier than three (3) days or later than twenty (20) days after the Completion Date defined in Section 5 above.  Buyer shall be obligated to purchase the Property and pay to Seller the Purchase Price on the Closing Date at the title company (the '**Closing**')." [Finding of Fact No. 38(c)].  These provisions unambiguously set forth the requirements for establishing a closing date for the purchase of the units covered by the Contracts.  *See Lenape*, 925 S.W.2d at 574 (Tex. 1996).

Several Certificates of Substantial Completion were issued in this suit, the first commencing on December 15, 2007, covering floor levels 3–8, and the final commencing on January 10, 2008, for floor levels 1–30. [Findings of Fact Nos. 45, 49 & 52].  Although the Contracts reference the form for the Certificates as the one attached to the Contracts as Exhibit "E" [Finding of Fact No. 45], the Court nevertheless finds that the issuance of the Certificates of Substantial Completion on the AIA Document G704–2000 form complies with Section 5(c) of the Contracts.  The language of the form attached to the Contracts as Exhibit "E" is included, in pertinent part, within the AIA form used by EDI Architectural, Inc. [Findings of Fact Nos. 45 & 52].  AIA Document G704–2000 is the standard form developed by the American Institute of Architects and is used in the construction industry "for recording the date of substantial completion of the work or a designated portion thereof." G Series: Contract Administration and Project Management Forms, *G704–2000, Certificate of Substantial Completion*, http://www.aia.org/contractdocs/AIAS076752 (last visited June 18, 2010).  Even if the Purchasers had a valid objection as to the use of the AIA Form instead of the form set forth in Exhibit "E" to the Contracts, they waived it by evidencing their intent to continue with closing after receiving notice regarding the Certificates of Substantial Completion. [Findings of Fact Nos. 48 & 67]; *see, e.g., Tiger Truck, LLC v. Bruce's Pulp and Paper, LLC,* 282 S.W.3d 176, 186 (Tex. App.—Beaumont, 2009, no pet.) ("Wavier is the intentional relinquishment of a known right or

intentional conduct inconsistent with claiming that right. Intent may be shown by silence or inaction for so long a period as to show an intention to yield to the known right."). In fact, Purchasers' counsel stated on the record that a Certificate of Substantial Completion did not have to reference an individual unit to be valid, such as the form attached as Exhibit "E," but rather could be issued as a single document to cover the entire building, such as the form AIA Document G704-2000 used by EDI Architectural, Inc. [March 25, 2010 Tr. 63:13–16]. Thus, according to Section 5(c) of the Contracts, the completion dates for the purchase of the condominium units were December 15, 2007 for floor levels 3–8 and January 10, 2008 for floor levels 1–30.

On December 27, 2007, the Debtor sent letters to two members of the Nichols Group, both purchasing condominium units within the floor levels covered by the December 15, 2007 Certificate of Substantial Completion, notifying them that their units were substantially complete and designating January 7, 2008 as the closing date on the purchase of their respective units. [Finding of Fact No. 47]. On January 4, 2008, the Debtor sent identical letters to the remaining Purchasers notifying them that their units were substantially complete and designating January 15, 2008 as the closing date on the purchase of their units.[58] [Finding of Fact No. 50]. Both the January 7, 2008 and

---

[58] Although these letters were dated January 4, 2008, prior to the date the final Certificate of Substantial Completion was issued, the Trustee testified that other Certificates covering various floor levels were issued prior to January 4, 2008. [Finding of Fact No. 49]. No further evidence was presented, and the Purchasers failed to raise any issue regarding this discrepancy. Even if other Certificates of Substantial Completion were not issued, the Court nevertheless concludes that the Debtor complied with the terms of the Contracts in designating the closing date five days after the applicable units were deemed substantially complete by the final Certificate. [Findings of Fact Nos. 50 & 52]. In further support of this conclusion, the Court notes that the City of Pasadena issued temporary Certificates of Occupancy to cover the general public's use of the floor levels applicable to the Contracts prior to the date these letters were issued [Findings of Fact Nos. 44 & 46], and several of the Purchasers expressly acknowledged in signed Waivers of Inspection that their respective units were "'complete' as provided in the Agreement, having received certification by Seller's architect." [Finding of Fact No. 48].

In certain instances where more than one party is named as a Purchaser on a Contract, it is unclear why every Purchaser was not mailed a copy of the January 4, 2008 correspondence. [Trustee's Ex. Nos. 4–7 & 14]. Additionally, in circumstances where the Purchasers wrote in under Section 24 of their respective Contracts the entity or individual whom they wanted to receive notice, it is unclear why the January 4, 2008 correspondence was not always mailed to those entities or individuals designated in the Contracts. [Finding of Fact No. 50]. Nevertheless, the Court concludes

the January 15, 2008 closing dates comply with Section 8(a) of the Contracts by occurring no earlier than three days or later than twenty days after the respective completion dates. [Finding of Fact No. 38(c)]. Thus, according to Section 8(a), the Purchasers were obligated to tender to the Debtor the full amount of the purchase price on the specified closing dates, either January 7, 2008 or January 15, 2008. [Finding of Fact No. 38(c)].

Although the Debtor remained willing and able to perform [Finding of Fact No. 53], no closings took place on either January 7 or January 15, 2008. [Finding of Fact No. 54]. In violation of their contractual obligations, none of the Purchasers appeared at the title companies to effectuate their Contracts with the Debtor. [Finding of Fact No. 54]. The Purchasers' failure to close constituted acts of default as set forth in Section 18, and, consequently, the Debtor's sole remedy was to terminate the Contracts. [Finding of Fact No. 38(d)]. Thus, the Debtor, through its attorney, issued letters to the Purchasers on February 4, 2008 providing notice of their defaults and terminating their respective Contracts.[59] [Finding of Fact No. 57]. In turn, pursuant to Section 18(b) of the Contracts, the Debtor became entitled to retain the Deposits and seek additional liquidated damages equal to 1.5% of the purchase price from the Purchasers. [Finding of Fact No. 38(d)].

The Debtor nevertheless presented the Purchasers with additional opportunities to close on their

---

that the notice supplied was sufficient to comply with Section 8(a) of the Contracts, as receipt of the correspondence by one Purchaser placed the information within the purview of his/her co-purchaser(s) and none of the Purchasers raised any issue regarding notice at trial. *Woodward v. Ortiz*, 150 Tex. 75, 79, 237 S.W.2d 286, 289 (1951) ("Actual notice embraces . . . those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed.") (internal quotations omitted); *accord Welborn Mortg. Corp. v. Knowles*, 851 S.W.2d 328, 331 (Tex. App.—Dallas 1993, writ denied); *Motor Vehicle Board v. El Paso Independent Automobile Dealers Association, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999) ("A party's express renunciation of a known right can establish waiver. Silence or inaction, for so long a period as to show an intention to yield the know right, is also enough to prove waiver.").

[59] The Court again notes that this correspondence was not addressed to every Purchaser named on those Contracts with more than one buyer. [Finding of Fact No. 57]. However, for the reasons set forth above, the Court concludes that all of the Purchasers received adequate notice of default.

individual units.  Through its attorney, the Debtor issued letters to the Purchasers on March 14, 2008

and March 25, 2008 offering to extend their closing dates to March 31, 2008 and April 15, 2008,

respectively, if the Purchasers agreed to forfeit any claim to the Deposits. [Findings of Fact Nos. 59

& 61].  Despite the Debtor's offer to extend the closing dates, none of the Purchasers revived their

Contracts by executing the enclosed releases, and no closings took place on either of the proposed

extension dates. [Findings of Fact Nos. 60, 62 & 63].  The Debtor then sent a second notice of

default to the Purchasers on April 17, 2008, demanding that they sign appropriate documentation

authorizing the title companies to release the Deposits and pay the amount of liquidated damages as

calculated pursuant to each of the Contracts. [Finding of Fact No. 64].  Once again, the Debtor was

authorized to make these demands because all ownership interest in the Deposits and the right to

seek liquidated damages passed to the Debtor upon the Purchasers' default under Section 18 of the

Contracts. [Finding of Fact No. 38(d)].  However, none of the Purchasers took any of the actions

demanded of them by the Debtor in this final correspondence. [Finding of Fact No. 65].

   3.  Because the Debtor obtained title to the Deposits prior to its bankruptcy filing, the Deposits
       are property of the Debtor's estate pursuant to Section 541.

Section 541 defines property of the estate to include "all legal or equitable interests of the debtor

in property as of the commencement of the case" regardless of where the property is located and by

whom it is held.  11 U.S.C. § 541(a)(1).  Based on the unambiguous language set forth in Section

2 and 18(a) of the Contracts, the Deposits are non-refundable. [Finding of Fact No. 38 (a), (d)].

Complete title to the Deposits vested in the Debtor upon completion of the Contracts, and this

interest remained in the Debtor regardless of whether it subsequently defaulted under the Contracts'

terms. [Finding of Fact No. 38(d)].  Even if the Deposits are considered refundable, the Debtor

obtained title to the funds upon the Purchasers' default. [Finding of Fact No. 38(d)].  As already

80

discussed above, the Purchasers defaulted when they failed to close in January 2008 according to the terms set forth in Sections 5(c) and 8(a) of the Contracts. [Finding of Fact No. 38(b), (c)]. Thus, the Debtor obtained a legal and equitable interest in the Deposits prior to the filing of its bankruptcy petition on May 4, 2009. [Finding of Fact No. 2]. Pursuant to Section 541 of the Bankruptcy Code, the Court concludes that the Deposits are property of the Debtor's estate even though the funds were being held in escrow by the title companies at the time of the bankruptcy filing.

**E. The Trustee is Entitled to Recover Money Damages.**

   1. <u>The Contracts' liquidated damages provisions are valid and enforceable against the Purchasers</u>.

As set forth above, the Court finds that the Purchasers' failure to close on their respective units in either January, March, or April of 2008 constitutes an act of default under Section 18 of the Contracts. [Finding of Fact No. 38(d)]. Pursuant to Section 18(b), the Debtor, as seller, is entitled to retain the Deposits and collect additional liquidated damages equal to 1.5% of the purchase price from the Purchasers. [Finding of Fact No. 38(d)]. On April 17, 2008, the Debtor gave notice of the Purchasers' default and demanded that the Purchasers pay the amount of liquidated damages provided by the Contracts. [Finding of Fact No. 64]. However, none of the Purchasers complied with the Debtor's demands. [Finding of Fact No. 65]. Accordingly, the Trustee now requests that the Court award it the money damages to which it is entitled pursuant to the Contracts' terms. [Finding of Fact No. 26].

The United States Supreme Court has traditionally upheld liquidated damages provisions, noting several decades ago that "the law does not look with disfavor upon liquidated damages provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss

caused by breach of contract, they are enforced." *Priebe & Sons v. United States*, 332 U.S. 407, 411

(1947).  Under Texas law, a liquidated damages provision is enforceable and is not a penalty when

the harm caused by the breach is uncertain or difficult to estimate and the amount of damages

requested is reasonable.  *Phillips v. Philllips*, 820 S.W.2d 785, 788 (Tex. 1991); *see also* Tex. Bus.

& Com. Code § 2.718(a).[60]  Whether a liquidated damages provision is enforceable is a question of

law for the court to decide.  *Phillips*, 820 S.W.2d at 788.  An assertion that a liquidated damages

provision is unenforceable as a penalty is an affirmative defense that the defendant has the burden

of pleading and proving.  *See, e.g., Urban Television Network Corp. v. Liquidity Solutions, L.P.*, 277

S.W.3d 917, 919 (Tex. App.—Dallas 2009, no pet.); *Murphy v. Cintas Corp.*, 923 S.W.2d 663,

665–66 (Tex. App.—Tyler 1996, writ denied).

Texas courts have repeatedly held that a provision for liquidated damages in a contract for the

sale and purchase of real estate is enforceable, as this is the type of transaction in which the amount

of damages based on a breach of contract is generally uncertain. *Enclave, Inc. v. Resolution Trust

Corp.*, 986 F.2d 131, 134 (5th Cir. 1993) (quoting *Zucht v. Stewart Title Guaranty Co.*, 207 S.W.2d

414, 419 (Tex. Civ. App.—San Antonio 1947, writ dism'd).  In *Enclave*, the purchaser under a real

estate purchase agreement failed to close on the date established by the agreement or any extensions

offered by the seller. 986 F.2d at 133.  The Fifth Circuit noted the difficulty in ascertaining the

amount of damage associated with unmet closings, the accompanying period of uncertainty, and the

ultimate termination of the purchase agreement. *Id.* at 134.  Applying Texas law, the Fifth Circuit

held that allowing the seller to retain 5% of the purchase price, as provided in the liquidated damages

---

[60] Specifically, Section 2.718(a) of the Texas Business and Commerce Code states that "[d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.  A term fixing unreasonably large liquidated damages is void as a penalty."

provision, was reasonable under the circumstances and not an unenforceable penalty. *Id*.

Likewise, a Bankruptcy Court in the Northern District of Texas held that the amount of liquidated damages charged pursuant to a breach of various commercial real estate contracts did not constitute an unenforceable penalty. *In re Independent American Real Estate, Inc.*, 146 B.R. 546, 553–54 (Bankr. N.D. Tex. 1992).  In *Independent American*, the debtor rejected contracts for the joint development of several shopping centers, and a co-contractor sued for liquidated damages based on the resulting breach. *Id*. at 549–50.  Due to the inherent difficulty in valuing the profit margin or the fair market rental value of the projects at the formation of the agreements, the court found that the amount of liquidated damages fixed in the contracts was not unreasonable. *Id*. at 554. The court noted that the burden of proof in negating an award of liquidated damages was on the trustee, acting on behalf of the debtor. *Id.*  The trustee, however, did not adduce any evidence indicating that the co-contractor's actual damages were not an approximation of the stipulated sum. *Id*.  Accordingly, the court held that the co-contractor was entitled to an allowed claim equal to the amount of liquidated damages provided in the applicable contracts. *Id*.

Identical to the buyer in *Enclave*, the Purchasers in the suit at bar breached the Contracts for the purchase of their respective condominium units by failing to close on the date established pursuant to the Contracts' terms or any extension offered by the Debtor. [Findings of Fact Nos. 54 & 63]. Like the defendant in *Independent American*, the Purchasers failed to present any evidence to this Court indicating that the amount of liquidated damages provided under Section 18 of the Contracts was unreasonable, and, thus, negated their ability to contest this award on the grounds that it constitutes an unreasonable penalty.  Even absent the Purchasers' failure to meet their requisite burden of proof, the Court recognizes that the real estate transactions at issue, similar to those in

*Enclave* and *Independent American*, are of the type in which the amount of damages based on a breach of contract remain uncertain.  In fact, the Contracts themselves expressly set forth that the "Buyer and Seller agree that if Buyer is in breach of Buyer's obligations under this Agreement, it will be difficult to determine Seller's damages (which may include the lost opportunity of effecting a sale of the Property while it was under contract to Buyer).  Consequently, the liquidated damages provided herein are a fair and reasonable estimate of Seller's damages." [Finding of Fact No. 38(d)]. Accordingly, the Court holds that the Trustee is entitled to an award of liquidated damages equal to 1.5% of the purchase price from the respective Purchasers under each Contract.[61]

2. <u>Under applicable law, the Trustee is entitled to pre and post-judgment interest on his liquidated damages awards</u>.

i. *Pre-judgment interest under Texas law*

Because pre-judgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism, Texas law will govern the issuance of pre-judgment interest in this case. *Comerica v. Smith (In re Magna Cum Latte, Inc.)*, Adv. No. 07-03304, 2008 WL 2047937, at *22 (Bankr. S.D. Tex. May 9, 2008) (holding that California law governed an award of prejudgment interest under a breach of contract action when choice of law rules mandated that California law otherwise controlled the suit); *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1134 (10th Cir. 2002) ("Prejudgment interest in a diversity action is thus a substantive matter governed by state law."); *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir. 1984).  Under Texas law, prejudgment interest may be awarded if either an "enabling statute" or the "general principles of equity" allow such an award.  *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d

---

[61] The Court has outlined which Purchasers are liable under the specific Contracts at issue and the exact amount of the awards to be imposed against them in a chart attached to this opinion as Exhibit A.

507, 528 (Tex. 1998) (citing *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.

1985) and *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 483-85 (Tex. 1978)).

Texas Finance Code § 304.101 specifies that Subchapter B, governing prejudgment interest, "applies

only to a wrongful death, personal injury, or property damage case." *See also Johnson & Higgins*,

962 S.W.2d at 529–30 (holding that this statute does not apply to any causes of action beyond those

specifically listed, as evidenced by the plain language of the provision).   Thus, any award of

prejudgment interest on the Trustee's money damages is governed by common law.

Texas courts have held that "the decision to award prejudgment interest is left to the sound

discretion of the trial court, which should rely upon equitable principles and public policy in making

this decision." *Citizens Nat. Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487 (Tex. App.—Fort

Worth 2004, no pet.).  With respect to awarding pre-judgment interest on breach of contract actions,

Texas courts have concluded that equity allows for such an award. *See, e.g., Jarrin v. Same White

Oldsmobile Co.*, 929 S.W.2d 21, 24 (Tex. App.—Houston [1st Dist.] 1996, writ denied) ("Pre-

judgment interest is recoverable as a matter of right when an ascertainable sum of money is

determined to have been due and payable at a definite date prior to judgment.") (quoting *Miner-

Dederick Constr. Corp. v. Mid-County Rental Serv., Inc.*, 603 S.W.2d 193, 200 (Tex. 1980)).

Additionally, Texas courts have continually awarded prejudgment interest on liquidated damages.

*See, e.g., Sealock v. Texas Federal Sav. & Loan Ass'n*, 755 S.W.2d 69, 70 (Tex. 1988); *Perry

Roofing Co. v. Olcott*, 744 S.W.2d 929, 932 (Tex. 1988) (Wallace, J., dissenting) ("The Legislature

has given contracting parties notice that if they enter into and subsequently breach agreements in

which damages are liquidated or otherwise ascertainable, they may be held liable for prejudgment

interest.  Parties to contracts have always had this corresponding obligation and right."); *Southern*

*Union Co. v. CSG Systems, Inc.*, No. 03-04-00172-CV, 2005 WL 171349, at * 7 (Tex. App—Austin

Jan. 27, 2005, no pet.) ("It is permissible for a trial court to award prejudgment interest when a

contract 'provides the conditions on which liability depends and . . . fixes a measure by which the

sum payable can be ascertained with reasonable certainty.") (quoting *Wheat v. American Title Ins.*

*Co.*, 751 S.W.2d 943, 944–45 (Tex. App.—Houston [1st Dist.] 1988, no writ)).

Under Texas law, "[t]he prejudgment interest rate is equal to the postjudgment interest rate

applicable at the time of the judgment." TEX. FIN. CODE § 304.103; *Int'l Turbine Servs., Inc. v.*

*VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002) (holding that under Texas law, the rate

of pre-judgment interest "accrue[s] at the same rate as post-judgment interest."); *see also Bob*

*Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at

*10-11 (Bankr. E.D. Tex. 2007). The post-judgment rate is statutorily set at the "prime rate as

published by the Board of Governors of the Federal Reserve System on the date of computation"

unless this rate is less than five percent or more than fifteen percent. TEX. FIN. CODE § 304.003(c).

Specifically, Section 304.003(c)(2) provides that the judgment rate shall be set at 5% if the current

price rate is less than 5%. The current prime rate is 3.25%. Federal Reserve Statistical Release, H.15

Selected Interest Rates, http://www.federalreserve.gov/releases/h15/current/h15.htm (last visited

May 20, 2010). Therefore, pursuant to Section 304.003(c)(2) of the Texas Finance Code, the Court

will apply a 5% interest rate to prejudgment awards.

When awarding prejudgment interest under the common law, the Texas Supreme Court has held

that it begins to accrue "on the earlier of (1) 180 days after the date a defendant receives written

notice of a claim or (2) the date suit is filed" and shall be computed as simple interest. *Johnson &*

*Higgins*, 962 S.W.2d at 531–32. In this suit, the Trustee's amended complaint was filed on February

86

10, 2010. [Finding of Fact No. 26].  On April 17, 2008, the Debtor, through its attorney, sent the Purchasers a second and final notice of default under the Contracts and corresponding demand for payment of liquidated damages. [Finding of Fact No. 64].  Therefore, the Court holds that prejudgment interest began to accrue 180 days after the Purchasers received written notice of the claim, or October 14, 2008, and shall be awarded from that date until the date judgment is issued.[62]

ii.  *Post-judgment interest under federal law*

Federal law authorizes this Court to award post-judgment interest on any money judgment. 28 U.S.C. § 1961(a) specifically provides that interest is allowed on "any money judgment in a civil case recovered in a district court" at the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  This provision has been interpreted to mean that "once a judgment is obtained, interest thereon is mandatory without regard to the elements of which that judgment is composed." *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1103 (D.C. Cir. 1984); *La. & Ark. Ry. v. Pratt*, 142 F.2d 847, 849 (5th Cir. 1944).  Federal courts have routinely held that a bankruptcy proceeding is a "civil case" under 28 U.S.C. § 1961(a), and, thus, judgments in bankruptcy proceedings are subject to post-interest as provided by this section. *Pester Refining Co. v. Ethyl Corp.* (*In re Pester Refining Co.*), 964 F.2d 842, 849 (8th Cir. 1992) ("Because a bankruptcy court is part of the district court, the statute applies to bankruptcy proceedings."); *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*, 956 F.2d 152, 154 (7th Cir. 1992); *In re A.S.M., Inc.*, 110 B.R. 802, 806 (Bankr. W.D. Tex. 1990).  Accordingly, the Court holds that the Trustee is

---

[62]  The exact amount of prejudgment interest awarded to the Trustee on the liquidated damages is set forth in the chart attached to this opinion as Exhibit A.

entitled to recover post-judgment interest on his money damages calculated according to the Treasury yield under 28 U.S.C. § 1961(a). This interest will begin accruing on the amount of the Trustee's damages from the date the judgment is entered until the date it is satisfied in full.

   3. Based on statutes applicable to the various causes of action pursued by the Trustee, the Trustee may recover reasonable attorneys' fees and costs from the Purchasers.

First, the Trustee seeks from this Court a declaratory judgment that the Deposits are property of the Debtor's estate. [Finding of Fact No. 26]. Pursuant to Chapter 37 of Texas Civil Practice and Remedies Code, which governs declaratory judgments, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. It is equitable and just for a court to award attorney's fees and costs to the prevailing party in a declaratory judgment action relating to the ownership of earnest money in a real estate purchase transaction. See Querencia Properties v. New Querencia Capital Partners, L.L.C., 224 S.W.3d 348, 353 (Tex. App.—Dallas 2006, no pet.). Indeed, none of the parties to this suit presented any evidence as to the inequity of such an award. Accordingly, the Court concludes that the Trustee is entitled to recover his reasonable and necessary attorneys' fees and costs as the prevailing party in this declaratory judgment action.

Second, the Trustee seeks from this Court money damages based on the Purchasers' breach of the Contracts for the purchase of their respective condominium units. [Finding of Fact No. 26]. Under Texas law, "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001. A plaintiff must prevail on his breach of contract claim and recover damages in order to recover attorneys' fees. Green Int'l v. Solis, 951 S.W.2d 384, 390 (Tex. 1997) (citing State Farm Life Ins. v. Beaston, 907 S.W.2d 430, 437 (Tex.

1995)).  As stated above, the Court concludes that the Purchasers' failure to close on the purchase of their units according to the Contracts' terms constitutes a breach of those agreements.  Further, the Court holds that the Trustee is entitled to recover liquidated damages and interest on those damages from the Purchasers.  Thus, as the prevailing plaintiff who is recovering damages on his breach of contract claim, the Trustee is entitled to reasonable attorneys' fees and costs from the Purchasers.

## F.   The Interested Parties' Affirmative Defenses

### 1.  The affirmative defenses asserted by all of the Interested Parties, excluding release, are waived.

Federal procedural rules require an affirmative defense to be specifically plead.  Federal Rule of Civil Procedure 8(c) provides a non-exclusive list of the affirmative defenses that must be "set forth affirmatively," including, "accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by a fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and *any other matter constituting an avoidance or affirmative defense.*" (emphasis added).  Although the Court is currently addressing breach of contract and related state law issues, these federal procedural requirements apply to this suit. *See Glass Containers Corp. v. Miller Brewing Co.*, 643 F.2d 308, 313 (5th Cir. 1981) (holding that federal procedural law also applies in diversity actions).

The Interested Parties assert the following affirmative defenses in their respective answers to the Trustee's first amended cross-claim and third-party claim: release, waiver, failure of consideration, estoppel, accord and satisfaction, that the Debtor was in breach of the purchase contracts, and that the Trustee's causes of action are barred by § 365 of the Bankruptcy Code.

[Findings of Fact Nos. 27, 28 & 30].[63]  Also, counsel for the Interested Parties asserted for the first time during trial that certain Purchasers cannot be held liable for breach of their agreements because they failed to execute the Contracts. [March 30, 2010 Tr. 39:25—40:2].  All of these affirmative defenses are specifically enumerated within Federal Rule of Civil Procedure 8(c) or fall under the catch-all language covering "any other matter constituting an avoidance or an affirmative defense."

The key to determining the sufficiency of the Interested Parties' pleadings under Federal Rule of Civil Procedure 8(c) is whether the Trustee was provided with fair notice of the defenses being asserted. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).  A pleading is deemed to give fair notice if the defendant "sufficiently articulated the defense so that the plaintiff was not a victim of unfair surprise." *Home Ins. Co. v. Matthews*, 998 F.2d 305, 309 (5th Cir. 1993).  The Fifth Circuit employs a fact-specific analysis in deciding whether the plaintiff is unfairly surprised. *See, e.g., Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) (noting that failure to plead a statutory limit on liability prejudiced the plaintiffs who would have offered additional proof of damages or pleaded other theories of recover had they been aware of the defense); *Automated Med. Labs v. Armour Pharm. Co.*, 629 F.2d 1118, 1122 (holding that pleading the statute of frauds as a defense for the first time in a pre-trial memorandum was insufficient); *In re Snelson*, 305 B.R. 255, 263–64 (Bankr. N.D. Tex. 2003) (holding that the debtor waived his affirmative defense that the liquidated damages provision in an assumed lease was an unenforceable penalty by not raising it until closing arguments and only presenting evidence supporting a related argument).

In the suit at bar, the Purchasers who attempted to assert the affirmative defense regarding

---

[63] The IRA Account Holders raise additional affirmative defenses, which are not addressed in this subsection discussing waiver but rather in a subsequent subsection beginning on page 109.  These defenses include: lack of jurisdiction over the subject matter and the person, insufficiency of process and service of process, statute of limitations, failure to state a claim upon which relief may be granted,  and lack of capacity. [Finding of Fact No. 30].

failure to execute their Contracts waived this defense by failing to plead or in any other manner raise the issue prior to trial.  Additionally, even though the remaining affirmative defenses were listed in the Interested Parties' answers, no specific facts were alleged explaining the basis on which the defenses were raised.  Aside from the defense of release, for which the executed Releases were admitted into evidence, no evidence was introduced at trial nor testimony adduced sufficient to put the Trustee on notice regarding the nature of the defenses raised.  In fact, counsel for the Interested Parties did not attempt to articulate the basis for these defenses until her closing argument.  Even then this Court was forced to make inquiries of counsel and seek clarification in order to understand the nature of the arguments being presented.  Accordingly, the Court holds that the Interested Parties waived all of the above referenced affirmative defenses, aside from release, by failing to specifically plead those defenses as required under the Federal Rules of Civil Procedure.

> 2. Even in the absence of waiver, the affirmative defenses asserted by the Interested Parties are inapplicable or invalid.

> > i. *The Contracts are valid and enforceable as to the Purchasers who did not sign the agreements.*

Although they did not raise the defense in their answers filed with the Court, Dan Waldenmaier and Kevin D. Mitchell asserted at trial that they could not be held liable for any breach because they did not execute the Contracts. As their counsel argued in closing, "[t]here is no evidence before the Court that Mr. Waldenmaier [or] Mr. Mitchell . . . signed the contracts for which they are being sued." [March 30, 2010 Tr. 39:25—40:2]. Indeed, the Court has found that Kevin D. Mitchell did not sign the Contract for unit 15W [Finding of Fact No. 41], and that Dan Waldenmaier likewise did not execute the Contract for the purchase of unit 15E [Finding of Fact No. 40].  Nevertheless, the Court concludes that the agreements for the purchase of condominium units 15W and 15E are valid

and enforceable against these Purchasers.

Under Texas law, the absence of a signature on a contract does not necessarily destroy its validity. *Simmons & Simmons Constr. Co. v. Rea*, 155 Tex. 353, 286 S.W.2d 415, 418 (1955); *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 292 (Tex. App.—Corpus Christi 2003, pet. denied). A non-signatory to a contract may accept by his acts, conduct, or acquiescence to the terms of the contract. *Simmons*, 286 S.W.2d at 417–18; *DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist] 2008, no pet.) (holding that a non-signatory assented to the terms of an agreement by taking possession of it, acting on it, and failing to object to its terms); *In re Citgo Petroleum Corp.*, No. 09-07-563-CV, 2007 WL 4938701, at *2 (Tex. App.—Beaumont Feb. 21, 2008, mand. denied) (noting that although a party's signature on a contract is strong evidence of that party's assent, other evidence may be relied on to prove a party's unconditional assent to a contract's terms).

Both the Debtor, as seller, and the other named buyers exclusive of Mr. Waldenmaier and Mr. Mitchell executed the Contracts for units 15E and 15W. [Findings of Fact Nos. 40 & 41]. Although Mr. Waldenmaier and Mr. Mitchell failed to sign the agreements, they nevertheless assented to the terms of the Contracts through their conduct. Specifically, Mr. Mitchell paid at least $40,000.00 of the Deposit for the puchase of unit 15W. [Finding of Fact No. 41]. Mr. Waldenmaier failed to respond or object to correspondence from the Debtor designating January 15, 2008 as the closing date for the purchase of unit 15E. [Finding of Fact No. 51]. When closing did not occur and the Debtor issued Mr. Waldenmaier a notice of default terminating the Contract [Finding of Fact No. 57], he again neglected to lodge any objection to his liability on the Contract [Finding of Fact No. 58]. Further, both Mr. Mitchell and Mr. Waldenmaier received several letters from the Debtor

offering to extend their closing dates in exchange for a release forfeiting any claim to their Deposits, and did not respond. [Findings of Fact Nos. 59–62]. The Debtor subsequently demanded both Purchasers to sign documentation authorizing release of their Deposits and to pay the amount of liquidated damages calculated pursuant to the Contracts, threatening to take legal action if they failed to comply. [Findings of Fact Nos. 64]. Once again, Mr. Mitchell and Mr. Waldenmaier raised no objection relating to their non-signatory status. Instead, they sent identical letters to the Debtor representing that they fully intended to close on the purchase of units 15E and 15W once they obtained appropriate financing and title clearance. [Finding of Fact No.67]. Accordingly, the Court finds that Mr. Mitchell and Mr. Waldenmaier unconditionally assented to the terms of the Contracts and, thus, may be held liable for breaching these agreements.

ii. *The Debtor did not breach the Contracts, and there was no failure of consideration as to the agreements.*

The Interested Parties raise the affirmative defenses of breach of contract and failure of consideration. [Findings of Fact Nos. 27, 28 & 30]. Counsel for the Interested Parties specified during her closing argument that "[b]ecause there is no completed Certificate of Substantial Completion and because the Debtor failed to repair the building within a year of Hurricane Ike, these are breaches by the Debtor." [March 30, 2010 Tr. 53:7–10]. "We have also pled failure of consideration. In this case we have shown that there was no condominium completed, there were no Certificates of Substantial Completion, as required by the contract, and no repairs completed." [March 30, 2010 Tr. 57:8–12].

**a. Valid Certificates of Substantial Completion were issued by EDI Architects, Inc.**

Counsel for the Interested Parties argues that the Certificates of Substantial Completion were not fully executed and, therefore, were not sufficient to set the completion date under the Contracts'

93

terms.  [March 30, 2010 Tr. 42:22—43:11].  Specifically, counsel objects to the fact that the Certificates were not signed by the contractor or the owner [March 30, 2010 Tr. 42:22—43:3].  While the Trustee agreed that the Certificates of Substantial Completion admitted into evidence did not contain the contractor's or the owner's signatures, he pointed out that these copies represented transmissions from the architect to the Debtor.  He received indication from these individuals that they did subsequently sign the Certificates, but he did not have access to their files to verify their statements. [March 25, 2010 Tr. 78:3–25].

Irregardless, the Court finds that an architect from EDI Architects, Inc. signed the Certificates of Substantial Completion that were issued on both December 15, 2007 and January 10, 2008 certifying that "the Work performed under this Contract has been reviewed and found, to the Architect's best knowledge, information and belief, to be substantially complete.  Substantial Completion is the stage in the progress of the Work when the Work or designated portion is sufficiently complete in accordance with the Contract." [Findings of Fact Nos. 45 & 52].  The contractor's and owner's signatures were not required to certify the substantial completion of the projects.  Rather, the contractor's signature would serve as a promise that it intended to "complete or correct the Work on the list of items attached hereto within [t]hirty (30) days from the above date of Substantial Completion," and the owner's signature would acknowledge that it "accepts the Work or designated portion as substantially complete and will assume full possession . . ." at the date and time specified. [Findings of Fact Nos. 45 & 52].

As emphasized by Trustee's counsel, these signatures constituted a separate portion of the document pertinent to final completion, which is the next stage in construction, not the stage of substantial completion relevant to setting the completion date under the Contracts. [March 30, 2010

94

Tr. 64:2–12]; *Honeywell Int'l, Inc. v. The Clark Construction Group, Inc.*, No. SA-06-CV-0125-XR, 2006 WL 2932217, at *8 (W.D. Tex. Oct. 11, 2006 ) (citing *Carr v. Norstok Bldg. Sys., Inc.*, 767 S.W.2d 936, 940 (Tex. App.—Beaumont 1989, no writ); *Shaddock v. Storm King Window Co.*, 696 S.W.2d 271, 273 (Tex. App.—Wichita Falls 1985, no writ)) (noting that no jurisdiction in Texas has ever held that substantial completion of a contract is legally equivalent to full performance or final completion).  Further, according to the Trustee's testimony, the owner and contractor agreed to the terms set forth in the Certificates by their own admission as well as their actions subsequent to the time the Certificates were issued. [Findings of Fact Nos. 45 & 52].   Accordingly, the Court concludes that the Purchasers' argument regarding the validity of the Certificates of Substantial Completion lacks merit.  As set forth above, the Certificates of Substantial Completion are sufficient to set the completion dates for purchase of the condominium units according to the Contracts' terms.

> **b.  The Debtor's actions subsequent to Hurricane Ike do not constitute a breach of the Purchasers' Contracts.**

Counsel for the Interested Purchasers argues that the Debtor failed to make repairs to the building within a year after Hurricane Ike, and that this behavior constitutes an act of default according to Section 18 of the Contracts. [March 30, 2010 Tr. 55:3—56:24].  Section 18 states the following:

> If the Property, or the Building, is destroyed or damaged by fire or other casualty prior to Closing, in an amount of more than ten percent (10%) of the total Purchase Price, Seller may terminate this Agreement by giving notice to Buyer within sixty (60) days of the date on which the Property was destroyed or materially damaged, and Seller shall, within thirty (30) days thereafter, return the earnest [m]oney to Buyer and the parties shall be released from any further obligation or liability hereunder or related hereto.  If Seller does not terminate this Agreement under the terms of this Section, the date of Closing shall be delayed and continued until Seller has a reasonable time to effectuate repairs or reconstruction of the Property, which time of delay may not exceed one year.  Any delay of over one (1) year due to such destruction shall be a material default under this Agreement . . . . [Finding of Fact No. 38(e)].

The parties do not dispute that Hurricane Ike caused damage to the Property in September of 2008. [Finding of Fact No.70]. Marzano testified that the Property experienced extensive flooding and estimated the damage covered two-thirds of the building. [Finding of Fact No. 70]. Thus, although not directly proven to this Court, there was arguably damage to the Property in an amount exceeding ten percent of the purchase price under the Contracts. In applying Section 18, the Court notes that the Debtor would be required to either terminate the existing Contracts or repair the damage within a year. The Court holds that this provision regarding default is inapplicable, however, because the damage caused by Hurricane Ike did not arise until September 2008, which was several months following the Purchasers' default and the Debtor's subsequent termination of the Contracts. [Finding of Fact No. 70]. Indeed, from January 2008 to September of 2008 (*i.e.*—prior to Hurrican Ike), the Debtor conducted 29 closings for the sale of units to buyers other than those in the Nichols Group. [Finding of Fact No. 70]. Accordingly, at the time the Purchasers were obligated to close on the Contracts, Hurricane Ike had not yet caused damage to the Property that might render any of the units either uninhabitable or incomplete.

Even assuming that the Purchasers did not breach the Contracts by failing to close in accordance with the Contracts' terms, the Purchasers have failed to prove that the Debtor's actions constitute a "material default" under Section 18. The Debtor did not terminate any of the existing Contracts at the time the property was damaged by Hurricane Ike. Rather, the Trustee, after being appointed on June 12, 2009 [Finding of Fact No. 3], sold the remaining units to a third party in December of 2009. [Finding of Fact No. 2]. Thus, there was no delay in closing for over one year on any of the units in the Property due specifically to the damage caused by Hurricane Ike. Accordingly, regardless of how the Purchasers' actions are construed in failing to close on the purchase of their

units, the Debtor did not commit an act of "material default" as that term is defined in Section 18 of the Contracts.

     iii. *The Releases are invalid and unenforceable.*

The Interested Parties raise the affirmative defenses of release and accord and satisfaction. [Findings of Fact Nos. 27, 28 & 30]. Specifically, as set forth in the Joint Pretrial Statement, they contend that the Contracts were terminated by the Debtor's execution of the Releases, and that those mutual releases constituted an accord and satisfaction of the Contracts. [Finding of Fact No. 27]. Indeed, certain Purchasers and Marzano, purportedly acting on behalf of the Debtor, executed the Releases directing the title companies to release the earnest monies associated with the Contracts directly to Endeavour GP, LLC. [Finding of Fact No. 78]. However, for the reasons set forth below, the Court concludes that the Releases do not terminate or constitute an accord and satisfaction of the Contracts at issue in this suit.

     **a.   The Releases are invalid for lack of consideration.**

Counsel for the Interested Parties contends that "[t]hese mutual releases relieved the Debtor of the obligation to get these units ready to clear the liens and to close. That was a benefit to the Debtor." [March 30, 2010 Tr. 58:23–25]. Marzano testified that the Debtor benefitted because it "did not have to finish and perform on the contract." [Finding of Fact No. 79]. The Trustee, however, asserted that the Debtor did not gain anything for its execution of the Releases. Rather, the Debtor relinquished the Deposits to which it was entitled pursuant to the Contracts' terms, as well as its right to recover liquidated damages from the Purchasers based on their breaches of the Contracts. [Finding of Fact No. 80].

A release is a writing which provides that a duty or obligation owed to one party to the release

is discharged immediately or on the occurrence of a condition. RESTATEMENT (SECOND) OF CONTRACTS § 284 (1981). In their memorandum of authorities for trial, the Interested Parties cite *Texas Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 414 (Tex. 1970) for the proposition that "parties may rescind their contract by mutual agreement and thereby discharge themselves from their respective duties. A mutual release of rights of parties is regarded as a sufficient consideration as a matter of law for such a release instrument." [Finding of Fact No. 27]. While the Court agrees that parties to a contract may rescind the contract through consensual agreement and that a mutual release of rights may constitute sufficient consideration, it does not necessarily follow that all releases are supported by valid consideration as a matter of law. *Sw. Fire & Cas. Co. v. Atkins,* 346 S.W.2d 892, 897 (Tex.Civ.App.—Houston 1961, no writ) ("The law is well settled that a release is not binding unless supported by a consideration."). Under Texas law, a release is a contract and is subject to avoidance on the same grounds as any other contract. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). Whether a contract or a release is enforceable and, thus, whether a release is supported by sufficient consideration, is a question of law. *E.g., Mickens v. Longhorn DFW Moving, Inc.*, 264 S.W.3d 875, 880 (Tex. App.—Dallas 2008, pet. denied).

Under Texas law, consideration is a bargained for exchange of promises, consisting of both benefits and detriments to the contracting parties. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 790 (Tex. 2008). The promises made under the contract must induce the parties to incur the detriments and vice versa. *Id.* However, when there is only one promisor, the mutual consideration is absent and the agreement constitutes a unilateral contract. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied). Unilateral contracts are enforceable only if the promise is treated as an offer and the promisee accepts that offer by

performing the act requested by the promisor. *Id*. at 224–25; *Johnston v. Kruse*, 261 S.W.3d 895, 899 (Tex. App.—Dallas 2008, no pet.).  When a unilateral contract is silent as to any act being required of the promisee, the agreement is unenforceable. *Spakes v. Weber*, No. 10-08-00313-CV, 2010 WL 139955 at *5 (Tex. App.—Waco Jan. 13, 2010, pet. filed); *Johnston*, 261 S.W.3d at 898 ("A contract that does not require a party to furnish consideration, or oblige him to do anything, lacks mutuality, is unilateral, and is unenforceable.")

   In the suit at bar, the Releases are not enforceable as either bilateral or unilateral contracts. There was neither a mutual exchange of benefits and detriments between the parties nor a unilateral offer for either party to perform.  Neither the Debtor nor the Purchasers promised to perform any action in order for the Releases to take effect. [Finding of Fact No. 78].  The Releases simply directed the title companies holding the Deposits to release the funds directly to Endeavour GP, LLC and unsuccessfully sought to void the Purchasers' Contracts.[64] [Finding of Fact No. 78].  Thus, the only entities required to act under the Releases were the title companies, who were not parties to the agreement. [Finding of Fact No. 78].  In fact, some Purchasers admitted in their response to the Trustee's requests for admissions that they "did not provide any consideration to the Debtor in exchange for the Release of Earnest Money." [Finding of Fact No. 82].  Additionally, certain Purchasers testified before this Court that they did not provide the Debtor with any compensation for the execution of the Releases. [Finding of Fact No. 82].  Accordingly, the Court concludes that the Releases are not supported by valid consideration and, thus, are unenforceable.

---

[64] Although the Releases specifically provide that the Contracts are "null and void" and "of no further force or effect" [Finding of Fact No. 78],  the Court holds, as set forth above, that the Contracts were terminated when the Purchasers failed to close in early 2008.  Accordingly, the Contracts were already terminated prior to the execution of the Releases in 2009. [Findings of Fact Nos. 77 & 78].

**b.  To the extent the Releases are valid, they constitute avoidable transfers.**

Alternatively, assuming that the Releases are supported by sufficient consideration, the Trustee seeks to avoid the Releases as fraudulent transfers under both the Bankruptcy Code and applicable Texas law. [Finding of Fact No. 26].  Under § 548 of the Bankruptcy Code and Texas Business and Commerce Code § 24.001 *et seq.*, a trustee is given the authority to avoid any transfer of the debtor's interest in property made within two years prior to the filing of the petition if the debtor received less than reasonably equivalent value in exchange for the transfer and any one of the following conditions is met: (a) the debtor was insolvent on the date the transfer was made or became insolvent as a result of such transfer; (b) the debtor was engaged or was about to engage in a business or transaction for which its remaining property was unreasonably small when compared to the transfer at issue; or (c) the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond its ability to pay as they became due. 11 U.S.C. § 548(a)(1)(B); Tex. Bus. & Com. Code § 24.005(a)(2), 24.006(a).

(1)  The Releases constitute a transfer of property of the estate.

According to § 541(a)(1), the bankruptcy estate includes "all legal or equitable interest of the debtor in property as of the commencement of the case."  The phrase "all legal or equitable interest" is construed broadly to include claims and causes of action under both federal and state law. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983) (citing legislative history for the proposition that § 541(a)(1) includes causes of action); *Wischan v. Adler* (*In re Wischan*), 77 F.3d 875, 877 (5th Cir. 1996) (stating that pre-petition causes of action are property of the estate).  A particular cause of action belongs to the estate if, under applicable law, the debtor could have raised the claim as of the commencement of the case. *Highland Capital Mgmt. LP v. Chesapeake Energy*

100

Corp. (*In re Seven Seas Petroleum Inc.*), 522 F.3d 575, 584 (5th Cir. 2008).   Assuming that the Contracts were still valid at the time the Releases were executed, the Debtor, as the seller under the Contracts, would have been entitled to retain the Deposits and seek additional liquidated damages upon the Purchasers' default. [Finding of Fact No. 38(d)].   These causes of action could have been pursued at the time the Debtor filed its Chapter 11 petition and, therefore, constitute property of the estate as defined in § 541.

A "transfer" is broadly defined under § 101(54)(D) to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or any interest in property."   A release of claims constitutes a "transfer," as defined in § 101, because the releasing party is disposing of or parting with the right to assert future causes of action. *Metzger v. Farris* (*In re e2 Commc'ns, Inc.*), 320 B.R. 849, 856 (Bankr. N.D. Tex. 2004); *see also Besing v. Hawthorne* (*In re Besing*), 981 F.2d 1488, 1494 (5th Cir. 1993) (holding that a state court dismissal of a cause of action is a transfer avoidable under § 548).   By signing the Releases, the Debtor purported to relinquish its right to the Deposits, as well as its right to seek damages from the Purchasers based on their breaches of the Contracts. [Finding of Fact No. 80].   Additionally, the Debtor released any cause of action it might have against the title companies pursuant to the Contracts' terms. [Finding of Fact No. 78]. Therefore, the Releases "disposed of or parted with" the Debtor's causes of action under the Contracts, thus constituting a transfer of property of the Debtor's estate.

(2)  The Debtor received less than reasonably equivalent value in exchange for the Releases.

Under both the Bankruptcy Code and the Uniform Texas Fraudulent Transfer Act, "value" is given for a transfer of property of the estate if property is received in return for that transfer or an

antecedent debt of the debtor is secured or satisfied. 11 U.S.C. § 548(d)(2)(A); TEX. BUS. & COM. CODE § 24.004(a). Texas' act further defines "reasonably equivalent value" to include "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COM. CODE § 24.004(a). As stated above, assuming that the Contracts were still in effect at the time the Releases were executed, the Debtor transferred property of the estate by releasing its right to the Deposits, as well as its right to pursue causes of action against either the Purchasers or the title companies. However, the Debtor did not receive any property in return for these transfers or obtain cancellation of a debt it owed to the Purchasers. Many of the Purchasers admitted in their answers to the Trustee's requests for admission and their testimony before this Court that they did not provide any consideration to the Debtor in exchange for its release of the Deposits and the liquidated damages. [Finding of Fact No. 82]. The only potential benefit that the Interested Parties could articulate was that the Debtor was no longer obligated to finish and perform on the Contracts. [Finding of Fact No. 79]. Voiding the Contracts, however, does not transfer any "value" to the Debtor, as that term is defined under applicable fraudulent transfer law and does not provide sufficient consideration for a bargained-for exchange. Under the terms of the Contracts, the Debtor was entitled to retain the non-refundable Deposits, regardless of whether the transactions closed or the Debtor defaulted. [Finding of Fact No. 38(a)]. Accordingly, the Debtor did not receive reasonably equivalent value in exchange for the release of its interest in the Deposits and relinquishment of its right to recover liquidated damages from the Purchasers in an event of default under the Contracts.

(3) <u>The Debtor was insolvent on the date the Releases were executed</u>.

A partnership is deemed "insolvent" under the Bankruptcy Code and Texas' Uniform

102

Fraudulent Transfer Act when "the sum of the partnership's debts is greater than the aggregate, at a fair valuation, of all of the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts." TEX. BUS. & COM. CODE § 24.003(c); *accord* 11 U.S.C. § 101(32)(B).   On the date the Debtor filed its Chapter 11 petition, it had total assets of approximately $9.5 million and total liabilities of approximately $31.0 million. [Finding of Fact No. 2].   The Trustee derived these valuations from the $9.5 million received for the Debtor's interest in the Property (*i.e.*, the remaining units, parking rights, storage units, rights and permits to boat docks, and causes of action related to storm damage on remaining units) in a § 363 sale and the $31,894,753.48 in total claims filed against the Debtor's estate. [Finding of Fact No. 2].  This Court explicitly stated in its § 363 sale order that the value "to be paid to the Trustee is fair and reasonable . . . and constitutes reasonably equivalent value and fair consideration for the property."  Based on the testimony presented, this Court finds that the Debtor's liabilities exceeded its assets on the date of the filing and within one year preceding the filing of the petition. [Finding of Fact No. 2].  Marzano testified that he agreed to release the Deposits in mid to late January of 2009. [Finding of Fact No. 76].  On April 23, 2009, Marzano and Parsley signed a certificate of corporate resolution purportedly authorizing Marzano to release the Deposits associated with the Contracts. [Finding of Fact No. 77].   Subsequently, Marzano and certain Purchasers executed the Releases at issue, although they did not date these documents. [Finding of Fact No. 78]. Thus, the Releases were executed some time after April 23, 2009, within 11 days prior to the filing of the Debtor's bankruptcy petition on May 4, 2009. [Findings of Fact Nos. 2 & 78].  Accordingly, the Court finds that the Debtor was insolvent when it executed the Releases.

In sum, to the extent that the Releases are not void for lack of consideration, the Court holds that

they are avoidable as fraudulent transfers under § 548 and Texas Business and Commerce Code § 24.001 *et seq.*, as they constitute a transfer of the Debtor's interest in property within two years of the filing of the Debtor's petition for less than reasonably equivalent value at a time when the Debtor was insolvent.

### iv. *The Debtor did not waive the Purchasers' obligations under the Contracts.*

The Interested Parties assert the affirmative defense of waiver in their answers. [Findings of Fact Nos. 27, 28 & 30]. Counsel for the Interested Parties stated in her closing argument that "[t]he Debtor repeated[ly] waived the alleged defaults, asked for the buyers' help in getting financing, submitted—according to Mr. Marzano, submitted our assurance letters to his lenders in order to get financing. These are actual waiver[s]." [March 30, 2010 Tr. 57:14–18]. Counsel further specified that "when the Debtor went to these buyers and asked for assurance letters so that they could go get their financing—the Debtor's financing, that that [sic] was an actual waiver." [March 30, 2010 Tr. 58:3–6]. However, the Interested Parties never articulated for this Court, through their pleadings or the testimony presented at trial, how these actions constituted an "actual waiver" of the Purchasers' defaults under the Contracts.

Waiver is "the intentional relinquishment or abandonment of a known right." *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004). Under Texas law, the party asserting the defense of waiver must show "(1) an existing right, benefit, or advantage, (2) knowledge, actual or constructive, of its existence, and (3) actual intent to relinquish the right, which can be inferred from conduct." *Perry Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 313 (5th Cir. 2005); *Homes v. Cull*, 258 S.W.3d 580, 602–03 (Tex. 2008). A party may affirm a contract that has been breached by either: (1) evidencing a conscious intent to do so; or (2) acting so as to induce the other party's detrimental

reliance, thereby creating an estoppel situation. *Consol. Eng'g Co. v. S. Steel Co.*, 699 S.W.2d 188, 191 (Tex. 1985).  However, acceptance of performance following a breach is not a waiver of that breach as a matter of law. *Cal-Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 812 (Tex. App.—Tyler 1999, no pet.).  Further, neither an innocent party's continuing performance following a breach of contract nor his efforts to induce a breaching party to perform under a defaulted contract constitutes a waiver of a non-breaching party's right to recover damages due to default. *Id.* (citing *Consol. Eng'g Co.*, 699 S.W.2d at 191).

In the suit at bar, the Interested Parties have failed to prove the Debtor's actual intent to waive the Purchasers' defaults.  Marzano did request assurance letters from the Purchasers in exchange for the Debtor's release of the Deposits. [Finding of Fact No. 76].  Marzano testified, however, that he had a fiduciary duty to the creditors of the Debtor's estate at the time he entered into these negotiations, and he admitted that he violated this fundamental duty in executing the Releases. [Finding of Fact No. 81].  Additionally, when Marzano entered into these negotiations with the Purchasers in mid January of 2009, he did not have the authority to release the funds in exchange for the requested assurance letters. [Findings of Fact Nos. 76 & 77].  Prior to executing the Releases, Parsley and Marzano did sign a certificate of corporate resolution purportedly authorizing Marzano to release escrow funds associated with the Contracts, but even Marzano admitted to this Court that the resolution did not authorize him to release the Deposits, terminate the Contracts, or breach his fiduciary duty to the creditors. [Finding of Fact No. 77].  No additional evidence was admitted indicating that the Debtor intended to waive its rights under the Contracts.  To the contrary, the Debtor provided the Purchasers with several opportunities to close on their units and issued multiple notices of default, the final notice emphasizing its intent to pursue legal action due to the Purchasers'

noncompliance. [Findings of Fact Nos. 47, 50, 57, 59, 61 & 64]. Accordingly, the Court holds that the Debtor did not waive any of the rights or remedies that it obtained under the Contracts upon the Purchasers' defaults.

  v. *The Debtor is not estopped from pursuing its causes of action against the Purchasers.*

  The Interested Parties also assert the affirmative defense of estoppel in their answers to the Trustee's amended cross-claims and third party claims. [Findings of Fact Nos. 27, 28 & 30]. Counsel for the Interested Parties first attempted to articulate this defense during her closing arguments. She stated that "by not providing the Certificates of Substantial Completion, failing to complete construction and repairs timely and then ultimately selling the units to other people, as well as signing mutual releases, these are all inconsistent positions, which support our affirmative defense of estoppel." [March 30, 2010 Tr. 59:5–10]. Through further questioning, the Court received additional clarification regarding the reasoning supporting the Purchasers' position, namely that the "Trustee is estopped from filing suit against [the P]urchasers because once the Bankruptcy Trustee took over, he sold all of the units to a third party." [March 30, 2010 Tr. 59:17–20].

  The doctrine of equitable estoppel requires the party asserting it to establish: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual, or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy*, 962 S.W.2d 507, 515–16 (Tex. 1998). Quasi estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 864 (Tex. 2000). This form of estoppel applies when it would be unconscionable to allow a person to maintain a

position inconsistent with the one in which he acquiesced or accepted a benefit. *Id.*

Since the Interested Parties failed to articulate which type of estoppel they claim precludes the Trustee's causes of action, the Court is left to assume that they seek a determination of quasi estoppel, as they did not even mention misrepresentation or reliance. *E.g., In re A.L.G.*, 229 S.W.3d 783 (Tex. App.—San Antonio 2007, no pet.) (noting that misrepresentation by one party, and reliance by the other, are not necessary elements of quasi-estoppel).  Even evaluating their defense under the doctrine of quasi-estoppel, however, the Court finds their arguments to be completely without merit.  The Trustee was not acting inconsistent with his right to pursue causes of action against the Purchasers when he resold the remaining units in the Property.  As this Court has already determined, the Deposits were rightfully owned by the Debtor pre-petition and, thus, became property of the estate upon its filing for bankruptcy.  Additionally, when the Purchasers failed to close on their units, the Debtor's contractual remedy was to treat the Contracts as terminated and seek liquidated damages from the Purchasers.  Upon appointment, the Trustee complied with his duty to pursue these causes of action against the Purchasers. [Findings of Fact Nos. 5 & 6].  Selling the units to a third party did not affect his prosecution of these actions, as the liquidated damages he seeks represent, according to the express language of the Contracts, "the lost opportunity of effecting a sale of the Property while it was under contract to Buyer." [Finding of Fact No. 38(d)].  Accordingly, the Court holds that the Trustee is not estopped from pursuing its breach of contract actions against the Purchasers.

vi. *The Trustee's causes of action are not barred by Section 365.*

The Purchasers assert that the Trustee's causes of action against them are barred by Section 365 of the Bankruptcy Code. [Findings of Fact Nos. 27, 28 & 30].  During her closing arguments,

107

counsel for the Purchasers contended that "if the releases were not valid, then the [C]ontracts—the Debtor entered bankruptcy with these [C]ontracts as executory contracts. They were rejected 60 days later, would be July 4th, 2009. This [a]dversary wasn't filed until July 19th." [March 30, 2010 Tr. 48:19–23]. Counsel agreed with the Court's clarification of her argument, namely that the Contracts were executory contracts in existence on the date of the bankruptcy filing and were rejected as a matter of law because they were not assumed by the Debtor within 60 days as provided under the Code. [March 30, 2010 Tr. 49:4—50:16]. If the Contracts were deemed rejected, counsel asserted that "either [according to] the purchase agreements or by operation of law, the money would have to go back to the people who put it there, the owners, and that would be these buyers." [March 30, 2010 Tr. 51:12–20]. Counsel appeared to be arguing, without fully articulating her reasoning, that if the Contracts were rejected in bankruptcy, they were terminated. This termination by the Debtor entitles the Purchasers to receipt of the Deposits and bars the Trustee's suit to enforce the Contracts.

The Court concludes that this affirmative defense has absolutely no basis in law or fact. First, § 365(d)(2) provides that "[i]n a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract . . . at any time before the confirmation of a plan." Counsel's representation to this Court that an unassumed contract is rejected within 60 days is derived from § 365(d)(1), which does not apply to Chapter 11 filings. Section 365(d)(1) provides "[i]n a case under **chapter 7** of this title, if the trustee does not assume or reject an executory contract . . . within 60 days after the order for relief . . . then such contract . . . is deemed rejected." (emphasis added) Thus, since this is a Chapter 11 filing, the Contracts would not be automatically rejected 60 days after the filing of the petition as counsel for the Purchasers incorrectly represented to this Court.

Second, the Court has concluded that both the Deposits and the causes of action being pursued

108

by the Trustee belonged to the Debtor prior to the time the bankruptcy was filed.  According to Sections 2 and 18 of the Contracts, the Deposits are non-refundable and, thus, owned by the Debtor regardless of whether the transactions close or the Debtor defaults. [Finding of Fact No. 38(a), (d)]. The Court has already held, applying the plain meaning of these provisions, that the Debtor obtained an ownership interest in these Deposits upon the execution of the Contracts.  Therefore, the Deposits became property of the estate automatically upon the filing of the Debtor's bankruptcy petition. Further, the Purchasers breached their Contracts by failing to close on the dates specified by the Debtor in accordance with Section 8 of the Contracts. [Findings of Fact Nos. 38(c), 47, 50, 54, 57, 59, 61 & 63].  The Debtor acted within its rights under Section 18 in treating the Contracts as terminated upon the Purchasers' default. [Finding of Fact No. 38(d)].  Thus, the Contracts were terminated prior to the filing of the Debtor's bankruptcy and could not be assumed or rejected in bankruptcy.  Based on the foregoing, the Trustee's causes of action are not barred by § 365.

    3.  <u>Additional affirmative defenses asserted by the IRA Account Holders are also invalid</u>.

The IRA Account Holders raise additional affirmative defenses, including: lack of jurisdiction over the subject matter and the person, insufficiency of process and service of process, statute of limitations, failure to state a claim upon which relief may be granted,  and lack of capacity. [Finding of Fact No. 30].  For the reasons set forth below, the Court finds that none of the IRA Account Holders' defenses provide an independent basis for denying the Trustee's recovery.

    i.  *The Statute of Limitations does not bar the Trustee from asserting his cross-claims against the IRA Account Holders.*

The IRA Account Holders assert in their answer that "[t]o the extent that the Trustee claims or may claim that the IRA accounts are not exempt property, Third Party Defendants assert the statute of limitations, Tex. Prop. Code §42.004." [Finding of Fact No. 30].  This portion of the Texas

Property Code provides that:

> If a person uses the property not exempt under this chapter to acquire, obtain an interest in, make improvement to, or pay an indebtedness on personal property which would be exempt under this chapter with the intent to defraud, delay, or hinder an interested person from obtaining that to which the interested person is or may be entitled, the property, interest, or improvement acquired is not exempt from seizure for the satisfaction of liabilities.

Texas Property Code § 42.004(b) also places a limit of two years on any such claims brought by a creditor.

However, this Court has not concluded that IRAs are not exempt property.  In fact, this Court recognizes that the IRAs at issue in this case may be exempt from certain types of attempts to acquire their assets in order to satisfy a debt. However, the current suit by the Trustee against the IRA Parties is not such an action.  Instead, insofar as the Trustee has asserted claims seeking relief through the IRAs for damages resulting from the actions of the IRA, Texas Property Code § 42.0021 does not apply.

The language of this section of the Texas Property Code clearly limits the exemption to "attachment, execution, and seizure for the satisfaction of debts" of a *person's* "right to the assets held in or to receive payments, whether vested or not . . . under any individual retirement account." Texas Property Code § 111.004(10), in defining a "person," provides that:

> "Person" means: (A) an individual; (B) a corporation; (C) a limited liability company; (D) a partnership; (E) a joint venture; (F) an association; (G) a joint-stock company; (H) a business trust; (I) an unincorporated organization; (J) two or more persons having a joint or common interest, including an individual or a corporation acting as a personal representative or in any other fiduciary capacity; (K) a government; (L) a governmental subdivision, agency, or instrumentality; (M) a public corporation; or (N) any other legal or commercial entity.

IRAs do not fit under any of the enumerated items (A) through (M), so the question left to this Court is to determine if "person" is any other "legal or commercial entity." Texas Property Code § 111.004

defines an "individual retirement account" as "a trust, custodial arrangement, or annuity under Section 408(a) or (b), Internal Revenue Code of 1954 (26 U.S.C.A. Sec. 408 (1986))."  Thus, an analysis of whether an IRA can be a legal or commercial entity necessarily entails an analysis of whether trusts, custodial arrangements, or annuities are legal entities under Texas law.

Texas Property Code § 111.004(4) defines an "express trust" as a fiduciary relationship with respect to property. The Texas Supreme Court, citing this language, has explicitly held that "[a] trust *is not a legal entity*." *Ditta v. Conte*, 298 S.W.3d 187, 191 (Tex. 2009) (citing Tex. Prop. Code § 111.004(4)) (emphasis added).  This is why, under Texas law, "suits against a trust must be brought against its legal representative, the trustee." *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006).

A custodial account under 26 U.S.C. 408(h) is very similar to an express trust, which favors a conclusion that a custodial account is not a legal entity.  Moreover, custodial relationships are more informal than trusts from a legal point of view, meaning they are more flexible and have fewer legal requirements as to their form. *See* 26 U.S.C. § 408(h).  This factor would seem to indicate that custodial accounts are even less likely than trusts to qualify for legal entity status.  Therefore, this Court concludes that custodial accounts are not a "legal entity" which would qualify as a "person" under Texas Property Code § 111.004(4).

Finally, an annuity under 26 U.S.C. § 408 shares the same characteristics of a fiduciary relationship that tend to define an express trust.  Therefore, this Court concludes that an "individual retirement account" is not a person under the Texas Property Code.  As a result, Texas Property Code § 42.0021 does not apply to any of the claims brought by the Trustee in this case because he is not attempting to reach the interest of any "person" in the IRAs or in the assets of the IRAs.

ii. *The IRA Account Holders have the capacity to be sued.*

The IRA Account Holders assert that the Trustee's claims against the IRA Parties should be dismissed because "the IRA accounts are not persons, and therefore have no legal existence or capacity to be sued." [Finding of Fact No. 30].   However, the Court concludes that this affirmative defense can not be supported for two independent reasons: (1) the IRA Account Holders who have objected on behalf of the IRAs waived their objection to the substitution of the IRA Parties; and (2) the Trustee's first amended cross-claim and third-party claim is pleaded such that the correct individuals and entities are designated as parties to the suit in order for the Trustee to obtain relief through the IRAs.   Each conclusion will be discussed in turn.

### a. The IRA Account Holders waived their objection to substitution of the IRA Parties.

In the Trustee's initial cross-claim and third-party claim, Entrust is listed as a defendant in its corporate capacity. [Finding of Fact No. 22].   On February 8, 2010, this Court signed the Order Substituting Parties, which provides that Entrust is to be removed from the case "in its corporate capacity only." [Finding of Fact No. 25].   In the place of Entrust, in its "corporate capacity," the IRA Parties were substituted as proper parties to the dispute. Pursuant to the Order Substituting Parties, Entrust was required, within three days, to forward a copy of the Order Substituting Parties and the complaint and summons served upon it to each account holder of the IRAs at issue in the dispute. [Finding of Fact No. 25].   Each account holder was ordered to appear and file a written answer within 20 days within the filing of the order.   Each account holder did, in fact, receive notice of the substitution. [Finding of Fact No. 25].

On February 9, 2010, the IRA Account Holders filed a motion to vacate the order substituting parties, requesting that the order be vacated on the basis that, among other things, "an IRA account

is an item of personal property, not an entity, and therefore may not properly be named as a party to litigation." [Finding of Fact No. 29].  On March 17, 2010, the IRA Account Holders entered into the agreed order on the motion to vacate the order substituting parties, which expressly states that the IRA Account Holders "withdraw their Objection to the Order Substituting Parties." [Finding of Fact No. 29].

This Court concludes that, in withdrawing their objection to the order substituting parties in the agreed order, the IRA Account Holders waived any further objection to the order substituting parties. Objections to capacity certainly may be waived. *See Howerton v. Designer Homes by Georges, Inc.*, 950 F.2d 281, 283 (5th Cir. 1992). This withdrawal includes any objection to the capacity of the IRA Parties, the objection to which was explicitly raised and then withdrawn by the IRA Account Holders.  The Court arrives at this conclusion for two reasons.

First, the IRA Account Holders may not agree to an order that includes waiving their objections to the substitution of the IRA Parties and then proceed to raise those same objections later in a responsive pleading. *See United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.  The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation.").  A party who withdraws an objection in an agreed order is not entitled to a second bite at the apple should that party later regret its decision to agree to that order.

Second, the Order Substituting Parties constitutes a final order from which the IRA Account Holders did not appeal. *See United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367, 1377 (2009).  The finality of a bankruptcy court's order following the conclusion of direct review stands

113

in the way of challenging the order's enforceability. *Id.* This is true even when a final judgment or order is based on legal error. *Id.* at 1380. Thus, even if the IRA Account Holders' assertion that the IRA Parties do not have capacity to be sued was true (an assertion that this Court finds to be incorrect, as discussed below), the Order Substituting Parties would still be enforceable and binding because the IRA Account Holders had notice of the order, withdrew their objection, and failed to timely appeal. *Id.* at 1380 ("But the order remains enforceable and binding on United because United had notice of the error and failed to object or timely appeal.").

> **b. The correct entities and individuals are parties to this dispute for the Trustee to obtain relief through the IRAs.**

Even if the IRA Account Holders had not waived their right to object to the substitution of the IRA Parties, the IRA Answer's contention that the Trustee has sued an item of personal property which does not have the capacity to be sued is incorrect. The resolution of this issue requires two determinations. First, this Court must determine who (or what) may be sued in order to obtain relief through an IRA. Stated differently, this Court must determine who (or what) has the capacity to be sued when relief is sought from an IRA. Second, this Court must determine the identities of the IRA Parties, and whether they are appropriate parties to a suit for relief from an IRA.

> (1) <u>Who has the capacity to be sued generally when relief is sought through an IRA?</u>

> (i) *Capacity to be sued—generally*

With respect to a party's capacity to be sued, Fed. R. Civ. P. 17, in relevant part, provides that: "(b) Capacity to Sue or Be Sued. Capacity to sue or be sued is determined as follows: (1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile; (2) for a corporation, by the law under which it was organized; and (3) for all other parties, by the law of the state where the court is located . . . ." As the IRA Parties are not individuals or

corporations (as Entrust was removed from this suit in its corporate capacity), it is Texas law, the law of the forum state, that determines the capacity of an IRA to be sued.

When applying state law, a federal court is bound by decisions of the given state's highest court. *Cochran v. B. J. Servs. Co.*, 302 F.3d 499, 501–02 (5th Cir. 2002). "When adjudicating claims for which state law provides the rules of decision, the federal court is bound to apply the law as interpreted by the state's highest court. If the state's highest court has not spoken on the particular issue, it is the duty of the federal court to determine, as closely as it can, what the highest court of the state would decide. The federal court is bound by an intermediate state appellate court decision unless convinced by other persuasive data that the highest court of the state would decide otherwise. However, the federal court will not expand state law beyond its presently existing boundaries." *Barfield v. Madison County,* 212 F.3d 269, 271–72 (5th Cir. 2000); *see C.I.R. v. Bosch's Estate*, 387 U.S. 456, 464–65 (1967). Here, there is no case law from the Supreme Court of Texas specifically addressing the capacity of an IRA to be sued. Indeed, there appears to be no Texas case law of any kind dealing specifically with the capacity of custodial IRAs to be sued. Thus, this Court is charged with determining how the Supreme Court of Texas would rule on the issue of the capacity of an IRA to be sued.

(ii) *Texas case law on the nature of IRAs*

26 U.S.C. § 408, the section of the tax code which authorizes the use of IRAs as tax deferral vehicles, states that an IRA must be a trust, administered by a trustee, or a custodial account, administered by a custodian who acts as a fiduciary for that IRA. 26 U.S.C. § 408(a), (h); 26 C.F.R. § 1.408–2(e). Custodial accounts must meet all of the same requirements as trusts to qualify for status as an IRA, with the exception that it may have one or more "defects" which prevent it from

115

being a trust under state law. *See* 26 U.S.C. § 408(h).  Despite the fact that custodial accounts are not trusts, the custodian of an IRA serves in a capacity very similar to that of a trustee. *See* 26 U.S.C. § 408(a), (h); 26 C.F.R. § 1.408–2(e). In fact, 26 U.S.C. § 408 provides that with respect to Title 26, the custodian will be treated as a trustee, evincing a desire on the part of Congress to designate an IRA as a trust or a trust-like entity, complete with a fiduciary representative, even in the event such an account fails to satisfy certain state-law requirements for the formation of a trust. *See* 26 U.S.C. § 408(h).  This fiduciary representative is responsible for, *inter alia*, the investment and disposition of property held in a fiduciary capacity, and employing or retaining legal counsel able to pass upon fiduciary matters and to advise the custodian. 26 C.F.R. § 1.408–2(e).  Indeed, not only is the fiduciary representative responsible for making investments and entering into transactions on behalf of the IRA, the practical consequence of the statutes and regulations governing IRAs is that **only** the fiduciary representative or its agents are allowed to enter into investments and transactions on behalf of the IRA. *See, e.g., Ancira v. Comm'r of Internal Revenue*, 119 T.C. 135, 138 (2002) (concluding that beneficiary acted as the custodian's agent in purchasing private stock in the name of the IRA, when custodian would not purchase stock which was not on a public market).

However, despite the structure of the federal statute, a handful of Texas intermediate appellate courts, that have assessed the nature of IRAs in other contexts, have rejected the approach of treating IRAs as trusts in favor of treating IRAs like savings accounts.  For instance, in analyzing whether an IRA was a "savings account" for the purposes of a bequest under a will, a Texas intermediate appellate concluded that "[a]n IRA is a unique type of trust. The depositor who creates the IRA is the beneficiary of the trust, and the bank, as trustee, acts only as the custodian of the account. The beneficiary possesses the sole authority to determine how the trust corpus may be

116

invested or may withdraw the money at any time, though there may be a penalty imposed for early withdrawal.  Because a beneficiary has unlimited capacity to reach the funds, an IRA is 'nothing more than a savings account established to defer tax liability and to supplement the beneficiary's retirement income in the future.'" *Sammons v. Elder*, 940 S.W.2d 276, 282 (Tex. App.—Waco 1997, no writ.) (internal citations omitted).

There are also a handful of cases that accept the idea that an IRA is a savings account, and go on to analogize IRAs to safe deposit boxes:

> The relationship between the bank and the IRA account is similar to the bank's relationship with a safe deposit box. The financial institution administers the IRA accounts, keeping records of all deposits and withdrawals, but the IRA depositor—or more accurately the IRA *settlor*—determines what assets the IRA account contains, or under the safe deposit box analogy, what is placed in the safe deposit box. Just as a bank is not responsible for the investment wisdom of storing cash in a safe deposit box, the financial institution administering the IRA account is not responsible if the IRA settlor's investment decision was unwise.

*Lee v. Guttierez*, 876 S.W.2d 382, 386 (Tex. App.—Austin 1994, writ denied) (internal citations ommitted); *see also*, *Colvin v. Alta Mesa Resources, Inc.*, 920 S.W.2d 688, 690-91 (Tex. App.—Houston [1st Dist.] 1996, writ denied).

However, this Court has doubts as to whether the Texas Supreme Court would decide to follow this line of reasoning for the purposes of the capacity of an IRA.  Whereas the characterization of IRAs as savings accounts or safe deposit boxes may make sense in the context in which they were analyzed by those intermediate appellate courts, this characterization leads to an absurd result when applied to the issue of the capacity of an IRA to be sued.

A substantial difference between a normal savings account or a safe deposit box and an IRA is that an IRA, through its fiduciary representative, may enter into contracts and other transactions. *See* 26 U.S.C. § 408(a); 26 C.F.R. § 1.408–2(e); *see, e.g., Ancira*, 119 T.C. at 138 (2002) (generally,

any transfer of assets into an IRA constitutes a "contribution" to the IRA; 26 U.S.C. § 408 provides that "no contribution will be accepted unless in cash;" as a result, any non-cash property that is to be held by the IRA as an investment must be purchased by the IRA through its fiduciary representative).  Further, an IRA may own property. *See Ancira*, 119 T.C. at 138 ("At all times, the IRA, not the petitioner, was owner of the shares even though it may not have been in physical possession of the stock certificate.").  The typical savings account cannot do either of these things.

These particular differences between IRAs and savings accounts lead to serious consequences if both types of accounts are treated identically with respect to the issue of who has the capacity to be sued if relief is sought through an IRA.  Under Texas law, in order to obtain relief through such a savings account, the Trustee would have to obtain a judgment against an individual with rights to assets or payments from the bank account. TEX. CIV. PRAC. & REM. CODE § 61.001; *see In re Argyll Equities, LLC*, 227 S.W.3d 268, 271 (Tex. App.—San Antonio 2007, no pet.).  Then, the Trustee would have to attach and execute upon the account, or alternatively, obtain a garnishment order for the bank account. *See* TEX. CIV. PRAC. & REM. CODE § 61.001; TEX. CIV. PRAC. & REM. CODE § 63.001.  Although this process may work to obtain relief through a regular savings account, Texas Property Code § 42.0021 exempts IRAs from attachment, execution, and seizure for the satisfaction of debts.  Because IRAs may enter into contracts, and indeed, must be the party to do so when contributions or other assets are invested, a holding that IRAs are to be treated like savings accounts for the purposes of their capacity to be sued would render IRAs judgment-proof as counterparties to a contract.  A fiduciary representative or beneficiary of an IRA could cause the IRA to breach a contract, safe in the knowledge that the counterparties who suffer damages from this breach would have no recourse against the IRA for payment of the damages caused by the breach.  It seems likely

118

that the practical result of this situation would be that very few people would engage in contracts with IRAs, severely limiting the effectiveness of IRAs as a retirement investment tool.

This Court does not believe that the Texas Supreme Court would allow an entity that may enter into contracts to be free from the consequences of the those contracts as a matter of law. *See Riddle v. Lanier*, 136 Tex. 130, 135, 145 S.W.2d 1094, 1096 (1941); *Ewing v. Wm. L. Foley Inc.*, 115 Tex. 222, 234, 1280 S.W. 499, 502–03 (1926) ("The holding that a trustee, in cases where he is not chargeable with personal fault or negligence, may legally be reimbursed out of the trust estate for such damages as may be recovered against him, is in effect a holding that in such cases the trust estate is itself liable for such damages, and, since the trust estate is so liable, we think our practice allows it to be proceeded against in a suit brought directly against the trustee in his representative capacity."). It is particularly unlikely that the Texas Supreme Court would do so when such a decree would severely impair a market utilized by great numbers of people to save for retirement.

Instead, this Court believes that, if faced with the issue of an IRA's ability to be sued, the Texas Supreme Court would decide that IRAs should be treated like trusts. This Court believes that such a conclusion would achieve two important goals. First, treating IRAs like trusts for the purposes of capacity results in a more equitable and economically beneficial approach, when compared to treating IRAs like bank accounts, as discussed above. Second, treating IRAs like trusts satisfies the mandate upon this Court to avoid "expand[ing] state law beyond its presently existing boundaries" when determining how the Texas Supreme Court might rule on this issue. *See Barfield*, 212 F.3d at 271–72. IRAs, though not necessarily created with the same formality as express trusts, are structured very similarly to a trust, with a fiduciary representative who has legal possession of the assets in the account, and a beneficiary who has the equitable rights to the assets. Most

119

importantly, both IRAs and trusts may enter into contracts and hold property through their fiduciary representatives, giving rise to the possibility that they can incur liability through breach of contract or a number of other causes of action.  Texas trust law has a well developed line of cases setting out the capacity of a trust to sue and be sued, and it strikes this Court that, for these purposes, the similarities between trusts and IRAs outweigh the differences.  Turning to this well developed body of case law in order to determine the capacity of IRAs allows this Court to remain well within the bounds of established state law for the purposes of this analysis, which also means that the remainder of this Court's analysis can rest upon well established state-law precedent, aiding its analysis and guiding its conclusions.  In sum, when compared to treating IRAs as bank accounts for the purposes of capacity to be sued, applying Texas trust law to the question of capacity results in a much more equitable, administrable, and economically beneficial approach.

> (iii) *Under Texas law, who (or what) has the capacity to be sued when relief is sought through the trust?*

Under Texas law, a trust itself may not sue or be sued directly. *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 571 (Tex. 2006).  Indeed, a trust is not a legal entity, and "[c]ivil suits may be maintained only by or against parties having an actual or legal existence." *Bailey v. Vanscot Concrete Co.*, 894 S.W.2d 757, 759 (Tex.1995); *Ray Malooly Trust*, 186 S.W.3d at 571.  Moreover, a "trustee has the sole right and responsibility to enforce a cause of action in favor of a trust," which is only abrogated to a beneficiary when the trustee cannot or will not enforce the cause of action. *Hamilton v. McLean*,  No. 03-99-00320- CV, 2000 WL 502828, at *3 (Tex. App.—Austin April 27, 2000, no pet.) (not designated for publication) (citing *Interfirst Bank-Houston, N.A. v. Quintana Petroleum Corp.*, 699 S.W.2d 864, 874 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)).  "As a general rule, both the trustee and the beneficiaries should be made parties to suits involving

trust property." *Starcrest Trust v. Berry*, 926 S.W.2d 343, 355 (Tex. App.—Austin 1996, no writ)

(internal citations omitted). "This rule, however, is subject to many exceptions[:]"

> In actions adverse to a trust, if the dispute involves no conflict between the trustee and the beneficiaries, or between the beneficiaries themselves, a trustee may sue or defend in the trustee's own name when, either by express grant or necessary implication, that power is vested in the trustee. In addition, in the absence of a conflict of interest, or of a pleading that they are inadequately represented, the beneficiaries who did not participate in the trial are not considered necessary parties to the case.

*Id.*

When such a suit is brought against a trust via its trustee and possibly its beneficiaries, relief

is provided through the trust. *See Ewing,* 115 Tex. at 233, 280 S.W. at 502.  Thus, in the dispute at

bar, where we are treating the IRAs like trusts, the proper parties for the Trustee to sue in order to

obtain relief through the IRAs is Entrust, the IRAs' fiduciary representative, and generally, the

beneficiaries as well.

### (2) The Trustee has properly sued Entrust in its fiduciary capacity and the account holders in their beneficiary capacity.

As just noted, in order to have properly sued the IRAs, the Trustee must have sued the

custodian, in its capacity as fiduciary representative.  In the Title Company's answer, counterclaim,

cross-claim and third party complaint, Entrust is listed as a third party defendant under the name

Entrust Retirement Services, Inc. [Finding of Fact No. 10].  In his initial cross-claim and third-party

claim, the Trustee likewise brought suit against Entrust Retirement Services, Inc. [Finding of Fact

No. 22].  Entrust took issue to being listed as a party to the suit in what it interpreted to be its

"corporate" or "individual" capacity, because, Entrust maintained, "[a]ll actions taken by Entrust

with respect [sic] all of the transactions and occurrences involved in this lawsuit were taken only as

an authorized agent for an IRA trust account established and maintained by Entrust." [Finding of

Fact No. 23]. Stated differently, Entrust did not assert any personal interest in the Deposits, nor did it want to be held personally liable for any damage awards that might be granted in this suit. In order to avoid this possibility, Entrust requested that the IRA Parties be substituted for it, in its "corporate capacity" (*e.g.*, Entrust Retirement Services, Inc., FBO Amina Abdulla IRA# 10846-01). The Trustee stipulated to this substitution at the hearing held on January 26, 2010 [Finding of Fact No. 24], and this Court entered an order that the parties be substituted on February 8, 2010 [Finding of Fact No. 25].

The IRA Answer contends that the parties listed in the substitution order are the IRAs themselves—personal property of the IRA Account Holders which does not have the capacity to be sued absent statutory authorization. This Court disagrees with this interpretation. Instead, the Court concludes that the substituted parties listed in the order and the Trustee's complaint represent Entrust, in its capacity as fiduciary for the IRAs (as opposed to its "corporate capacity").

When Entrust, in its capacity as fiduciary representative, was making the IRAs parties to the Contracts, it signed with the designation "Entrust Retirement Services, Inc., FBO (name of Account Holder) IRA# XXXX-XX," accompanied by the name of the specific Entrust employee who was signing the document. [Finding of Fact No. 37]. These designations are the same as those used for the IRA Parties, indicating that when Entrust was removed from the dispute at bar in its "corporate capacity," the IRA Parties that were substituted were the IRAs with Entrust in its capacity as fiduciary representative. Moreover, at the hearing on January 26, 2010, counsel for Entrust emphasized that it was being removed from the case in its corporate capacity only, and that it nonetheless remained the fiduciary representative for the IRAs through which relief was being sought. [Finding of Fact No. 24]. Entrust was served with summons for the trustee's first amended

cross-claim and third-party claim. [Finding of Fact No. 29]. At the hearing of March 12, 2010, counsel for Entrust clarified that it was only being dismissed from the case in its corporate capacity, but *not* in its fiduciary capacity. [Finding of Fact No. 29]. These statements evince an intent on the part of Entrust to be removed from this suit in its corporate (or individual) capacity and to be added to this suit in its capacity as the fiduciary for the IRAs. In short, the pleadings and statements on the record demonstrate that Entrust intended to remain a party to this dispute in its capacity as fiduciary representative by way of the substitution of the IRA Parties, and the Trustee intended to sue Entrust in its capacity as fiduciary representative of the IRAs.

In addition, the IRA Account Holders were already parties to the dispute at bar when the order substituting parties was entered on the docket, so by way of making the IRA Account Holders parties to the suit as beneficiaries of the IRAs, they were delivered copies of the summons and the order substituting parties within three days of the entry of the order on the docket. [Finding of Fact No. 25]. No IRA Account Holder has asserted that he or she did not receive service of this process. Moreover, the Trustee had his amended cross-claim and third-party claim served upon the IRA Account Holders as well. Thus, the IRA Account Holders, in their capacity as beneficiaries of the IRAs, have been made parties to the dispute at bar. Accordingly, all parties who must or should be parties to this dispute have been made parties to this adversary proceeding.

(3) <u>In the alternative, the Texas Supreme Court would hold that a party may obtain relief through an IRA by suing its beneficiaries.</u>

Alternatively, it is possible that the Texas Supreme Court might decide that because self-directed IRAs, like those in the dispute at bar, are almost entirely controlled by their beneficiaries, only the beneficiaries need to be sued in order to obtain relief through a self-directed IRA. Doing so would create a new category of account with respect to capacity, which may be disfavored by the

123

Texas Supreme Court.  On the other hand, such a holding would be more closely in line with the treatment of IRAs as bank accounts that has been advanced by Texas intermediate appellate courts while avoiding the absurd result, discussed above, that treating IRAs as simple bank accounts would create.

Such a holding would also make sense because it relieves the fiduciary representatives of IRAs of the burden of defending the IRAs in the same manner a trustee would have to defend a trust. Because IRAs can be more informal than trusts, their fiduciary representatives may have lighter fiduciary duties.  For instance, some (but not all) courts have held that 26 U.S.C. 408 does not impose any fiduciary duties itself; such duties would instead be imposed by the contract governing the IRA. *See, e.g.*, *Cowburn v. Leventis*, 619 S.E.2d 437 (S.C. Ct. App. 2005).  Therefore, it may make sense to make the beneficiaries of an IRA the necessary representative parties to a suit against the IRA.

As noted above, such a conclusion would allow the Trustee to obtain relief through the IRAs because the IRA Account Holders are already parties to the dispute at bar and they were each served with summons giving notice that the IRA Parties were being sued along with a copy of the order substituting parties.  Thus, the beneficiaries were parties to the suit, and were given notice that the Trustee was seeking relief through the IRAs.  Accordingly, the Trustee has pleaded properly to allow him to obtain relief through the IRAs.

> (4) <u>In the alternative, the Texas Supreme Court would hold that a party may obtain relief through an IRA by suing the IRA directly.</u>

Alternatively, the Texas Supreme Court might step entirely outside its previous approaches to capacity and simply conclude that it is possible to sue an IRA directly.  Again, this Court believes it unlikely that the Texas Supreme Court would do so, as it would necessitate a holding that an IRA

is a "legal entity" under Texas law. Such a conclusion would appear to be in tension with Texas case law which has explicitly held that trusts, close structural analogs of IRAs generally, are not legal entities which may not be sued directly. However, it is possible that the Texas Supreme Court would be influenced by the example of other jurisdictions which appear to allow IRAs to be sued directly. *See, e.g.*, *Cmty. Bank of Ariz. v. G.V.M. Trust*, 366 F.3d 982 (9th Cir. 2004); *Callahan v. Moneta Capital Corp.*, 415 F.3d 114 (1st Cir. 2005).

In such a case, this Court concludes that the correct parties have been sued in the dispute at bar for the Trustee to obtain relief through the IRAs. Pursuant to the order substituting parties, Entrust delivered copies of the summons it had received and the order substituting parties on the IRA Account Holders, indicating that the IRA Account Holders are parties to the suit as representatives for the IRAs.

iii. *The IRA accounts were sufficiently served with process in this suit.*

Insufficiency of process is distinct from service of process. Insufficiency of process challenges irregularities in contents of summons and insufficient service of process deals with the manner of delivery of summons and complaint. *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492, 1499 n.14 (D. Utah 1987). For sufficiency of process, a summons satisfies due process when it complies with the provisions of Fed. R. Civ. P. 4(b) or "any other applicable provision . . . that deals specifically with the content of the summons." *Id.* In the present suit, the IRA Answer does not allege any defect in the summons which would prevent it from complying with Fed. R. Civ. P. 4(b) or any other applicable provision that deals specifically with the content of the summons. Accordingly, this Court concludes that process was sufficient.

125

The standard for adequacy of process was clearly stated by the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950):

> But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, compare *Hess v. Pawloski*, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091, with *Wuchter v. Pizzuti*, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446, 57 A.L.R. 1230, or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

Further, the Supreme Court provided that "[p]ersonal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding." *Id.* at 314. Here, the Trustee served written notice on both Entrust and the beneficiaries/depositors pursuant to the order substituting parties. Although the beneficiaries did not receive direct service from the Trustee, they did receive his written notice indirectly through Entrust, who was required to forward a copy of the Trustee's amended cross-claim and third party claim and the order substituting parties to each account holder. [Finding of Fact No. 25].  Thus, Entrust, and each account holder, received written notice of the Trustee's cross-claims and third party claims.  Accordingly, process and service of process is adequate for the Trustee's amended cross-claim and third party claim.

iv. *The Trustee has stated a claim against the IRA Account Holders upon which relief can be granted.*

As discussed above, the IRA Parties have been correctly named (*i.e.*, as Entrust in its capacity as fiduciary representative along with the IRA Account Holders in their beneficiary capacity) so that the Trustee may obtain relief through the IRAs.  Therefore, this Court concludes that the Trustee's amended cross-claim and third-party claim has stated causes of action and requests for relief which

126

are facially plausible, as required to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

*Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009).

### G.  The Interested Parties Are Not Entitled to an Equitable Remedy.

In the process of presenting their defense before this Court, the Interested Parties appeal to the general principles of equity and unjust enrichment in seeking return of the Deposits.   The Interested Parties who testified at trial stated the reasons why they believe they are entitled to return of the Deposits, which included a myriad of equitable claims.  Most prevalent among these equitable assertions was the notion that this Court should refund the Deposits to the Interested Parties because the money belonged to them initially. [Finding of Fact No. 83(b)–(e), (h) & (i)].  Some Interested Parties asserted that they are entitled to the Deposits because they did not receive anything in exchange for the funds. [Finding of Fact No. 83(f), (g) & (j)].  One Interested Party even asserted that she needed the money because of her current financial situation and, thus, the Court should return her Deposit. [Finding of Fact No. 83(a)].

Under Texas law, unjust enrichment characterizes the result of failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract. *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.* 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, no pet.); *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied).  When a valid, express contract covers the subject matter of the parties' dispute, recovery is typically not allowed under a quasi-contract theory. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).  The Texas Supreme Court reasons that parties should be bound by their express agreements, and recovery under an equitable theory is generally inconsistent with a valid agreement addressing the matter. *Id.*  This rule especially follows when

127

sophisticated parties bargain for express contracts. *TransAmerican Natural Gas Corp v. Finkelstein*, 933 S.W.3d 591, 600 (Tex. App.—San Antonio 1996, writ denied); *Mandell v. Hammon Oil & Ref. Co.*, 822 S.W.2d 153, 160 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

Applying Texas law, the Fifth Circuit refused to allow parties to a commercial real estate purchase to escape the terms of their express agreement which provided that the deposits were non-refundable. *Prime Income Asset Mgmt.*, No. 09-10349, 2009 WL 5102848, at *2. Emphasizing enforcement of the express language of a contract when sophisticated parties bargain for an exchange, the Fifth Circuit refused to return the non-refundable deposits on a theory of equity and good conscience. *Id*.

While the transactions at issue in this suit involve residential rather than commercial real estate, the Purchasers are all reasonably sophisticated parties. [Finding of Fact No. 42]. Certain Purchasers are very sophisticated, having experience in areas such as medicine, engineering, accounting, and business management. [Finding of Fact No. 42]. Additionally, many of the Interested Parties entered into a partnership agreement with Nichols for the purpose of entering into transactions related to units in the Property. [Finding of Fact No. 35]. The Interested Parties, as limited partners under the agreement, made representations and warranties to the partnership (*i.e.*— Endeavour Partners, LP), the general partner (*i.e.*—Endeavour GP, LLC, managed by Nichols), and each other, including that he/she: (1) "has thoroughly read and evaluated all of the information and understands the nature of the risk involved in the proposed investment"; (2) is "experienced and knowledgeable in real estate investments in general, and with respect to investments similar to the investment in this Partnership, or has obtained qualified and experienced independent advice with respect to such Limited Partner's investment in the Partnership"; and (3) "recognizes that the

128

Partnership is . . . a speculative venture involving a high degree of risk of loss." [Findings of Fact Nos. 35 & 36]. Noting the sophistication of the parties who entered into this exchange, the Court finds no reason to look outside the express agreement of the parties. Accordingly, the Court holds that the Interested Parties are not entitled to return of the Deposits on any equitable theory.

## VI. CONCLUSION

For all of the reasons set forth herein, the Court holds that the Deposits are property of the Debtor's bankruptcy estate. Thus, the Court will enter judgment that the funds deposited into the registry of the Court be released to the Trustee. Further, the Court concludes that the Purchasers breached their respective Contracts by failing to close in accordance with the terms of their respective agreements, and that none of the Interested Parties' affirmative defenses provides an independent basis for denying the Trustee's recovery. Accordingly, the Trustee is entitled to recover liquidated damages from the Purchasers as provided for in the Contracts. The Court also awards the Trustee his reasonable attorneys' fees and costs, as well as pre- and post-judgment interest on the liquidated damages. A judgment consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 13th day of July, 2010.

_____
Jeff Bohm
United States Bankruptcy Judge

## Exhibit A

| Unit | Purchaser(s) | Purchase Price | Liquidated Damages (1.5% of Purchase Price) | Prejudgment Interest (10/14/08 to 7/13/2010)[1] | Total Damages |
|---|---|---|---|---|---|
| 6W | Entrust Retirement Services, Inc. FBO Tom Monheim IRA | $539,000 | $8,085.00 | $705.50 | $8,790.50 |
| 11W | Horace James Colbert | $525,150 | $7,877.25 | $687.37 | $8,564.62 |
| 14W | Entrust Retirement Services, Inc. FBO Gregg Boyle IRA #10811-01 and Entrust Retirement Services, Inc. FBO Vivian Abobo IRA #10812-01 | $932,600 | $13,989.00 | $1,220.68 | $15,209.68 |
| 14E | Edward A. Schroeppel and James R M Butcher | $981,600 | $14,724.00 | $1,284.82 | $16,008.82 |
| 15E | Dan Waldenmaier and Vivian Abobo | $975,000 | $14,625.00 | $1,276.18 | $15,901.18 |
| 15W | Carter Hartwig and Kevin D. Mitchell | $939,600 | $14,094.00 | $1,229.84 | $15,323.84 |
| 18S | Fred and Mary Shepherd | $575,000 | $8,625.00 | $752.62 | $9,377.62 |
| 19W | Carter Hartwig | $730,000 | $10,950.00 | $955.50 | $11,905.50 |
| 20S | Wayne Alexander Pace, Rebecca Anne Pace, Jerry Wayne Pace and Dorothy Eileen Pace | $555,350 | $8,330.25 | $726.90 | $9,057.15 |
| 20W | Glenn Nichols | $666,200 | $9,993.00 | $871.99 | $10,864.99 |
| 21S | Glenn Nichols Trustee | $595,000 | $8,925.00 | $778.80 | $9,703.80 |
| 5W | Entrust Retirement Services Inc FBO Suleman Abdulla IRA # | $535,000 | $8,025.00 | $700.26 | $8,725.26 |
| 23S | Entrust Retirement Services Inc FBO Amina Abdulla IRA# 10846-01 | $570,350 | $8,555.25 | $746.53 | $9,301.78 |
| 25W | Jerry Wayne Pace, Dorthy Eileen Pace, Andrew N. Pace and Stephanie Pace | $691,200 | $10,368.00 | $904.71 | $11,272.71 |
| 26W | Glenn Nichols | $701,200 | $10,518.00 | $917.80 | $11,435.80 |
| | | | **$157,683.75** | **$13,759.50** | **$171,443.25** |

1.  The total amount of prejudgment interest owed by the respective Purchasers under each Contract listed above is calculated by multiplying the principal by the rate, then multiplying that amount by the term.  Here, the principal is the amount of liquidated damages due on the respective Contracts. For the reasons set forth in this Court's Memorandum Opinion, the Court applies the rate of 5.0%, meaning that the Court multiples the amount of liquidated damages due on each Contract by .05. The term is computed by dividing the number of days from the date that pre-judgment interest began to accrue until the judgment date (*i.e.* from October 14, 2008 to July 13, 2010, or 637 days) by the number of days in a year.  This figure, 637 divided by 365, equals 1.7452.  Thus, the Court computes the pre-judgment interest by multiplying the amount of liquidated damages owed on the Contract by .05, and then multiplying that number by 1.7452.